UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMAR PARKER,

        Plaintiff,

vs.

                                Case No:  16-cv-13036-GAD-SDD
                                Hon. Gershwin A. Drain
CITY OF DETROIT, et al.,           Mag. Stephanie Dawkins Davis

      Jointly and severally,
            Defendants.

| | |
|---|---|
| SALVATORE PRESCOTT & PORTER, PLLC | CITY OF DETROIT LAW DEPT. |
| Sarah S. Prescott (P70510) | Gregory B. Paddison (P75963) |
| Nakisha N. Chaney (P65066) | Attorney for Defendants |
| Attorneys for Plaintiff | 2 Woodward Ave., Ste. 500 |
| 105 East Main Street | Detroit, MI 48226 |
| Northville, MI 48167 | (313) 237-0435 |
| (248) 679-8711 | paddisong@detroitmi.gov |
| prescott@spplawyers.com | |
| chaney@spplawyers.com | |

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

INDEX OF AUTHORITIES ........................................................ ii

STATEMENT OF QUESTIONS PRESENTED ......................... vi

CONTROLLING AUTHORITY ................................................. vii

FACTS AT ISSUE & LEGAL STANDARD ................................ 1

LEGAL ARGUMENT ................................................................ 1

    I.    Qualified Immunity Does Not Apply Here ................................ 1

        A.    Qualified Immunity Has Been Waived........................... 1

        B.    Defendants Fail to Shoulder Their Burden to Establish a Necessary Predicate to Qualified Immunity ................................ 4

        C.    Qualified Immunity Also Could Not Be Applied Here Because What Happened Is in Dispute........................................ 6

    II.    Whether the City Is Liable Depends on Questions of Fact.................... 11

    III.    Defendants Are Not Entitled to State Government Immunity............... 23

RELIEF REQUESTED .............................................................. 25

# INDEX OF AUTHORITIES

**Cases**                                                      **Page Number**

*Adams v. Metiva,*
    31 F.3d 375, 387 (6th Cir. 1994) ........................................................ 6

*Alpert v. United States,*
    481 F.3d 404, 409 (6th Cir. 2007) ...................................................... 8

*Angelo v. Kroger Co.,*
    828 F.2d 19 (6th Cir. 1987)................................................................ 23

*Arizona v. Bliemester,*
    296 F.3d 858, 862 (9th Cir. 2002) ...................................................... 2

*Attorney Gen. ex rel Dep't of Envtl. Quality v. Bulk Petroleum Corp.,*
    276 Mich. App. 654, 664 (2007) ........................................................ 24

*Baarck v. Rice,*
    2010 WL 715841 (Mich. App. 2010) ................................................. 25

*Barton v. City of Lincoln Park,*
    No. 15-cv-13362, 2016 WL 7405801 (E.D. Mich. Dec. 22, 2016)............vii, 22

*Brandon v. Holt,*
    469 U.S. 464 (1985) .......................................................................... 11

*Brown v. Crowley,*
    312 F.3d 782, 787-88 (6th Cir. 2002)................................................. 1

*Buckner v. Kilgore,*
    36 F.3d 536, 539 (6th Cir. 1994) ........................................................ 6

*Buntin v. Breathitt Cty. Bd. of Educ.,*
    134 F.3d 796, 799 (6th Cir. 1998) ...................................................... 6-7

*Cain v. Carroll,*
    No. 16-2463, 2017 WL 4863194 (6th Cir. Oct. 5, 2017) ............................14-18

*City of Canton, Ohio v. Harris,*
    489 U.S. 378 (1989) ..................................................................................vii, 12

*Gillam v. Lloyd,*
    172 Mich. App. 56, 577 (1988)........................................................................25

*Graham v. Conner,*
    490 U.S. 386, 394 (1989) ............................................................................8, 13

*Fisher v. City of Memphis,*
    234 F.3d 312, 317 (6th Cir. 2000) ....................................................................6

*Frohriep v. Flanagan,*
    483 Mich. 920 (2009)...........................................................................vii, 24-25

*Hill v. Blind Indus. & Servs. of Maryland,*
    179 F.3d 754, 757 (9th Cir. 1999) ....................................................................4

*Hutt v. Gibson Fiber Glass Products, Inc.,*
    914 F.2d 790 (6th Cir. 1990).............................................................................23

*Kennedy v. City of Cleveland,*
    797 F.2d 301 (6th Cir. 1986)..............................................................................2

*Ku v. State of Tennessee,*
    322 F.3d 431, 434 (6th Cir. 2003) ....................................................................2

*Lima Township v. Bateson,*
    302 Mich. App. 483 (2013)..............................................................................24

*Marchese v. Lucas,*
    758 F.2d 181 (6th Cir. 1985).......................................................................vii, 22

*Michigan v. DeFillippo,*
    275 F.3d 544, 550 (6th Cir. 2001) ....................................................................9

*Monell v. Dep't of Soc. Servs. of City of New York,*
    436 U.S. 658 (1978) ..................................................................................12, 18

*Poe v. Haydon,*
    853 F.2d 418, 425, 426 (6th Cir. 1998) .............................................................. 6

*Odom v. Wayne County,*
    482 Mich. 459  (2008)...........................................................................vii, 23, 25

*Oliver v. Smith,*
    290 Mich. App. 678 (2010)....................................................................... 25

*Owen v. City of Independence,*
    445 U.S. 622, 650-652 (1980) ............................................................... 1

*Rich v. City of Mayfield Heights,*
    955 F.2d 1092, 1095 (6th Cir. 1992) ..................................................... 4

*Richardson v. McKnight,*
    521 U.S. 399, 407-08 (1997)................................................................. 5

*Ross v. Consumers Power Co (On Reh),*
    420 Mich. 567 (1984).....................................................................23-25

*Scozzari v. Miedzianowski,*
    454 Fed. Appx. 455 (6th Cir. 2012)...................................................... 25

*Shumate v. Cleveland,*
    2012 WL 1871580 (6th Cir. 2012) ....................................................... 25

*Smith v. Cupp,*
    430 F.3d 766, 774 (6th Cir. 2005) .................................................10-11

*Tennessee v. Garner,*
    471 U.S. 1 (1985) ..................................................................... 10, 13

*Tolan v. Cotton,*
    134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)........................................... 25

*Tranter v. Orick,*
    460 F. App'x 513, 514 (6th Cir. 2012) ................................................ 8

*Watson v. Quarles,*
    146 Mich. App. 759, 764 (1985) ........................................................................ 25

*Wegener v. Covington,*
    933 F.2d 390, 392 (6th Cir. 1991) .................................................................... 4

**Statutes**                                       **Page Number**

42 U.S.C. § 1983 ....................................................................................... 3, 11
MCL § 691.1407(3) ..................................................................................... 23
MCL § 691.1407(5) ..................................................................................... 25

**Rules**                                       **Page Number**

Fed. R. Civ. P. 56 .................................................................................. vi, 10
Fed. R. Civ. P. 56(a) ................................................................................. 1
Fed. R. Civ. P. 56(f) ................................................................................. 3
Fed. R. Evid. 803(6) ............................................................................... 13

## STATEMENT OF QUESTIONS PRESENTED

1.   Whether Defendants have timely asserted and properly established that qualified immunity applies here despite many disputed questions of fact?

   Plaintiff answers: No.

   Defendants answer: Yes.

2.   Whether the City Defendant has timely asserted and properly established there is no question of fact as to its liability?

   Plaintiff answers: No.

   Defendants answer: Yes.

3.   Whether the individual Defendants have shouldered their burden to establish as an affirmative defense that they are entitled to governmental immunity under state statute regarding Plaintiff's alleged intentional tort claims.

   Plaintiff answers: No.

   Defendants answer: Yes.

## <u>CONTROLLING AUTHORITY</u>

Federal Rule of Civil Procedure 16

Federal Rule of Civil Procedure 56

*Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985)

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)

*Barton v. City of Lincoln Park*, No. 15-CV-13362, 2016 WL 7405801, at *7 (E.D. Mich. Dec. 22, 2016)

*Odom v. Wayne County*, 482 Mich. 459 (2008)

*Frohriep v. Flanagan*, 483 Mich. 920 (2009)

### Facts at Issue & Legal Standard

The facts set out in this Court's recent summary judgment opinion, Docket No. 78, apply here. Other facts necessary to resolve the motion are cited below.  The Court's recitation of the controlling standard also applies here, *id.* Pg. ID 1429-1430.

### Legal Argument

I.   **Qualified Immunity Does Not Apply**

At Mot. 7-19, Defendants argue that they are entitled to qualified immunity. For several independently sufficient reasons, the defense is inapplicable in this case.

A.   **Qualified Immunity Has Been Waived**

The first reason the individual Defendants are not entitled to qualified immunity is that they have waived this defense.  Such waiver has been recognized where, as here, defendants recited the potential affirmative defense in their answer, but then do not timely argue it later.  *Brown v. Crowley*, 312 F.3d 782, 787–88 (6th Cir. 2002).  Here, the scheduling order set a time for a summary judgment, which has long since passed.  The cases holding that an omission of this character constitutes a waiver "are legion."  *Id.*  (citing cases).

Our courts recognize that enforcing the waiver of an immunity defense is necessary to preserve the integrity of the judicial system.  Any other result would allow the government to try other defenses, then bring forward immunity selectively when it perceives it is losing.   There is a clear "need to avoid inconsistency, anomaly,

and unfairness," which trumps "a State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages."  *Ku v. State of Tennessee*, 322 F.3d 431, 434 (6th Cir. 2003); *Arizona v. Bliemester*, 296 F.3d 858, 862 (9th Cir. 2002) (failure to raise immunity until after the government "perceived it was losing…. undermines the integrity of the judicial system").

Untimely, assertion of immunity presents a particularly troubling possibility in that defendants may, by this method, delay trial excessively—as is seen here. Specifically, the Sixth Circuit has recognized the "opportunity for abusive delay inherent in the protections afforded by the doctrines of absolute and qualified immunity," created by the specter of interlocutory appeals.  *Kennedy v. City of Cleveland*, 797 F.2d 297, 301 (6th Cir. 1986). The Court noted qualified and absolute immunity are **not** jurisdictional and must be pursued timely. Late assertion of these defenses constitutes waiver, and trial courts are "entirely" correct in rejecting them. *Id.* at 300. "The quid pro quo is obvious: in exchange for the defendant's right to interrupt the judicial process, the court may expect a reasonable modicum of diligence in the exercise of that right." *Id.*

Defendants' apparent explanation for not raising qualified immunity in the summary judgment motion heard in April 2018 is apparently the August-September 2017 deaths of members of the undersigned's family.  While the undersigned genuinely appreciated several weeks' grace to respond to a summary judgment brief,

2

that collegial agreement loses its luster as an asserted justification for a substantive shift in the rights and duties of the litigants many months later.  In any event, Defendants are responsible for their own litigation strategy.  That strategy was to bring a summary judgment motion during discovery. Plaintiff responded by moving under Rule 56(f) seeking that discovery be allowed.  Dkt. No. 54.  While that request for time was pending, it became moot since discovery was completed in February 2018.  Defendants could have reworked their motion then; it was still not briefed. They chose not to do so.  That is not because the undersigned had suffered personal losses several months before.

Now Defendants have seen that their defense embodied in the original motion has not worked, so they are pivoting to a flat-out incompatible, contrary second string of arguments.  In the first motion, they argued that they must not be liable under 42 U.S.C. § 1983 because the facts showed they were not acting officially.  That matter being held to be a question of fact, they now seek to employ a directly opposite argument—that they *were* acting officially and must be afforded special immunity as a result.  Framing those two arguments side-by-side back in a re-worked February or March amended motion would have highlighted glaring factual questions about Defendants' status on the night in question, undermining *both* defenses.  Instead of risking that, Defendants loaded their eggs into one basket and opted not to update their motion.  Now that that has failed, they should not be entitled to start over.  *Cf.*

3

*Hill v. Blind Indus. & Servs. of Maryland*, 179 F.3d 754, 757 (9th Cir.), *opinion amended on denial of reh'g*, 201 F.3d 1186 (9th Cir. 1999) ("The integrity of the judicial process is undermined if a party, unhappy with the trial court's rulings or anticipating defeat, can unilaterally void the entire proceeding and begin anew" with immunity defenses).

### B.   Defendants Fail to Shoulder Their Burden to Establish a Necessary Predicate to Qualified Immunity

Qualified immunity applies only to those acting within the scope of authority granted to them by the government. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).   Indeed, "Defendants bear the initial burden" of adducing facts to prove "that they were acting within the scope of their discretionary authority during the incident in question." *Id.*   Only after defendants do so must plaintiff then respond by addressing the two elements applicable to this immunity. *Id.*   After all, "the doctrine's purpose[] is protecting government's ability to perform its traditional functions ....encouraging the vigorous exercise of official authority," since lawsuits may "distrac[t] officials from their governmental duties." *Richardson v. McKnight*, 521 U.S. 399, 407–08 (1997) (citations omitted).   In short, the defense follows the duties and official roles.

In this motion, Defendants have done nothing to meet their initial burden and show that they were delegated official authority and were carrying out a governmental

duty at the times and places in question.  Nor can they hope to do so—for throughout this matter, they have claimed the exact opposite, consistently and in binding admissions.  The Court need only refer to the recent motion for summary judgment, facts cited therein and oral argument by Defendants, in which they argued that it was *indisputable fact* that they were "not acting as police officers, but strictly as private citizens."  Dkt. No. 46-2 Pg. ID 736 and interrogatory answers at Dkt. No. 46-6 cited therein.

Now, for the Defendants to benefit from qualified immunity and defeat this case without the chance for a factfinder to weigh in, they would need to show exactly the opposite—that no reasonable person could disagree that they **_were_** acting in official roles.  Rather than do so, they assume the conclusion they need at Mot. 2, Pg. ID 1461, that "for purposes of the present Motion, the Individual Defendants will be assumed to have been acting in their capacity as Detroit Police Officers."  That is inadequate.  When a movant seeks summary judgment on an affirmative defense, it can prevail only if it "established the defense so clearly that no rational jury could have found to the contrary." *Buntin v. Breathitt Cty Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998).

Plaintiff's position is, and has been, that there is a disputed question here.  This Court has not made, to Plaintiff's understanding, a **_factual finding_** one way or the other. Rather, it has recognized there is a material, disputed issue on this subject.  As

such, the Court should hold Defendants have not met their initial burden.

### C. Qualified Immunity Also Could Not Be Applied Here Because What Happened Is in Dispute

Summary judgment on qualified immunity is improper if the facts on which the decision must be based are in dispute. *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994). It is reversible error to grant summary judgment where "[t]he legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Id.*; *Poe v. Haydon*, 853 F.2d 418, 425, 426 (6th Cir. 1988) ("[S]ummary judgment would not be appropriate if there is a factual dispute (i.e., a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violated clearly established rights.") (citation omitted); *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994) (same); *Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000) (same).

Here, there is no question that Defendants dispute central facts. In general, the parties dispute whether—

- Townson shoved Parker and tore his shirt (he denies it, but Parker says it happened);
- Parker tried to punch Townson (Blanding and Ways say yes, while Townson and Parker say no);
- Townson brandished a gun at Parker (Parker says yes, but Townson says no);
- Ways chased Parker with a gun (Ways told police he did not have his gun, but later testified he did have it);
- Parker brandished a gun while driving South on Mendota (Blanding says yes, Parker says no, and no other witness saw Parker with a gun and

Ways said it was too dark to see something like that);

- Ways stepped in front of Parker's oncoming car while holding a gun (Parker says yes, and Ways says no, while Blanding says Parker was on an entirely different street than Ways);
- Parker tried to run over Ways with his car (Ways says yes, but Parker says no, and Blanding says he shot before Parker was even on the street with Ways); and
- Where Parker and Blanding were when Blanding shot.

*See* Dkt. No. 70, 78 (citing facts). Ignoring these very material disputes, Defendants instead argue that there was probable cause to arrest Parker when they arrived. Mot. 10-11. This argument proceeds entirely without advising that probable cause is typically a fact question. *Wesley v. Campbell,* 864 F.3d 433, 441 (6th Cir. 2017).

Defendants cannot foreclose a triable question on probable cause for several reasons. First, their focus is on things that happened before they arrived, so they rely entirely on statements of third parties *given outside of court proceedings*. These citations are to Def. Exhibits A-C, which Plaintiff cannot even confirm were filed with this Court; they certainly were not served on Plaintiff. In any case, these police statements are hearsay, *United States v. Graham,* 391 F.2d 439, 448 (6th Cir. 1968), which this Court cannot consider on summary judgment. *See, e.g., Tranter v. Orick,* 460 F. App'x 513, 514 (6th Cir. 2012); *Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007).

Second, according to Defendants' cited precedents about not using 20/20 vision and only considering what the officers saw (*see* Mot. Pg. ID 1468-69), this Court can only consider "circumstances within the officers' knowledge." *Michigan v.*

*DeFillippo,* 275 F.3d 544, 550 (6th Cir. 2001).  What third parties saw or thought is irrelevant.  Here, Defendants' factual account about why they had probable cause relies entirely on alleged events that no one has testified the officers knew about.  Examples of that include that Parker damaged a houseplant or that he was threatening to punish Sanchez's child, or he seemed drunk.  Indeed, in bold at Mot. Pg. ID 1475, Defendants flat-out assert that such facts were **"known to the officers at this time,"** albeit with no citation.  In fact, there is no evidence that anyone told any of the officers any of the facts Defendants cite.  At best, Defendant Townson – not the others – knew that Parker was trying to get in a house and would not leave, that there were loud sounds, and that his son was scared and wanted to go.  But that is not evidence of a crime, since Townson thought Parker was shut out *of his own house*.  Ex. C, Ways Dep. 26-27. The other two Defendants had no idea what was going on, other than Townson's son was calling Townson to have him come get him.[1]

Beyond all this, Ways testified that he knew of nothing criminal Parker had done at the point in the events when he chased Parker down with a gun.  Ex. C, Ways Dep. 49, 160-161.  This admission alone precludes Defendants from showing they had probable cause to arrest Parker.  On the site, at that moment, Ways assessed that

---

[1] According to Townson, he did not ask or expect the other individual Defendants to come to the house that night, and only conveyed where he was going in a general description in case he ran into trouble.  Ex. B, Townson Dep. 26.  Ways, who got Townson's call, does not recall learning anything about Parker that night, just that the boy was calling for his dad.  Ex. C, Ways Dep. 26.  Blanding, the shooter, was just along for a ride in Ways's car at the time and had "no idea what" Townson may have told Ways; he just knew Townson wanted to get his son.  Ex. D, Blanding Dep. 77-80, 187 (did not hear conversation with Townson).

he had no reason to engage Parker at all.  This is buttressed by Blanding saying he saw Ways undertake no police action (*see* Ex. D, Blanding Dep. 84-85, 87, 89-90), and the fact that Townson separates and goes on to get his son by leaving the street scene and encouraging his son to come outside.  Ex. D, Blanding Dep. 111-112; Ex. B, Townson Dep. 52-53.  A jury could reasonably conclude that these actions show the officers perceived that the situation was not dangerous and was resolved.  Yet when Parker next drives down the street, Ways steps in front of the oncoming vehicle, with his gun drawn, "as if he's trying to get me to stop my car," while Blanding is aiming his gun at Parker.  Ex. E, Parker Dep. 79-80.  A jury must decide if this seizure was supported by probable cause. *United States v. Smith,* 594 F.3d 530, 536 (6th Cir. 2010), establishes this action is a seizure.

Shooting is also a seizure, subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner,* 471 U.S. 1, 9 (1985).  At the time Parker was shot, Defendants argue the use of deadly force was justified by these facts: (A) "the *suspect*" was "*escaping*" and (B) driving by yelling threats and (C) then returning in his car. *See* list at Mot. Pg. ID 1476. This list must be updated to the light most favorable to Plaintiff, per Fed. R. Civ. Proc. 56, as follows: (A') a man who had done nothing illegal was chased away by an armed assailant (Ways) and no one ever tried to assert he was under suspicion or under arrest; (B') he then drove by and told the assailants, "this isn't over;" and (C') when he looped around to get their license plate

9

number, he and his car were shot 15 times with no verbal warning. Ex. W, Parker Dep. 56-66, 79-80; Blanding Dep. 109. Moreover, no one was in danger at the very split second of the shooting that Defendants insist is pivotal: *per both Ways and Parker, the shots were taken after Parker drove past Ways and was leaving the scene.*

Taking the facts in the light most favorable to Plaintiff is required here, but in this case, both the Defendants' account at Mot. Pg. ID 1476 (items A-C) and Plaintiff's "updated" list (A'-C'), get to the same point. After all, shooting is deadly force, which is not permitted, except when an officer has probable cause to believe that the victim poses a threat of serious physical harm to someone nearby. *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005), Ex. P. Defendants' list of actions (A-C) does not even get close to showing Parker posed a threat of serious harm; certainly Parker's account (A'-C') does not. Apparently recognizing this, Defendants add to their list the *disputed* allegation that Parker swerved at Ways. But this Court cannot credit that disputed evidence in this posture (nor, incidentally, did anyone at DPD ever conclude that Way's story amounted to probable cause to arrest Parker).[2] This is a case like *Smith v. Cupp, supra,* where the factual accounts differed regarding an

---

[2] The Court may be confused by Defendants' assertion at Mot. Pg. ID 1476 that "four eye-witnesses" all agree that Plaintiff drove at Ways who had to dive out of the way. That is simply wrong. One—**Ways**—so testified. **Blanding** testified that he shot at Parker before Parker was even on the same street as Ways. Ex. D, Blanding Dep. 95, 99-100. **Parker** testified that he drove his car around Ways when Ways stepped into his line of traffic. Calvin **Moore** reported that Parker drove in the direction of the shooter, Blanding, and he did not see any other person nearby or mention any swerving or diving. Moore's report is hearsay and most certainly is not evidence "uniform" with the Defendant officers' accounts.

officer supposedly about to get run over: because "a jury could conclude that Officer [Ways] was not in any danger in the first place," qualified immunity is inapplicable. *Id.* "The fact that this was a rapidly evolving situation does not, by itself, permit…deadly force." *Id.* at 775.

## II.     Whether the City is Liable Depends on Disputed Questions of Fact

The parties agree that a city is not liable for acts of its agents under 42 U.S.C. § 1983 by *respondeat superior*.  However, a city may be liable for its own acts of creating and tolerating behaviors likely to harm others.

Defendants dispute whether there was a policy at work in this case.  Yet the **absence** of a policy can also give rise to municipal liability, *e.g., Brandon v. Holt,* 469 U.S. 464, 466–67 fns. 3–5 (1985). Also, a city "by the very terms of [§ 1983], may be sued for constitutional deprivations visited pursuant to governmental 'custom,' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).  Given this background, there are several paths forward for Plaintiff in this procedural posture.  Each one is sufficient.  He can show a question of fact as to (a) a policy or custom of failure to train or (b) to supervise/discipline or (c) ratification.

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), established that "inadequacy of police training may serve as the basis for § 1983 liability…where the

failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. Plaintiff raises a triable question through a factual record that is remarkable when considered in the context of the Detroit Police Department's history of excessive force. That history is key to this motion, because it reflects ***notice*** and the unmet duty to take action – i.e., deliberate indifference – on the part of the City.

Between 1995 through 2000, DPD officers had shot 47 people including unarmed black men shot in the back. Defendant Blanding was a repeat offender in this bunch, and he would go on to be sued repeatedly in this Court alone: Case Nos. 98-73711 and 99-60276, and the City would settle Case No. 99-71841. By 2000, Detroit Mayor Dennis Archer asked the Department of Justice to initiate an investigation into "gross deficiencies of police operations in Detroit," particularly involving shootings. *See* Order, Case No. 03-72258, Pg. ID 10429. The Justice Department investigated—

> all of the DPD's shootings at people between January 1998 and September 2001, a total of 259 incidents and found that 81 (31%) of the shootings were not legally justified under the standards of Graham v. Conner, 490 U.S. 386, 394 (1989), and Tennessee v. Garner, 471 U.S. 1 (1985). These incidents included shootings when <u>no imminent threat of harm existed</u> to officers or the public, <u>shooting at fleeing vehicles</u>, and <u>even shooting at persons suspected only of committing misdemeanors.</u> In addition, we found 53 (21%) other shootings that, although justified at the time of the discharge, might have been avoided had officers made better tactical situations. These included incidents where <u>officers unnecessarily placed themselves in harm's way</u>, <u>fired shots without first establishing a clear target</u>, or <u>separated from their partners to pursue</u>

<u>subjects alone</u>….

Ex. E, McQuade Letter. The underlined items above are relevant in this case and are discussed below. But first, to complete the history, the DOJ filed suit in this Court in June 2003 alleging a "pattern or practice" of "excessive force," due to "failure to adequately train, supervise, and monitor police officers; to investigate, review and evaluate use of force incidents; to investigate alleged misconduct, and discipline officers who are guilty of misconduct." Case No. 2:03-72258, Pg. ID 1, Ex. AA.

The parties simultaneously presented the Court with a consent decree relative to the improper/excessive uses of force, which is attached hereto as Ex. F. The Sixth Circuit has recognized that that decree was entered "to remedy ***a pattern or practice*** of conduct by law enforcement officers that deprives individuals of rights, privileges or immunities secured by the Constitution or federal law." *Cain v. Carroll*, No. 16-2463, 2017 WL 4863194, at *3 (6th Cir. Oct. 5, 2017) (Ex. A) (emphasis added).

For purposes of this case, it is most relevant that the decree focused on failures to train and/or to implement intermediate (non-deadly) force and failures to train as to use of force on- and off-duty, specifically involving use of deadly force; it required the DPD to revise policies and training on each of these subjects. The decree further identified and sought to address systemic failures to investigate officer-involved violence, including delayed and inadequate investigations and failures to weigh credibility, to promptly collect evidence and to punish officers where appropriate. *See*

Ex. F, Consent Decree.

Monitors were retained to enforce the decree, which proved to be extremely difficult to do.  As the years passed, progress occurred in some areas, yet "stubborn compliance problems remain, punctuated by issues in the Department's investigations [of misuse of force], a critical police function." Ex. X, Case No. 2:03-72258, Dkt No. 641-1, Pg. ID 9117.  Moreover, "the question of sustainability" on all advances reached in the first place "looms large." *Id.*

After over a decade of federal oversight (and just over one year before this case arose), "the road forward has gotten tougher;" "there really have been no appreciable gains [in compliance] over the past year;" and "some of the most complex and difficult requirements—those that lie closest to the core of sound and constitutional police practice ….remain to be fully embraced….[and] pose the greatest challenge." Ex. Y, Dkt. No. 677-1, Pg. ID 9776.  The issues at the heart of this case – "use of legal force," "policies regarding off-duty officers" "investigative interviews" – remained out of compliance.  *Id.* at Pg. ID 9777.  Monitors were concerned with shifting "emphasis from the goal of bringing about the substantive and cultural changes supporting constitutional policing….to a focus on the mechanics" of scoring well on the monitors' metrics.  *Id.*

Despite this, several months later, in August 2014, the U.S. Attorney would recommend releasing the City—then in the throes of bankruptcy—commenting that

the goals were mostly met.  Ex. E.  She believed that "with a continued focus and commitment to the Consent Judgment's core values, the DPD can sustain these hard-fought reforms." *Id.;* Ex. G, Stipulated Transition Agreement.  After all, among other things, the department now apparently tracked uses of force on a new computer system, MAS, that supposedly contained "all records and information" such as "incident reports, officer histories," etc.  *Id.* at 5.

However, this perhaps optimistic conclusion glossed over the final report of the monitors dating to just a few weeks earlier.  In July, 2014, the monitors issued what would be their final report. Ex. H.  In it, the monitors reflected that the department appeared to require "just enough to be *technically* compliant, but not necessarily *sustainably* compliant" with constitutional standards as to excessive force.  Ex. H, Case No. 2:03-72258, Dkt. No. 715, Pg. ID 10154.  For example, the monitor deemed it "imperative" to provide training on de-escalation "as a means of avoiding violent confrontations between citizens and police."  *Id.*  The department also was not compliant with standards agreed over a decade earlier regarding investigating and punishing misuse of force. *Id.*

The above history begs the question how the consent decree actually was implemented and experienced by individual officers—and whether that recommended training and push for sustainability ever occurred.  On those questions, the record is clear.  Despite being part of the department during the decree, the Defendant officers

15

had little, if any, understanding what the consent decree meant or what history of force had prompted it, nor could they specify ways the consent decree had changed police operations. *E.g.,* Ex. C, Ways Dep. 116-118; Ex. D, Blanding Dep. 58-60.

Equally troubling, they could not speak whatsoever to how the Department had trained them on uses of force. An excerpt at Ex. Z for Defendant Ways is typical in which he simply cannot explain anything about using force or how he has been trained to use or not use force. Officers also did not recall training on when or how to use force while off- versus on- duty. *E.g.*, Ex. B, Townson Dep. 124-127, 163-166 (unable to define "use of force terms" and unsure of what qualifies as "police action"); Ways Dep. 76:10-83:5 (recounting that as far as he knows, the only training is do "what you feel comfortable in that situation;" the "guidelines are[:] whatever you decide to do or not to do you're held accountable").

This information is not merely anecdotal. Plaintiff deposed, in a 30(b)(6) deposition, the department's chosen representative to speak about training generally. *See* Ex. I, Notice of Deposition. It established the following:

- The department recognizes that all officers, of course, spend time off-duty (Ex. J at 25), but has no information on *any* training on use of force while off-duty (other than that the gun range teaches how to secure a weapon not in use) (*id.* at 25-26, 27, 39-40);
- The department is aware of the critical need to teach de-escalation (*id.* at 27);
- The department is unaware of any training for Blanding on de-escalation or on alternative techniques that allow effectuation of an arrest, short of violence (*id.* at 28, 36);
- Although policy would seem to require it, Ex. P, DPD cannot say if

16

disengagement is taught as a tactical alternative to violence (*id.* at 35);

- Although policy would seem to require it, Ex. P, DPD does not know whether waiting out suspects is taught as a tactical option (*id.* at 35);
- In fact, the department is not aware if de-escalation had been trained on *at all* prior to the timeframe of the deposition (January 2018, years after the events at issue) (*id.* at 31);
- The department cannot identify updates in training over the last 15 years or because of the consent decree (*id.* at 20-22);
- The department is unaware of training on when/whether officers should get involved in civil disputes (*id.* at 31-32);
- The department is not sure whether officers are trained on use of a gun while off-duty (nor, apparently, while operating as a civilian, i.e, while not uniformed etc.) (*id.* at 34);
- The department is unaware of training regarding foot pursuit with a firearm drawn (*id.* at 37);
- While policy says not to step in front of cars, Ex. P, the department is unaware of training not to do so, as Ways did here (*id.* at 27);
- The department is unaware of anyone *ever* being referred for use of force training because of concerns with misuse of force (*id.* at 46);
- The department does not track if/when uses of force rise to the level of constitutional wrongs (as opposed to mere violations of policy) so as to train or flag as to those matters (Ex. V, Sims Dep. 19);
- The department is unaware whether information from other departments, such as civil rights, are used to develop training modules (Ex. J at 57).

It is also established that the way the MAS computer system tracks force is to look back over 180 days. If the officer commits a certain set of offenses *in that time*, he or she may be flagged for additional oversight or training. But events (such as shootings) which occurred before the computer system was operational are not tracked at all, and even now if a person exhibits excessive force, say, every 181 days, then **he is never flagged**. *Id.;* Ex. V, Sims Dep. 181. Again, DPD could not identify any case of someone diverted to training under this system. Moreover, supervisors do

17

not have details on misuses of force and trainers do not know about individual officers' actual histories/uses of force, their discipline histories, citizen complaints, lawsuits or open excessive force investigations when they train them, *id.* at 42-43, 51, 67, 47.  Finally, the incidence of complaints is not addressed in evaluations, even after an individual officer receives scores of complaints as Blanding (the shooter) did here. *E.g.*, Ex. T, D, Blanding Dep. 174.

The government's excessive force case against DPD remained pending and the consent decree was in a transition phase in August 2015, when Blanding shot yet another victim, Plaintiff Parker.  The Sixth Circuit has held that the decree serves as prima facie evidence of constitutional violations supporting a *Monell* claim. *Cain v. Carroll*, No. 16-2463, 2017 WL 4863194, at *3 (6th Cir. Oct. 5, 2017).  The above record of failure to train on the very issues that had (a) been admitted as constitutionally infirm (*see* Ex. F) and (b) been subsequently reviewed for years and considered non-compliant (*see* Exs. X, Y and H) also raises a fact question here as to failure to train.  After all, Ways created a foreseeably dangerous situation by chasing Parker, separating from his partners; then he did so again by stepping into harm's way in the line of traffic; Blanding then shot at a fleeing car, though there was no imminent danger to any officer as set forth above.  These are the very factors identified in the 1990's (see underlined notification letter cited above) as creating unnecessary risks of death, sparking the consent decree.

18

Plaintiff also has adduced evidence of failure to take seriously the City's role in investigating excessive force and coaching/rehabilitating rogue officers. The evidence cited above establishes that over the entire course of the consent decree, this issue never got corrected.  Many of the factors cited as persistent failures were seen in this case. One example is excessive delay in investigation.  These Defendants were not interviewed for 82 days (Ways and Townson) or, for Blanding, 305 days after Parker was shot.  *See* Garrity Statement, Exs. K-M and compare to Parker being questioned within two days.  Even when they were interviewed, investigators spent just a few minutes with each officer (compare Parker: grilled for hours), and glaring inconsistencies among the officers' stories were entirely ignored. In fact, the lead investigator claimed at her deposition that Blanding had never said he had shot while Parker was driving South on Mendota—otherwise, she would have followed up given such a difference in the stories the others had relayed. Ex. N, Dep. 100-104, 82-84. Yet Blanding's written report from the night, which she had, Ex. O, and his live Garrity statement to her, attached as Ex. M, reveal he did in fact always tell the story the same way, utterly contrary to his fellow officers. Such a lack of follow up allows the inference that she just did not care.  Likewise, ballistics were never checked against Blanding's statement that he shot at Parker as Parker passed him on a street corner, turning left from Mendota southbound to Curtis eastbound.  Ex. N at 140. Had this been remotely considered, it could have shed light on where Blanding was

when he shot.[3]

Perhaps one of the most telling lapses was the utter disinterest in supposed DPD policy against vigilante police work.  Department policy ostensibly is to call in forces from the local precinct to a scene, if there is suspected danger.  Ex. P, Policy.  Instead, Townson summoned his partners to the scene "to keep the peace," in lieu of calling the local authorities.  Ex. C, Ways Dep. 26.  The City Law Department recognized this was a clear breach of City policy in Ex. Q, Law Department Memo.  Yet DPD never even contemplated those charges, as seen in its report on the matter.  Ex. R.  None of the Defendants received any coaching, discipline or censure for the shooting or recognized breach of policy.  *E.g.,* Ex. C, Ways Dep. 109; Ex. D, Blanding Dep. 15, 174; Ex. B, Townson Dep. 102-103, 138.

Beyond all this, the evidence is clear that Blanding was a very violent officer whose years of citizen complaints, shootings, lawsuits, and settlements did, or should have, put the City on notice of a unique need for further training.  Blanding's history included dozens of citizen complaints.  Ex. T.  He had used his service weapon to

---

[3] Exactly these issues were identified specifically as ongoing failures to comply with constitutional standards in the last several reports of the consent decree monitors. They noted "a lack of full, thorough, and complete investigations" into misuse of force, with investigations that "often lack credibility and are deficient in many areas," including failures to "resolve material inconsistencies in statements" and interviews being "unnecessarily delayed" and "lack of ballistic examinations." *Id.* at 10163.  "We also found that investigators routinely fail to ask appropriate follow-up questions leaving the interviews appearing to revolve around reporting – not investigating." Ex. H Pg. ID 10172. Such failures violated the consent decree, departed from generally accepted practices, prevented DPD from "hold[ing] accountable officers who deviate from policy and training," and threatened "the protection of the DPD, its officers and the citizens of Detroit." *Id.* at 10164. Any apparent compliance was technical, not "substantive," and "the need for training is clear." *Id.* at 10173.

shoot animals for sport.  Ex. D, Blanding Dep. 11.  He had been charged with assault and battery and accused of beating up another officer.  He had shot an unarmed black man while off duty, then claimed the citizen had a gun – sparking a lawsuit that was later settled – but Blanding does not recall any investigation at all into that matter at all. *See generally* Ex. D, Blanding Dep. 8-10.  His personnel filed showed no investigation or censure.  Ex. S, Personnel File.  That may be because Blanding was never punished for anything (except for shooting the animals). Ex. D, Blanding Dep. 10-11.  The computer system that was supposedly tracking his history, *does not contain any of this information* about his violent—and for the City—costly misconduct.  Ex. T, MAS File.  Moreover, the investigators who looked into the Parker shooting did not know about it or seek to learn about any of the above.  Ex. N. Indeed, to this day the City as a whole cannot account for or relay the total settlement payments it has made for Mr. Blanding, because nowhere does anyone keep that information.  Ex. U, Defs' Discovery Responses.

The above is far more information than this Court needed to find a question of fact on municipal liability in *Barton v. City of Lincoln Park*. There, this Court found a question of fact on a city's liability where an officer had two citizen complaints and one verbal reprimand, but there was no record of real discipline. Additionally, the officer could not recall evidence of training on the use of force. This Court recognized that "because force was used against the Plaintiff, a jury could find that the

inadequate training on the use of force was related to the Plaintiff's injuries." *Barton v. City of Lincoln Park*, No. 15-CV-13362, 2016 WL 7405801, at *7 (E.D. Mich. Dec. 22, 2016), *rev'd and remanded on other grounds*, No. 17-1073, 2018 WL 1129737 (6th Cir. Mar. 1, 2018).

Ratification is an alternative basis for holding the City liable where, as here, "there was, in fact, no serious investigation conducted either by [the head of the law enforcement office] or any of his deputies. This record does not reveal that any perpetrators were identified; or that any penalties or reprimands were ordered as to officers in charge at the times and places of the assaults." *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985). Plaintiff has raised a triable question on this issue by the above evidence.

On this note, the Court should meticulously apply the controlling standards for supporting a motion for summary judgment. In the face of the above details, Defendants' argument specific to this case on vicarious liability occurs at Mot. 21-22, in a single paragraph. The sum total of those "arguments" are assertions that "there is no evidence" of anything on point. *Hutt v. Gibson Fiber Glass Products, Inc.*, 914 F.2d 790 (6th Cir. 1990). "[T]the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Angelo v. Kroger Co.*, 828 F.2d 19 (6th Cir. 1987). "[A] conclusory assertion that the nonmoving party has no evidence is insufficient. Such a 'burden' of production is no burden at all and would simply

permit summary judgment procedure to be converted into a tool for harassment." *Id.* In other words, "a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record." *Id.*

### III. Defendants are Not Entitled to State Statutory Immunity

The statute that provides governmental immunity on state law intentional torts is MCL § 691.1407(3). *Odom v. Wayne County*, 482 Mich. 459 (2008), the definitive explication of the statute, makes two key points. First, it re-adopted a test set forth in *Ross v. Consumers Power Co. (On Reh)*, 420 Mich. 567 (1984) for determining whether immunity applies. *Odom*, 482 Mich. at 479-480. Second, *Odom* confirmed that "the burden continues to fall on the governmental employee to raise ***and prove*** his entitlement to immunity ***as an affirmative defense.***" *Id.* at 479 (emphasis added). Together, these points mean that Defendants must raise ***and prove*** the following elements, originally from *Ross*: (a) The complained of acts were undertaken during the course of the defendant's employment within the scope of his authority, (b) the acts were in good faith, and (c) the acts were discretionary, as opposed to ministerial. *Id.* at 480. In short, "it is obvious that the immunity extended to individuals is far less than that afforded governmental agencies. We believe that this was the result intended by the Legislature." *Ross*, 420 Mich. at 635.

The burden of proof is central here, as seen in *Frohriep v. Flanagan*, 483 Mich.

920 (2009).  There the court reversed a summary disposition decision where the burden to *disprove* the immunity defense was improperly placed on plaintiff, rather than requiring the defendant to prove entitlement to this defense.

These Defendants cannot prevail here for the same reason they cannot show federal qualified immunity applies.  Namely, they cannot show as a matter of law that the complained of acts were undertaken within the scope of their authority, where they have claimed that just the opposite is true.  In general, questions whether "the defendant acted in the course of his employment and within the scope of his authority…are ***questions of fact***.  Where reasonable minds could differ, these questions should be left to the jury." *Gillam v. Lloyd*, 172 Mich. App 563, 577 (1988) (emphasis added).  Here, all of the proofs and arguments marshaled in the last round of briefing clearly undermine this defense now.

Turning to the second prong of the immunity defense, *Watson v. Quarles*, 146 Mich. App. 759, 764 (1985), citing *Ross,* held that a police officer's decision concerning ***whether*** "to make an arrest, issue a warning, or wait for assistance, is a discretionary act entitled to immunity."  However, the ***execution*** of those decisions, including the use of excessive force in effectuating them, is merely a ministerial act. *Id*. at 764-765.   "It was generally conceded in *Ross* that a police officer's use of excessive force in effectuating an arrest is a ministerial act and not entitled to the cloak of immunity." *Oliver v. Smith*, 290 Mich. App. 678, 690 (2010).

As to the final prong of the immunity defense, lack of "good faith" is shown by "such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Odom,* 482 Mich. at 474-475.Whether these Defendants acted in good faith is a question of fact and, because reasonable minds could differ, it "***should be left to the jury.***" *Gillam,* 172 Mich. App. at 577 (emphasis added).  *Baarck v. Rice*, 2010 WL 715841, *6 (Mich. App. 2010) (questions whether governmental actors "acted in good faith" and within their authority were "***of course***" questions of fact "left to the jury.").  The Sixth Circuit agrees.  *See, e.g., Shumate v. Cleveland*, 2012 WL 1871580 (6th Cir. 2012) (good faith was fact question for jury); *Scozzari v. Miedzianowski*, 454 Fed. Appx. 455 (6th Cir. 2012) (same). Defendants' arguments, which are conclusory on "good faith," are insufficient given *Frohriep*'s conclusion that plaintiffs must not be put in a position of *disproving* any element of this defense.

### Relief Requested

For the foregoing reasons, Plaintiff urges this Court to deny Defendants' motion.

Respectfully submitted,
SALVATORE PRESCOTT & PORTER

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Attorneys for Plaintiff
105 East Main Street
Dated: July 3, 2018            Northville, MI 48167

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2018, I electronically filed the foregoing document, Plaintiff's Response to Defendants' Renewed Motion for Partial Summary Judgment, and this Certificate of Service with the Clerk of the Court using the Court's ECF system, which will send notification of such filing to counsel of record.

Dated: July 3, 2018                     /s/ Sarah Prescott
                                                        Sarah Prescott