# EXHIBIT D

**In The Matter Of:**

*Parker vs.*
*City of Detroit, et al.*

---

*Police Officer Jerold Blanding*
*October 12, 2017*

---



**Bingham Farms/Southfield ● Grand Rapids**
Detroit ● Ann Arbor ● Flint ● Lansing ● Jackson ● Mt. Clemens ● Saginaw ● Troy

*Original File BLANDING_POLICE OFFICER JEROLD.txt*
*Min-U-Script® with Word Index*

Parker vs.
City of Detroit, et al.

Police Officer Jerold Blanding
October 12, 2017

---

Page 1

1             UNITED STATES DISTRICT COURT
2             EASTERN DISTRICT OF MICHIGAN
3                  SOUTHERN DIVISION
4
5  DEMAR PARKER,
6             Plaintiff,
7  -vs-                    Case No. 16-cv-13036-GAD-SDD
8  CITY OF DETROIT, et al.,    Hon. Gershwin A. Drain
9  jointly and severally,    Mag. Stephanie Dawkins Davis
10             Defendants.
11  ~~~~~~~~~~~~~~~~~~~~~~~~/
12  DEPONENT:     POLICE OFFICER JEROLD BLANDING
13  DATE:     Thursday, October 12, 2017
14  TIME:          1:22 p.m.
15  LOCATION:     City of Detroit Law Department
16                2 Woodward Avenue, Suite 500
17                Detroit, Michigan
18
19  REPORTER:     John J. Slatin, RPR, CSR-5180
20                Certified Shorthand Reporter
21
22          (Appearances listed on page 2)
23
24
25

---

Page 2

1  APPEARANCES:
2
3          SARAH S. PRESCOTT (P70510)
4          Salvatore, Prescott & Porter, PLLC
5          105 East Main Street
6          Northville, Michigan  48167
7          (248) 679-8711
8          prescott@spplawyers.com
9              Appearing on behalf of the Plaintiff.
10
11          GREGORY B. PADDISON (P75963)
12          City of Detroit Law Department
13          2 Woodward Avenue, Suite 500
14          Detroit, Michigan  48226
15          (313) 237-0435
16          paddisong@detroitmi.gov
17              Appearing on behalf of the Defendants.
18
19
20
21
22
23
24
25

---

Page 3

1   TABLE OF CONTENTS
2
3   WITNESS                         PAGE
4
5   POLICE OFFICER JEROLD BLANDING
6
7   Examination by Ms. Prescott          4
8   Examination by Mr. Paddison          176
9   Re-Examination by Ms. Prescott          187
10
11      **EXHIBITS (Attached):** IDENTIFIED
12
13  Exhibit 1     Diagram          81
14  Exhibit 2     Signature page          118
15  Exhibit 3     Screen shot          133
16  Exhibit 4     Screen shot          140
17  Exhibit 5     Khary Mason screen shot     166
18  Exhibit 6     Management Awareness System  166
19      document
20  Exhibit 7   Detroit Police Department,  171
21      Personnel Order
22
23
24
25

---

Page 4

1   Thursday, October 12, 2017
2   Detroit, Michigan
3   1:22 p.m.
4   * * *
5   POLICE OFFICER JEROLD BLANDING,
6  having been first duly sworn, was examined and testified
7  as follows:
8   **EXAMINATION**
9   **BY MS. PRESCOTT:**
10 Q.  So, good afternoon, Officer Blanding.  My name is Sarah
11 Prescott.  I represent Demar Parker, and today is the
12 date for -- Noticed for your deposition.
13     It's being taken under the Federal Rules of Civil
14 Procedure relative to the federal suit we filed in this
15 case, and it can be used for all the purposes that the
16 rules allow.
17     My job today is to ask you a series of questions,
18 and when I've done that and you answer, I have to assume
19 that we were on the same page.
20     So, if you have any questions about anything I've
21 said, or "What are we talking about?" or clarifications,
22 anything that you need clarified whatsoever, will you
23 let me know?
24 **A.  Yes.**
25 Q.  Okay.  If you need a break, will you let me know?

---

Parker vs.                                                    Police Officer Jerold Blanding
City of Detroit, et al.                                                October 12, 2017

Page 5

1  A.  Yes.
2  Q.  Okay.  And if you -- at some point you need to talk to
3     your lawyer, you can certainly let me know that.  I just
4     need to take an answer to each question, so we have like
5     peanut butter and jelly, the pair, every question and
6     answer, and then you can take a break and step out.
7  A.  I need to ask you something before we start.
8     MS. PRESCOTT: Okay.
9     (Short recess at 1:23 p.m.)
10    * * *
11    (Record resumed at 1:24 p.m.)
12    MS. PRESCOTT: Okay.  So, we're back on the record,
13    and --
14 A.  So, do I --
15    MR. PADDISON: No.
16    There was a brief conversation off the record.
17 There is anticipation that testimony given during
18 Officer Blanding's Garrity interview will be taken.
19 Counselors have agreed that that testimony will be part
20 of a separate sealed record.  Just the request has been
21 made that no additional recording of the testimony but
22 for the court reporter be taken during this deposition.
23    MS. PRESCOTT: Okay.  And that's fine.  And so we
24 may -- we may do some playing, and we'll just -- just to
25 clarify your point about the separate sealed record,

Page 6

1  we'll just -- it will be subject to the protective order
2  we have; right?
3     MR. PADDISON: Right.  Right.
4     MS. PRESCOTT: Okay.  All right.
5     BY MS. PRESCOTT:
6  Q.  Okay.  So, we have -- we have a basic understanding
7     here, but, Officer, how many times have you been deposed
8     prior to today?
9  A.  What do you mean?
10 Q.  How many times have you sat and given testimony where
11    you were either in court where you took an oath, or you
12    sat down in a -- court reporter -- room with a court
13    reporter and took an oath before today?
14 A.  Several times. I've been on the police department over
15    23 and a half years.
16 Q.  Okay.  So, what was the first one of those?
17 A.  Are you talking about as far as me making an arrest?
18 Q.  No.  Times when you've come in and testified under oath.
19 A.  As far as just like this, like the deposition?
20 Q.  Okay.  So, let's break it down.
21    So, let's put aside court where you're in a
22    courthouse.
23 A.  Okay.
24 Q.  In the middle of a courtroom where, you know, you've got
25    a judge and maybe a jury.

Page 7

1     Putting those aside, have you sat down in a
2  proceeding like this where it was a court reporter and
3  yourself, a lawyer asking you questions?
4  A.  As I recall, maybe once -- one other time.
5  Q.  Okay.  And what do you remember about it?
6  A.  It was from a prior shooting -- previous.  I can't
7     remember what year.  '96 or '97.
8  Q.  And who was being sued?
9  A.  The City.
10 Q.  Anyone else?
11 A.  Not as far as I know.
12 Q.  Like you -- do you know if you were sued?
13 A.  Yeah, well -- was I sued?
14 Q.  Right.
15 A.  I can't remember the outcome of the case, but it was
16    from an attempted robbery.
17 Q.  Okay.  Separate from the outcome, do you know if you
18    were accused of doing something wrong in the case?
19 A.  No.  I wasn't accused of anything wrong, no disciplinary
20    action or anything.
21 Q.  Okay.  Who was the person that was bringing the lawsuit?
22 A.  I think his name was Johnny Crenshaw.
23 Q.  Was he convicted of whatever, the robbery or acts around
24    a robbery?
25 A.  I have no idea.

Page 8

1  Q.  Okay.  Do you know whether he was charged?
2  A.  I have no idea.
3  Q.  Okay.  And in terms of the outcome, with regard to
4     Crenshaw, you don't recall what happened there?
5  A.  They didn't tell me.  They just said I was -- you know,
6     after I gave my deposition, that I was fine; that he
7     apparently received some money for some of his injuries,
8     not all of them.
9  Q.  Okay.  And so you are aware that Mr. Crenshaw settled
10    with the City relative to what happened there?
11 A.  They wouldn't tell me as to how much or whatnot.  They
12    just said the case was over.
13 Q.  Okay.  You had shot Mr. Crenshaw?
14 A.  Yes.
15 Q.  And you claimed that he had a gun; right?
16 A.  He tried to rob us.
17 Q.  But you claimed the man had a gun; right?
18 A.  Yes.
19 Q.  And he said that was a lie; right?
20 A.  If that's what he said.
21 Q.  Do you know?
22 A.  I don't know.  I've never -- I didn't deal with him at
23    all except for the shooting.  It was a separate issue.
24 Q.  Do you know -- and so you don't know whether you were a
25    person who was sued as well as the City?

Parker vs.
City of Detroit, et al.

Police Officer Jerold Blanding
October 12, 2017

---

Page 9

1 A.  As I recall, it was the City.

2    You have to talk to the attorney.  His name was

3  Jacob Schwarzberg.  That's who handled my case.

4 Q.  Did you give permission to settle the case?

5 A.  How could I give permission to settle the case?

6 Q.  If you were sued, you would have to be the one to say,

7  "I want to go to trial," or "I want to settle."

8    MR. PADDISON: Counselor, I think it

9  mischaracterizes the relationship between the police

10  officers and the Law Department and city council.  City

11  council, in lawsuits against officers in their official

12  capacity or the City, city council makes the decision

13  whether or not to settle, not the individual officer.

14    MS. PRESCOTT: Okay.  Well, he can tell me that, if

15  that's how it rolls.

16    MR. PADDISON: Well, you were telling him how the

17  settlement rolls.

18    MS. PRESCOTT: Well --

19    MR. PADDISON: I believe your statement was, "You

20  would have to give permission" --

21    MS. PRESCOTT: I was --

22    MR. PADDISON: -- which mischaracterizes the

23  relationship to the Law Department.

24    MS. PRESCOTT: I was offering ways that it might be

25  that he would give permission.  If he's named in a

---

Page 10

1  personal capacity, maybe he gives permission.  Maybe

2  that's a way we can find out if he was named.  Hence, my

3  question.

4    MR. PADDISON: I mean, you can ask him if he knows

5  if he was sued.

6    MS. PRESCOTT: Yeah, and I did.  And we're trying

7  to get at it another way now.

8    MR. PADDISON: Okay.

9    MS. PRESCOTT: Okay.  That's why.

10    BY MS. PRESCOTT:

11 Q.  Suffice it to say, you don't recall being a part of a

12  discussion of whether or not to go on with the case, go

13  to trial, settle it?

14 A.  I don't recall.

15    I know I went to the deposition, and then nothing

16  else happened with it.

17 Q.  Okay.  So, Crenshaw is shot.  There is a lawsuit.

18    Is there an internal investigation about it?

19    MR. PADDISON: Form.  Foundation.  Relevance.

20    Go ahead and answer if you know.

21 A.  I've never been disciplined for any of that.

22    BY MS. PRESCOTT:

23 Q.  Okay.  My question was different.  It was whether there

24  was an internal investigation.

25 A.  I have no idea.

---

Page 11

1 Q.  Nothing that you can recall, sitting here?

2 A.  No.

3 Q.  Okay.  And what have you been disciplined for?

4    MR. PADDISON: Objection.  Relevance.

5    Go ahead and answer.

6 A.  Minor things.  I can't recall.  I don't -- I have a good

7  record.  I -- probably an ACR entry or whatnot, but

8  nothing as far as losing days or suspension, nothing.

9    BY MS. PRESCOTT:

10 Q.  So, an ACR entry is an entry into your record of the

11  fact of there was a discipline?

12 A.  Yes.  And it's supposed to stay in like six months and

13  then it's supposed to be erased out of your file.

14 Q.  Okay.  So, what are the things you've been disciplined

15  for?

16 A.  I can't recall everything.

17    At this point, through my 23 and a half years,

18  probably -- probably twice.

19 Q.  What are those?

20 A.  One was an incident back in '94 for shooting at a bird

21  in a vacant building.  And then the second one was

22  something -- some paperwork that we had filed not

23  correct.  And I can't remember.  It was minor stuff.

24 Q.  So, you used your service weapon while you were on duty

25  and shot at a bird?

---

Page 12

1 A.  Yes.

2 Q.  And what was the -- what did you understand was the

3  reason for discipline?  Like is there a policy violation

4  there or what?

5 A.  I can't recall.  That happened when I first got on the

6  job, ma'am.

7 Q.  Has anyone ever mentioned or raised that to you since

8  1994?

9 A.  They was -- the boss was mad because that wasn't -- that

10  was supposed to have been erased out of my file, so that

11  shouldn't even have been brought up.

12 Q.  I didn't understand the first part.

13    Did someone --

14 A.  It was supposed to have been erased out of my file after

15  six months.

16 Q.  Okay.

17 A.  That happened way back in '94.  I was brand new on the

18  job.

19 Q.  Okay.  But has anyone ever mentioned it or discussed

20  that incident with you ever since 1994?

21 A.  Just the stuff that you guys put in the paper.

22 Q.  But like -- it's a good clarification.

23    Has any boss of yours, any supervisor above you,

24  ever mentioned it?

25 A.  No.

---

Parker vs.                                                        Police Officer Jerold Blanding
City of Detroit, et al.                                                         October 12, 2017

---

Page 13

1  Q.  Has anyone ever asked you about what happened there or
2  the circumstances ever since 1994?
3  A.  No.
4      Those bosses retired, ma'am.
5  Q.  Okay.  But like -- I mean, do you even have any idea
6  that your current bosses would know about that?
7  A.  I've never looked at my record.  If it's still in there,
8  it shouldn't be.  They would know.  They would have
9  access to that.
10  Q.  Okay.  It's not in your record, I don't think.  So,
11  that's why I am trying to figure out if your bosses know
12  about it.
13  A.  Your guess is as good as mine, ma'am.
14  Q.  Okay.  You don't know?
15  A.  No.
16  Q.  And then this paperwork thing is what?  What was the
17  allegation against you?
18      MR. PADDISON:  Okay.  So, I don't want to jam you
19  up.  I'll just put an ongoing to the line of questioning
20  regarding allegations of past misconduct.  That way I'm
21  not jamming you up.
22      MS. PRESCOTT:  Yeah.
23      MR. PADDISON:  Go ahead and answer.
24  A.  Something -- not checking something off on a run sheet
25  that we had to start doing.

---

Page 14

1  BY MS. PRESCOTT:
2  Q.  What year was this?
3  A.  I have -- it happened after 2010.
4  Q.  Let me circle back.
5      With regard to the 1994 incident with the shooting,
6  what was the rule or the policy or the -- whatever that
7  was at issue?
8      Did you say you didn't know?
9  A.  No.  I believe it was just discharging my firearm.
10  Q.  Okay.  But why?  I mean, why -- what was wrong with
11  that?
12  A.  I don't recall, ma'am.
13  Q.  Okay.  And do you recall -- you don't recall what was
14  wrong with the run sheet or what the --
15  A.  It was something about -- we -- they changed some
16  policy.  They wanted us doing a run sheet, and my
17  partner and I were -- kept forgetting to do it because
18  it was something new, something very tedious, and one of
19  the sergeants just got mad and said -- they gave us a
20  verbal counseling and, by me being a senior officer, an
21  ACR entry.
22  Q.  And do you recall what the -- like what it was that they
23  were --
24  A.  Not checking in one of the boxes on top of the run sheet
25  because he got tired of having to check it every day.  I

---

Page 15

1  can't recall what it was.
2  Q.  Okay.  And so are those the only two times you've ever
3  been disciplined?
4  A.  As far as -- I had had verbal counseling or something
5  before.
6  Q.  Okay.  How about any kind of discipline?
7  A.  No.  I've never been suspended, never lost any days,
8  nothing, ma'am.
9  Q.  You weren't disciplined with anything regarding to Demar
10  Parker or shooting him?
11  A.  No.
12  Q.  Okay.  So, the first time that you -- we started walking
13  down this road because of time -- I asked you about
14  times you had come in and had to sit and testify like
15  this, and you said the one had to do with Crenshaw.
16      Are there other times where you've come in and
17  given questions, with a court reporter, like this?
18  A.  As I recall, we had an incident when I was at Narcotics,
19  but our whole raid crew had to go down with that one to
20  trial at the City-County Building, but they were found
21  not guilty.  But I can't remember if we did this
22  individually like this.
23  Q.  Okay.  And what year are we in here that that happens?
24  A.  Either '95, '96 or '97.  I was at Narcotics then.  Maybe
25  even '98.  It was a fight that the raid crew had.

---

Page 16

1  Q.  And so this is -- this fight or this thing with the
2  narcotics crew, this is the same thing?  There's one
3  incident?
4  A.  I can't recall, like I said, if we did this
5  individually.
6  Q.  Right.
7  A.  I know that we did have to come to City-County Building,
8  went to trial for about three days, four days, and we
9  were all found not guilty.
10  Q.  You all were?
11  A.  Yes.
12  Q.  Okay.  And was there a lawyer that you worked with on
13  that?
14  A.  I can't recall who it was.
15  Q.  And do you recall who was making a claim that something
16  wrong had been done?  Like was there a person like
17  Johnny Crenshaw?
18  A.  It was like two guys that were in the house during the
19  raid.
20  Q.  They had alleged that they -- that officers used
21  excessive force, undue force?
22  A.  Yes.  Something to that extent.
23  Q.  Okay.
24      THE REPORTER:  I'm sorry?
25  A.  I said something to that extent.  I can't recall exactly

---

Parker vs.                                                    Police Officer Jerold Blanding
City of Detroit, et al.                                            October 12, 2017

Page 17

1    what --
2       THE REPORTER: Thank you.
3       BY MS. PRESCOTT:
4    Q.  Okay.
5    A.  And they were charged, too.
6    Q.  And what names -- you don't remember their names?
7    A.  No.
8    Q.  And do you remember some of the other folks who went
9    down to the City-County Building and were part of that
10   trial, like other officers?
11   A.  The raid crew I was on then -- you mean their names?
12   Q.  Yeah.  Like other police officers.
13   A.  At the time, it was Sergeant Patrick O'Rourke(sic);
14   Officer Dennis Griffiths, he's deceased now; Officer
15   Darren Bell; Officer John Dembinski; myself; I believe
16   Officer Daniel Mitchell.  I can't recall if he was on
17   our raid crew that day.
18      That was the crew that I worked on for years.
19   Q.  Okay.  And was there ever a time you ever had to go down
20   to the federal courthouse on Lafayette for a trial or a
21   case?
22   A.  A shooting happened in 2004.
23      I've been to federal court a couple times on drug
24   cases.
25   Q.  Okay.  And what was the 2004 matter?

Page 18

1    A.  I shot a guy in the raid.
2    Q.  And he claimed that that was wrongful, excessive?
3    A.  No.  He was trying to beat the dope case.  He was a
4    habitual offender.  He had a gun.  He went to fire at
5    me, and I fired first.
6    Q.  So, was there a lawsuit by him?
7    A.  No.  That was a federal court case.
8    Q.  I just asked because sometimes federal court cases can
9    be claiming, like this one, excessive force.
10   A.  No, none of that.
11   Q.  Okay.  Do you remember his name?
12   A.  They said he's dead now.
13      I believe it was Edward Robinson, Junior.
14   Q.  So, were you testifying in his criminal conviction or in
15   his criminal case?
16   A.  Yes.  He got found guilty, life in prison with no
17   parole.
18   Q.  Okay.  And then other times you -- have there been other
19   times that you've been down at that Lafayette Building?
20   A.  Yes, for narcotic cases.
21   Q.  Okay.  Have there been other times where you were down
22   there relative to someone saying that you had done
23   something wrong?
24   A.  No.  Just narcotics cases.
25   Q.  How many times have there been citizen complaints

Page 19

1    against you?
2       MR. PADDISON: I'm just going to renew the
3    objection as ongoing.
4       Go ahead and answer.
5    A.  I have no idea, ma'am.
6       BY MS. PRESCOTT:
7    Q.  Do you get notified of them?
8    A.  Yes, we would get notified, but the majority of them
9    came when we were at Narcotics, and they would be
10   against the whole raid crew.
11   Q.  So, how many have said that you used excessive force?
12   A.  I can't recall.  There were just accusations of
13   different things of not having a search warrant, just
14   trying to beat the narcotics case.
15   Q.  Okay.  And so you're not sure about the number that
16   involved a claim of excessive force?
17   A.  Me personally, no.
18   Q.  And how many of them were resolved where there was a
19   specific finding one way or another way as opposed to
20   unfounded or unsubstantiated or just no resolution at
21   all?
22   A.  The majority of them were unfounded, no resolution.
23      And, like I said, I have a good record.
24   Q.  Well, when you say "majority," then I have to probe it,
25   because "majority" to me means more than half.

Page 20

1       So, I want to make sure we get on the same page.
2       Do you know how many have come out with specific
3    findings one way or another?
4    A.  No.
5    Q.  Is that something that you can go back, if you wanted --
6    like back at your precinct or whatever and you can go
7    back and look up?
8    A.  No.  When I was at Narcotics, the majority of the stuff
9    was on paperwork, so I don't know where you would find
10   that stuff at in Narcotics.
11   Q.  Do you know how many times you've been named as a person
12   who is sued in a lawsuit?
13   A.  Just -- as I recall, just this and with Johnny Crenshaw.
14      And the incident I told you about where the whole
15   raid crew went; that they were trying to sue the whole
16   raid crew.
17   Q.  And with regard to the Crenshaw, did you -- did you get
18   put out on a leave while there was an investigation --
19   if -- at any point, did you get put out on a leave
20   relative to that shooting?
21   A.  No.
22   Q.  Has anyone discussed that shooting with you since this
23   case came -- the events of this case?
24      MR. PADDISON: I'll just clarify.  I'm going to
25   instruct my client not to answer to the extent it was --

Parker vs.
City of Detroit, et al.

Police Officer Jerold Blanding
October 12, 2017

Page 21

1 involves conversations between himself and his attorney
2 in this case or himself and his DPOA attorney.
3   Beyond those objections, you can go ahead and
4 answer.
5 A.  What was your question again?
6   MR. PADDISON: Sorry.
7   MS. PRESCOTT: That's all right.
8   BY MS. PRESCOTT:
9 Q.  Has anyone at Detroit Police Department raised or
10 discussed the Crenshaw matter with you since the events
11 of this case?
12 A.  No.
13 Q.  Like there were no questions about that when you were
14 questioned about Demar Parker?
15 A.  No.
16 Q.  Did you have your badge or gun taken at any point
17 relative to the Crenshaw thing?
18 A.  No. I've never had my -- wait a minute. Let me think.
19   THE REPORTER: Excuse me?
20 A.  I said let me think.
21   When -- the Crenshaw thing, I had to go to the lab
22 the next day for them to fire it, but I never had my gun
23 taken.
24   With this incident, they took my gun and gave me
25 a -- I'm trying to think.

Page 22

1   Did they give me a loaner?
2   Yeah. They gave me a loaner on this incident.
3   BY MS. PRESCOTT:
4 Q.  Relative to Demar Parker?
5 A.  Yes.
6 Q.  Okay. Other than the time that you just described where
7 they took your gun and gave you a loaner in the Demar
8 Parker matter, have you ever had your gun taken?
9 A.  Taken as far as what, ma'am? That's two different
10 things.
11   Like suspended?
12 Q.  Yeah, like "Give me your badge and your gun."
13 A.  No, never.
14 Q.  Okay. And were there ever any charges sought against
15 you with regard to the Crenshaw matter?
16 A.  No.
17 Q.  Have you ever had criminal charges sought against you?
18 A.  Just the incident, as I recall, with the raid crew.
19 Q.  Criminal charges?
20 A.  I can't remember exactly, ma'am. It was a horrible
21 fight in the house, a bunch of dogs, a bunch of
22 commotion.
23 Q.  Okay.
24 A.  And they got found guilty of the drugs, and all the
25 allegations against us were dismissed during the jury

Page 23

1 trial.
2 Q.  My question is whether or not anyone ever sought
3 criminal charges against you for whatever you -- what
4 your role was.
5 A.  It was the whole raid crew, ma'am. That's what I keep
6 trying to explain to you.
7 Q.  Okay. So, do you think the whole raid crew had criminal
8 charges taken against them as opposed to a guy saying,
9 "You did something wrong to me"? Did the --
10 A.  I was part of the raid crew.
11 Q.  -- prosecutor? You're not sure?
12 A.  It's confusing. I was part of the raid.
13   MR. PADDISON: Can I -- because I think you and I
14 understand what you're asking. Do you mind if I try and
15 clarify?
16   MS. PRESCOTT: Yeah.
17   MR. PADDISON: And if I'm not getting it for you --
18   Has there ever been a situation where you were
19 involved in a lawsuit or a criminal prosecution where
20 there was a possibility that you could go to jail or
21 that you could be convicted of a crime?
22 A.  No.
23   MR. PADDISON: Okay. Are you aware of any
24 circumstance where you could be found liable to pay
25 money, or the City pay money on your behalf?

Page 24

1 A.  No.
2   MS. PRESCOTT: Okay.
3   MR. PADDISON: I hope I --
4   BY MS. PRESCOTT:
5 Q.  Has anyone every sought a warrant on you?
6 A.  Do you mean -- well, per Homicide, if there's a
7 shooting, they have to do a warrant, but they were
8 denied.
9 Q.  When did Homicide have to do warrants for you?
10 A.  As far as I know, they have to do them for every
11 shooting.
12 Q.  Do you know whether that was in place back when the
13 Crenshaw thing happened?
14 A.  I'm sure they did, but as far as them arresting me or
15 anything, no.
16 Q.  No, no. Yeah, I guess I want to distinguish what you
17 know and what you think probably was true.
18   So, do you know when the policy was of we're just
19 going to go get -- look for a warrant after any
20 shooting?
21 A.  As far as I know, each time you fire your weapon,
22 Internal Affairs and Force Investigation and Homicide
23 will have to sought a warrant against the officer, and
24 so far they have all been denied, and one is still open.
25 Q.  Okay. And so the seeking of the warrant, that's been

Parker vs.                                                    Police Officer Jerold Blanding
City of Detroit, et al.                                              October 12, 2017

Page 25

1  true your whole career, it sounds like, then, is what
2  you're telling me, or at least since the Crenshaw thing
3  happened?
4  A.  Yes.
5  Q.  Okay.  And so far as you would know, they would seek
6  a warrant relative to Crenshaw, the guy in the raid in
7  the house with a bunch of you in Narcotics, Demar
8  Parker, and then you said there's one still outstanding?
9  A.  Yes.
10     It was another shooting prior to that, but that --
11  all of them were denied.  And the one that's still
12  outstanding now, it's still an ongoing investigation.
13  Q.  And so what is another shooting prior that I missed?
14  Which one did I miss?
15     MR. PADDISON:  Okay.  Just to clarify, I'm going to
16  place an ongoing objection as to allegations of past
17  misconduct or past shootings with -- I'll now place an
18  ongoing as to any allegations of misconduct or shootings
19  that occurred after the Demar Parker incident.  Counsel,
20  I don't want to jam you up.
21     So, go ahead and answer.
22     MS. PRESCOTT:  Okay.  So, that -- just -- that's a
23  fine objection, but --
24     BY MS. PRESCOTT:
25  Q.  So, you had mentioned -- so, I ticked off -- okay -- so,

Page 26

1  Crenshaw, the one with the raid with Narcotics, Parker,
2  and then one outstanding.  You said, well, there's
3  another shooting prior.
4     Have I missed a shooting?
5  A.  Oh.  There's a guy named Charles Trask.
6     THE REPORTER:  The name?  I'm sorry.
7  A.  I believe his last name was Trask.  Charles Trask.
8     BY MS. PRESCOTT:
9  Q.  And was there a lawsuit around that or not a lawsuit?
10  A.  No.
11  Q.  And was he killed?
12  A.  No.
13  Q.  Okay.  But -- and you were the officer involved in the
14  shooting?
15  A.  Yes.
16  Q.  Okay.  And what year?
17  A.  I don't recall.  '97, '98.
18  Q.  And what was he doing that caused you to shoot him?
19  A.  That case, I have no idea, ma'am.  He pulled up next to
20  me and my buddy and started shooting at us.  I didn't
21  have any words with anyone, never saw the guy in my
22  life.  He -- per the investigators, they think that he
23  thought I was someone else.
24  Q.  Okay.  So, did he -- did he shoot the person you were
25  with or you?

Page 27

1  A.  I shot him.
2  Q.  Okay.  So, you said, "He pulled up and started shooting
3  at us."
4  A.  Just started -- just pulled up and started shooting.
5  Q.  Okay.  So, did he shoot anybody?  Did he shoot anybody?
6  A.  Oh.  No one got shot, not me or my buddy that I was
7  with.
8  Q.  Okay.  And who were you with?
9  A.  He's retired now.
10  Q.  So, it was an officer?
11  A.  Yes.
12  Q.  Were you on duty?
13  A.  No.
14  Q.  Okay.  What was the officer's name?
15  A.  Heshimu Greene.
16  Q.  Okay.  And was there damage to a car?
17  A.  My car was -- my dad's vehicle was shot all up.
18  Q.  Okay.  So, what -- were you like at a stoplight or
19  something?
20  A.  No.  I was turning around in an alley to go pick up
21  someone else, down a side street, and he came driving
22  down the alley, and then just started unloading on us.
23  Q.  Okay.
24  A.  No words exchanged, nothing.  I don't know the guy,
25  never saw the guy before or anything.

Page 28

1  Q.  Okay.  And so it was just a random thing?
2  A.  Per the investigators, they said he must have thought we
3  were someone else.
4  Q.  Okay.  And you didn't have to give up your badge or your
5  gun for that?
6  A.  No.
7  Q.  And you didn't have any suspension for -- during an
8  investigation?
9  A.  No.
10  Q.  And do you know whether this is marked in any of your
11  files anywhere?
12  A.  Probably in the archives.
13  Q.  Not sure?
14  A.  I said this is back when we were doing paperwork, ma'am,
15  when we were literally typing paperwork.
16  Q.  Okay.  But -- so, did you have to make a report about
17  it?
18  A.  Yes.
19  Q.  And was there an Internal Affairs investigation?
20  A.  Not that I know.  He was caught days later.
21  Q.  Was there any kind of investigation into your conduct at
22  all?
23  A.  No.
24     We went to trial on that.
25  Q.  Okay.  And the other open warrant is about what?

Parker vs.                                                    Police Officer Gerold Blanding
City of Detroit, et al.                                              October 12, 2017

---

Page 29

1      MR. PADDISON: You can go ahead.  I already placed
2   my objection.  You can go ahead and answer.
3 A.  Oh, a fatal shooting I had February 13th.
4      BY MS. PRESCOTT:
5 Q.  2016 or '17?
6 A.  This year.
7 Q.  And that was a kid -- kids in a car joyriding or
8   something?
9 A.  Well --
10 Q.  They had stolen a car?  What was going on?
11 A.  It was are you a suspect.
12 Q.  Oh, can you say that -- what that means, please?
13 A.  He had carjacked someone.
14 Q.  Okay.  And there was a group of people in the car?
15 A.  Just him.
16 Q.  Oh, there was just him.
17      Okay.  So, you're on duty?
18 A.  Yes.
19 Q.  And so they tell you -- go get this guy with
20   such-and-such description of the car?
21 A.  No.  We were just doing routine investigation.  The car
22   started going at a high rate of speed.  We couldn't
23   catch up to it to give out the plate.  He ended up
24   crashing into a building and took off running.  We gave
25   chase.

---

Page 30

1      MR. PADDISON: I'm going to pause you right here.
2      Have you given a Garrity statement about this
3   issue?
4      Counsel, the only reason I ask is, during Garrity
5   they are instructed not to discuss --
6 A.  Oh.  You know what?  You're right.  I'm not sure because
7   I've been off.
8      MR. PADDISON: Because they are instructed not to
9   discuss the matters of that investigation until it is
10   concluded.
11      Do you know if you've given a Garrity statement
12   relevant to that?
13 A.  I've just been going to therapy.
14      MR. PADDISON: Okay.  Have you had a situation
15   where you had a DPOA attorney there with you and you
16   were asked questions by a use of force investigator?
17 A.  I can't recall.
18      MR. PADDISON: Okay.  Counselor, unless you object,
19   could we put this portion of the testimony under a
20   separate seal, just pending whether I get information
21   that there's been a Garrity statement?  I don't want to
22   put him in --
23      MS. PRESCOTT: We can take the rest of the answer
24   on the same -- subject to the same protective order
25   issue.

---

Page 31

1 A.  I thought you were telling me not to talk about it
2   except --
3      MR. PADDISON: No -- right.  That why we're putting
4   it on a protective order.
5      So, if it comes out that Garrity -- that you have
6   done a Garrity statement in that, this portion of the
7   transcript will be protected under a protective order;
8   okay?
9      Do you know if you've met with an attorney?  I
10   mean --
11 A.  I've been off work since.
12      MR. PADDISON: I -- I'm trying to --
13      MS. PRESCOTT: It doesn't matter.  I mean, you're
14   being -- I mean, this is a compelled, you know,
15   statement, so --
16      MR. PADDISON: No, I understand.
17      MS. PRESCOTT: It's not like you're choosing to
18   come gossip about it or something to someone.
19      MR. PADDISON: No, I understand that.  But also, I
20   mean, he could be facing criminal charges for speaking
21   about it, so -- if he's got a sealed Garrity order not
22   to discuss it until the conclusion of the investigation.
23      MS. PRESCOTT: That doesn't bind me, though.  I
24   mean, whatever the department wants to say to its people
25   doesn't stop me in a --

---

Page 32

1      MR. PADDISON: Okay.  Then -- I mean, what we'll do
2   then -- and -- so, Officer Blanding, until we figure out
3   whether or not there has been -- whether or not you've
4   taken a Garrity statement relevant to this incident,
5   I'll instruct you not to answer.
6      I will stipulate with counsel that if you haven't
7   taken a Garrity, we will produce you for a deposition
8   limited to those issues.
9      MS. PRESCOTT: Okay.  But that will be the third
10   time that I have had to come down here.
11      MR. PADDISON: Okay.  Then the alternative,
12   Counsel, is that I just advise him of his Fifth
13   Amendment rights and tell him not to answer, and we get
14   nowhere with that.
15      MS. PRESCOTT: Yeah.  Okay.  Well, so I'll take
16   that.
17      I mean --
18      MR. PADDISON: Okay.
19      MS. PRESCOTT: So, if that's the better -- if
20   that's what --
21      MR. PADDISON: I'm stipulating to saying let's --
22   with respect to this issue, we can press pause, and I'm
23   happy to reproduce him if we find there is no Garrity
24   order.
25      MS. PRESCOTT: Why don't we -- why don't we -- I

---

Parker vs.                                                      Police Officer Gerold Blanding
City of Detroit, et al.                                              October 12, 2017

Page 33

1   don't agree to press pause, but if you want to maybe
2   look at it while we are on a break or something or find
3   out or whatever, we can come back to it.
4        MR. PADDISON: Okay.  That's fine.
5        MS. PRESCOTT: Let's put it that way.
6        MR. PADDISON: I'll get ahold of the DPOA rep and
7   figure out if there's been a Garrity statement.  If
8   there hasn't, he can talk about it.
9        So, we'll move on.  Next time -- next time we take
10  a break, I'll talk to the DPOA and we'll figure out
11  what's going on with that.
12        BY MS. PRESCOTT:
13  Q.  Okay.  Relative to that situation, it sounds like you've
14  been off work I just heard you saying; is that right?
15  A.  Administrative leave.
16  Q.  Since when?
17  A.  February 13th.
18  Q.  And what is administrative -- like how does that get
19  initiated?  Who says you're going to be on the
20  administrative leave?
21  A.  Between the union and my commander, I guess, and medical
22  section.
23  Q.  Okay.  So, you put in for a request medically to be off?
24  A.  I didn't put in for it.
25  Q.  Did someone tell you, "You can't come back to work until

Page 34

1   we say so," or is it --
2   A.  It's still under investigation.  They still have me
3   going to therapy once a week and going to another
4   doctor, then going to the medical section.
5        That's out of my control.
6   Q.  Okay.  So, the department has put you out while you're
7   going through that therapy?
8   A.  Yes.
9        Not out like you think.  I mean, just on
10  administrative leave.
11  Q.  Well, would you be working if you -- I mean, are you
12  able to go back and say, "I'm ready to come back now"?
13  A.  No.  I don't want to go back right now.
14  Q.  But my question is, could you?
15        If you woke up tomorrow and said, "I feel like
16  going to work," can you do that?
17  A.  I'm not sure.
18  Q.  Okay.  Do you know whether you have to take a
19  fitness-for-duty exam at any point?
20  A.  Have I taken one?
21  Q.  Well, let's start there.
22        Have you ever been asked to take a fitness-for-duty
23  exam by a doctor?
24  A.  No.  I just answer these questions when I go to therapy.
25  Q.  Okay.  And do you know whether -- what you'd have to do

Page 35

1   to get re-placed on the active roles, active duty?
2   A.  That, I'm not sure.
3   Q.  And are you on any medications today?
4   A.  Yes.
5   Q.  What?
6        MR. PADDISON: Counsel, this is off record.
7        MS. PRESCOTT: Okay.
8        MR. PADDISON: Medical information.  But he can
9   answer off the record.
10        THE REPORTER: So, I'm sorry --
11        MS. PRESCOTT: Oh.  Well, no.  Oh, I thought you
12  just wanted to talk to me.
13        MR. PADDISON: No.  I'm saying that -- I mean, his
14  private medical information -- I mean, I understand
15  your -- why you're requesting it, but it doesn't need to
16  necessarily be part of a public transcript.
17        MS. PRESCOTT: Okay.  Do you want to put it on the
18  other record?
19        MR. PADDISON: That's fine.  We can do that.
20        MS. PRESCOTT: Okay.  So, we'll go on the record
21  subject to the protective order.
22        (Testimony from pages 36 and 37 excerpted
23        and bound under separate cover.)
24        *
25        *

Page 38

1        (Non-excerpted testimony resumes.)
2        BY MS. PRESCOTT:
3   Q.  How many times did you answer questions about Demar
4   Parker, in the matter of Demar Parker, to your bosses or
5   internal investigators at DPD?
6   A.  I went down with -- for Garrity, you mean?
7   Q.  Could be Garrity, could be something less formal.
8   A.  I went down there for that, for the Garrity, and then
9   I did a report when he cut me off at the kids' school.
10  And that was about it.
11  Q.  Okay.  So, what I'm asking about is times where somebody
12  at DPD sat down asked you questions about Demar Parker
13  like I'm doing here today.  Like, you know, just asked
14  you questions, person to person, verbally.
15        Was it just the one Garrity?
16  A.  I went to the union --
17        MR. PADDISON: I'm going to advise you not to
18  discuss what was said between you and an attorney, but
19  you can discuss that you spoke to somebody.
20  A.  Whatever day that was I went to the union.
21        I can't remember when you talked to --
22        MR. PADDISON: Counselor, I believe that was the
23  day that he actually showed up and Marcus Ways's
24  deposition was scheduled.
25        I don't know the date off the top of my head.

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 39

1    MS. PRESCOTT: Okay.
2    MR. PADDISON: But you spoke with a DPOA attorney
3  at that time?
4 A.  Yes.
5    MR. PADDISON: Okay.
6    BY MS. PRESCOTT:
7 Q.  Okay.  When we were supposed to be here last time giving
8  questions and answers, what happened that day?
9 A.  I forgot why I had to go to the union that day, but --
10 Q.  So, I'm on a different day.  I'm on a couple weeks ago
11  when we were scheduled to be here and then you didn't
12  come.
13    Why?  What happened that day?
14 A.  What do you mean I didn't come?
15 Q.  You were not here for your deposition.
16    MR. PADDISON: I think it was last -- was it last
17  week?
18 A.  I didn't know anything about it.
19    I barely go in to the station.  My supervisor
20  called me and said that they will notify me.
21    BY MS. PRESCOTT:
22 Q.  Okay.  So, you didn't know until recently that you were
23  scheduled for this deposition?  This is the first time
24  you think you've been scheduled?
25 A.  I thought I would hear it from the City, and that's when

Page 40

1  I got a phone call and said okay.
2 Q.  Okay.  Relative to a report about cutting off at a kid's
3  school, what are you talking about?
4 A.  I saw Mr. Parker -- well, I didn't know it was him at
5  first.
6    I was leaving the kids' school and found out later
7  that his daughter and my kids were attending the same
8  school.  Leaving out of the parking lot, he cut me off,
9  was looking at me real hard.  I didn't know who he was
10  or if he was rushing to leave or go to work or whatever.
11  The crossings guard were telling him to go ahead.  He
12  kept looking at me real hard, staying in front of me,
13  blocking traffic, saying something through his window,
14  but his window was up, and I was still looking, like
15  signaling for him to go ahead.  I didn't know who he
16  was.  Then as soon as he pulled off, it snapped and I
17  said that was Demar Parker, and I did a report.
18 Q.  Okay.  So, he got in your way in the school parking lot?
19 A.  Well, cut me off, like an intimidation.
20 Q.  Okay.  So, he was driving and you were driving?
21 A.  Yes.
22 Q.  Okay.  And he was in front of you to be cutting you off;
23  is that right?
24 A.  I was in front of him at first.
25 Q.  Okay.

Page 41

1 A.  And then he drove up on the side of me, real close, and
2  then cut me off.
3 Q.  Okay.  And --
4 A.  The union has a report on that, and I can't remember
5  what detective was handling it.
6 Q.  And was there a police report?
7 A.  Yes, I did a police report.
8 Q.  Okay.  And so what was the -- why did you do a police
9  report?
10 A.  For the intimidation and because I didn't know what else
11  he had in mind and to protect my kids just as well as
12  his.
13 Q.  Okay.  So, you -- the intimidation is the looking at
14  you?
15 A.  The cutting me off the way that he was driving.
16 Q.  Yeah, but, I mean, you must have been cut off in traffic
17  a hundred times.  We all have.  That's my point.
18 A.  Ma'am, this is a small school.  The way that he cut me
19  off in the parking lot, he knew exactly what he was
20  doing.
21 Q.  Okay.  So --
22 A.  Even the crossing guards were telling him to move on, to
23  move on, to move on, and I just thought he was someone
24  late, going to work.  As soon as he pulled off, it
25  clicked to me who he was.

Page 42

1 Q.  Okay.  So, at the time, you think it was just some guy,
2  and you're like, "What the heck?  Get out of my -- go,"
3  whatever?
4 A.  That's what I said.
5 Q.  Okay.  And then that was it?
6 A.  And then I --
7 Q.  I mean, there's nothing else that day?
8    I know you made a report, but like have we covered
9  everything that happened in the school parking lot?
10 A.  Yeah.  I mean, I figured out who he was and who -- that
11  our kids went to the same school, so that's why I did
12  the report as well.
13 Q.  Yeah.  I'm just asking, have we covered everything that
14  happened in the parking lot?
15 A.  As far as I know, yes.
16 Q.  Okay.  And there's never been any other time in the
17  parking lot or at the school grounds or the park or any
18  time you've ever seen him since?
19 A.  No, I see him every now and then.
20 Q.  Oh, you have?
21 A.  Yes.
22 Q.  Whereabouts?
23 A.  At the school.
24 Q.  Oh, seen at school.
25    Okay.  And then what happened?  Anything happening

Parker vs.
City of Detroit, et al.

Police Officer Gerald Blanding
October 12, 2017

---

Page 43

1  at those times?
2  A.  Nothing.
3  Q.  Okay.  Have you ever seen him any other place before
4  that time at the school with the cutting off, between
5  the night that you shot him and the night in the
6  school -- or the day at the school?
7  A.  I didn't know him from Adam.
8  Q.  But did you see him in between at all?
9  A.  No.
10  Q.  Okay.  And you'd never seen him before the night of the
11  shooting?
12  A.  No.
13  Q.  Did you work the day -- earlier in that day of the night
14  of the shooting?
15  A.  Yes.
16  Q.  In the 10th or the 12th Precinct?  10th?
17  A.  10th.
18  Q.  Who was the -- did you have a partner when you were
19  driving with this thing in February of 2017?
20      You said, "We were doing a routine investigation."
21      Did you have a partner you were with that day?
22  A.  As far as the fatal shooting?
23  Q.  Yeah.
24  A.  Yes.
25  Q.  Who?

---

Page 44

1  A.  Mike Davis.
2  Q.  Anyone else?
3  A.  Other people made the location later.
4  Q.  How about Mr. Ways or Mr. Townson?
5  A.  No.  They -- Townson has been off, and Ways is working
6  in another unit.
7  Q.  Okay.  So --
8      THE REPORTER: I'm sorry?
9  A.  Townson has been off work, and Ways is working in
10  another unit.
11      THE REPORTER: Thank you.
12      BY MS. PRESCOTT:
13  Q.  Okay.  And so had you been -- you had been partners with
14  Ways and Townson off and on during the years prior to
15  the shooting; right?
16  A.  From prior to -- I went to Number 10 in 2010, and that's
17  when I met them.
18  Q.  You met them both because you moved to the 10th
19  Precinct?
20  A.  Yes.
21  Q.  You didn't know them at all before?
22  A.  No.
23  Q.  Okay.  And then through your working together, you guys
24  became good friends; right?
25  A.  Yes.

---

Page 45

1  Q.  And you had a relationship outside of work with both of
2  them; right?  You had seen them outside of work?
3  A.  Yes.
4  Q.  And then you would also like visit with each other's
5  families?
6  A.  Yes.
7  Q.  Okay.  And so there were -- and I've gotten to talk to
8  both of them first, so I know -- some of this we'll just
9  run through a little bit quicker, but it sounds like at
10  some time there was almost like a three-person car or a
11  three-person partnership between Townson and Ways and
12  you; is that right?
13  A.  Three or four.
14  Q.  Okay.  And who was -- when you would have a fourth, who
15  would that be?
16  A.  They would switch up whoever is the extra we working --
17  Q.  Okay.  And in 2010, when you arrived, was your boss the
18  same as the night of the shooting, like your direct
19  chain of command, sergeant or whoever it would have
20  been?
21  A.  From which time, ma'am?
22  Q.  So, from 2010 to 2015, you have the same boss, or does
23  it change up?
24  A.  Oh, it changed up.
25  Q.  Okay.  So, then, as of August of 2015, who is your boss,

---

Page 46

1  or if there's a couple sergeants that oversee, who are
2  they?
3  A.  With Mr. Parker?
4  Q.  In August 2015, yeah.
5  A.  Oh, my immediate supervisor was Anthony O'Rourke.
6  Q.  The same Anthony O'Rourke that was -- was that a Patrick
7  O'Rourke who you were --
8  A.  No.  Those are two different people.
9  Q.  Okay.  So --
10  A.  And -- I'm sorry -- it's Patrick Rourke, not O'Rourke.
11  Q.  Okay.  It's Patrick Rourke?
12  A.  Yes.
13  Q.  Okay.  So, Anthony O'Rourke was your supervisor in
14  August of 2015?
15  A.  Yes, with this incident.
16  Q.  And so when you say "with this incident," you mean
17  that's who came out that night from the 10th or --
18  A.  After other supervisors came there, I called him --
19  Q.  Okay.
20  A.  -- to see if he was still at the station and advise him
21  what had happened, because he was my immediate
22  supervisor.  I was under his, what they call, span of
23  control.
24  Q.  Okay.  And what put you under his span of control at
25  that time?

---

Parker vs.                                                      Police Officer Gerold Blanding
City of Detroit, et al.                                               October 12, 2017

Page 47

1  A.  I have no idea why they did that.

2  Q.  Who else's span of control were you under at that time;

3     if anyone?

4  A.  That depends on the supervisors, ma'am.  He was our

5     special ops supervisor.  I think I fell under his span

6     of control because I was working days and he worked

7     days.

8  Q.  Okay.

9  A.  If someone else -- if he was off work or if he was on

10    military leave, the supervisors would switch up who was

11    under your immediate span of control.  I have nothing to

12    do with that.

13 Q.  Okay.  So, whether it's O'Rourke or anybody else in the

14    10th Precinct, none of them have ever asked you any

15    questions about Demar Parker; right?

16 A.  They asked me if I was okay after the incident.

17 Q.  Anything other than that?

18 A.  No.

19 Q.  None of those people who were in -- had you under their

20    span of control have ever asked you anything about

21    Crenshaw; right?

22 A.  No.

23 Q.  And none of them have asked you about the raid that

24    became a shooting case relative to the whole narcotics

25    team that you described; right?

Page 48

1  A.  No.

2  Q.  And you don't know of any facts that would -- there's

3     nothing that they would even discussed with you that

4     would make you think they even know about that stuff;

5     right?

6  A.  Just some things, what they may have heard.

7        THE WITNESS:  I need to step out and text my

8     therapist and let him know --

9      MS. PRESCOTT:  Need to take a break?

10     MR. PADDISON:  Yeah.

11     MS. PRESCOTT:  Okay.

12    (Short recess at 2:14 p.m.)

13     *  *  *

14    (Record resumed at 2:20 p.m.)

15     MR. PADDISON:  Okay.  During the break, I had an

16 opportunity to speak with my supervisor regarding the

17 testimony involving a shooting that occurred after the

18 incident which gives rise to the subject matter of this

19 lawsuit.

20    After that discussion, I've been instructed to

21 advise Officer Blanding as follows:  Officer Blanding, I

22 do not act as your attorney relevant to that incident.

23    Do you understand that?

24 A.  Yes.

25     MR. PADDISON:  Do you understand that I am advising

Page 49

1     you that I believe it would be in your best interest to

2     speak to an attorney regarding that incident?

3  A.  Yes.

4      MR. PADDISON:  I'm -- do you understand that I'm

5  instructing you not to assert your Fifth Amendment

6  right, but that you have the Fifth Amendment right not

7  to testify regarding that issue?

8  A.  Yes.

9      MR. PADDISON:  Okay.

10    Counsel, should it create to be that Officer Blanding

11 has not taken his Garrity relevant to this incident --

12 or -- excuse me -- related to this incident, or that

13 he's released from testifying about it, I will stipulate

14 to produce Officer Blanding to testify regarding the

15 February -- excuse me, February 13th, 2017 shooting.

16     MS. PRESCOTT:  Okay.  None of that whatsoever has

17 anything to do with the civil lawsuit that we're here

18 about today.

19     MR. PADDISON:  Actually, I think nothing --

20     MS. PRESCOTT:  Excuse me --

21     MR. PADDISON:  -- nothing about the February 13

22 incident has anything to do about this civil lawsuit.

23     MS. PRESCOTT:  Okay.  I'm just going to -- I'm just

24 going to make my points; you've made yours.

25     MR. PADDISON:  Certainly.

Page 50

1      MS. PRESCOTT:  I'm here today -- I'm here for the

2  second time, my time having been completed wasted the

3  last time around.  I didn't make a big stink about it.

4  I didn't ask anyone to pay any damages or costs, but

5  here we sit.  I'm not coming back down here a third

6  time.

7      This officer is individually sued in his own

8  capacity.  Accordingly, he's free to have whatever

9  lawyer he wants here for his very own self.  If he

10 needed to bring someone else into this room, he could

11 have done that.  He hasn't done that.

12     MR. PADDISON:  He doesn't need to, not to testify

13 about this incident.

14     MS. PRESCOTT:  Well, good.  So, then -- so, then --

15     MR. PADDISON:  But to testify about a subsequent

16 incident, he very well may.

17     MS. PRESCOTT:  I'm willing to put whatever we want

18 to put on a separate record, but I'm going to ask my

19 questions, and I'm going to interpret a refusal to

20 answer as an assertion of the Fifth.

21    And if that's -- I mean, you can't just say -- I

22 mean, this isn't -- I know in the halls of congress,

23 we're pretending like we can claim privilege, but we're

24 not going to claim privilege, but we're going to say we

25 might claim privilege, but here in this deposition

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

---

Page 51

1 that's not how it's going to roll.
2    BY MS. PRESCOTT:
3 Q.  How it's going to roll is, I'm going to ask my
4 questions, and you can sit there silently and we can
5 just assume what we want to assume from that, or we can
6 take answers or do whatever you want to do.
7    MR. PADDISON: Actually, I think the law is that
8 you don't take an assumption of guilt from an assertion
9 of the Fifth, but --
10    MS. PRESCOTT: Well, that's in a criminal
11 proceeding, but here we sit in a civil proceeding --
12    MR. PADDISON: And I understand --
13    MS. PRESCOTT: -- and I'm entitled to --
14    MR. PADDISON: Counsel, would you like me to
15 stipulate to produce him again should it come out that
16 he can testify or no?
17    MS. PRESCOTT: No.  No.
18    MR. PADDISON: Okay.
19    MS. PRESCOTT: Because that doesn't -- that doesn't
20 address the fact that I've had to prepare twice for
21 this, and I'm not preparing a third time.  That doesn't
22 address it and nor should I have to and nor should my
23 client be put to that expense and nor should I.
24    So, we're just going to go through it, and, you
25 know, he can assert the Fifth; he can answer the

---

Page 52

1 questions.  It's really his choice.
2    BY MS. PRESCOTT:
3 Q.  You had left --
4    MS. PRESCOTT: We can go on to the separate record,
5 John.
6    (Testimony from pages 53 and 54 excerpted
7    and bound under separate cover.)
8    *
9    *
10    *
11    *
12    *
13    *
14    *
15    *
16    *
17    *
18    *
19    *
20    *
21    *
22    *
23    *
24    *
25    *

---

Page 55

1    (Non-excerpted testimony resumes.)
2    BY MS. PRESCOTT:
3 Q.  With regard to your relationship with the Defendant in
4 this case, Mr. Townson, you -- nobody in DPD has ever
5 asked you any questions about that relative to Demar
6 Parker, have they?  They have never delved into like how
7 you guys go back, are you good friends, any questions
8 like that, have they?
9 A.  No.
10 Q.  And same with Ways?
11 A.  No.
12 Q.  In other words, I'm right; it's been the same way with
13 Ways?
14    MR. PADDISON: Form.
15    You can answer if you understood the question.
16 A.  I don't get what you're asking.
17    BY MS. PRESCOTT:
18 Q.  Okay.  I asked it in a way that makes the answer
19 ambiguous.  It's not your fault.
20    Ways, it's the same thing?  Nobody has ever asked
21 you, relative to investigating the Parker matter, "Hey,
22 how do you go back with Ways?  How do you know the guy?
23 Are you good --" those kinds of questions about your
24 relationship?
25 A.  No.

---

Page 56

1 Q.  Ways said that he couldn't really imagine a circumstance
2 in which he would ever say anything bad about you.
3    Do you feel the same way about him?
4 A.  That I could say anything bad about him?
5 Q.  Yeah.
6 A.  No.
7 Q.  Do you feel that -- I mean, can you picture a set of
8 circumstances in which you would, you know, say anything
9 negative about him?
10 A.  No.
11 Q.  How about Townson?
12 A.  No.
13 Q.  Both of them said that, you know, you got -- that they
14 feel, you know, that they would take a bullet for you.
15    Do you feel the same about Ways and Townson?
16 A.  Yes.
17 Q.  You guys are all very good friends?
18 A.  Yes.
19 Q.  You -- have you ever been in a position where you've
20 given a statement as to another officer being accused of
21 excessive force?
22    So, somebody in your department, maybe, or your
23 precinct, and they called you in, and you've given a
24 statement about someone else being accused of excessive
25 force?

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 57

1  A.  I'm sure I have.  But, like I said, I spent half my
2  career in Narcotics and it was -- we were always getting
3  complaints.  But, again -- I don't know if you
4  understand, and I'm not trying to give you a hard way to
5  go -- it would be a complaint against the whole raid
6  crew.
7  Q.  Okay.
8  A.  If you were -- for example, if you were involved in a
9  raid, and even if you're in rear security, you still had
10  to come down and make statements of what you heard and
11  what you know of that's happened to each raid crew
12  thousands of times.
13  Q.  And have you ever given a statement where you expressed
14  the view that you thought someone did use force that was
15  beyond what the situation called for?
16  A.  No.
17  Q.  And have you ever heard of any police officer saying
18  another police officer used force beyond what a
19  situation called for?
20  A.  No.
21  Q.  You've been an officer before, during and after
22  something called a consent decree.
23     Do you remember when that came and went?
24  A.  Yes.
25  Q.  What makes you sort of laugh about it?

Page 58

1  A.  Nothing.
2  Q.  Well, something did.
3     What was it?
4  A.  It's just stupid to me, but I didn't make the laws.
5  Q.  What about it was stupid?
6  A.  It's hard to explain, ma'am.
7  Q.  Well, do your best.
8  A.  Just certain laws that -- certain things that changes
9  how you can work and --
10     THE REPORTER:  Excuse me?
11  A.  How we could work.
12     THE REPORTER:  Thank you.
13  A.  You know, more paperwork.  You know, it was just extra
14  paperwork where as opposed to back in the day you would
15  do a PCR.  Now they added extra, extra paperwork where
16  an arrest would normally take 30 minutes.  It would take
17  almost an hour or whatnot.
18     BY MS. PRESCOTT:
19  Q.  Do you understand why there was a consent decree?
20  A.  Yes and no.
21  Q.  What do you understand caused the consent decree to be
22  entered?
23  A.  Something that happened, an investigation with several
24  officers in the past and other cities and stuff,
25  something the mayor, ex-mayor Dennis Archer had brought

Page 59

1  up.
2  Q.  Okay.  Was there a pattern and practice of Detroit
3  police officers using excessive force?
4  A.  I have no idea.
5  Q.  You're not sure?
6  A.  No.
7  Q.  Was there a failure to train them; if you know?  Train
8  the officers about use of force?
9  A.  You start having use of force classes when we go for our
10  40-hour training.
11  Q.  Okay.  But was there -- I mean, was that part of what
12  went into the consent decree; if you know?
13  A.  I don't know.
14  Q.  Was there a history of unconstitutional police shootings
15  here in Detroit?
16     MR. PADDISON:  Objection.  Calls for speculation.
17  Answer if you know.
18  A.  I have no idea.
19     BY MS. PRESCOTT:
20  Q.  Okay.  Was there a recurring problems with excessive use
21  of force with citizens in Detroit?
22     MR. PADDISON:  Same objection ongoing.
23  Go ahead and answer if you know.
24  A.  I have no idea.
25     BY MS. PRESCOTT:

Page 60

1  Q.  Was there a -- like a failure to kind of follow up when
2  there were citizen complaints and, you know, get to the
3  brass tacks about whether something real had needed to
4  be done?
5  A.  I have no idea, ma'am.  That's above my pay grade.
6  Q.  Okay.  So, what -- so, some paperwork was instituted
7  that made processing arrests more detailed.  You just
8  testified about that.
9     Anything else that changed for you day-to-day
10  before versus after the consent decree?
11  A.  No.
12  Q.  Okay.  And do you -- in your 23 and a half years, have
13  you ever known an officer to be disciplined because of
14  excessive force?
15  A.  Did I work with one or have I heard rumors about one?
16  Have I seen one or --
17  Q.  Well, let's start with any information you know about
18  any particular person that was removed for excessive use
19  of force.
20  A.  I just heard rumors of officers that were accused.
21     But as far as me working with them, as it being my
22  partner or whatnot, no.
23  Q.  Anyone you know of?
24  A.  No.  I can't think of any names.
25  Q.  Okay.  Was there an allegation with regard to Crenshaw

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

---

Page 61

1  that investigation into the situation was slanted or
2  skewed because -- in your favor?  Do you know that?
3  **A.  I had never got in any trouble before that, ma'am.**
4  Q.   Did you know that there was an allegation that the
5  department covered for you in that situation?
6  **A.  No.**
7  Q.   And so you sit here today and you have no idea how much
8  money has been paid in settling cases of excessive force
9  involving you; right?
10  **A.  No.**
11  Q.   And you don't even know if $1 has been paid at all; is
12  that right?
13  **A.  No.  I know that something was paid to Mr. Crenshaw, but**
14  **they would not tell me the amount.  They said I don't**
15  **have to worry about that.**
16  Q.   And what about anybody else?  Do you know whether any
17  other money has been paid?
18  **A.  No.**
19  Q.   Okay.  At have you ever heard of an officer being
20  removed or even disciplined for dishonesty in a use
21  of force investigation?
22  **A.  I've heard of officers that's been what we call getting**
23  **Giglio, but as far as --**
24      THE REPORTER: I'm sorry.  "-- getting --"
25  **A.  Giglio.  Getting caught up in lies and testifying.**

---

Page 62

1      **But as far as me working with them and all that,**
2  **no.**
3      **BY MS. PRESCOTT:**
4  Q.   So, no one you know?
5      Like you could give me a name?
6  **A.  No.**
7  Q.   How many times have you given Garrity statements?
8  **A.  Wow.**
9      **Several.**
10  Q.   Can you -- could you put a specific number on it?
11  **A.  No.**
12  Q.   When was the last one?
13  **A.  With Mr. Parker.**
14  Q.   And how long before Parker was the one -- you know, like
15  how long had it been by the time you go do the Parker
16  one?
17  **A.  I couldn't give you a date on that.**
18  Q.   Okay.  And you did say that you went down and that there
19  was a time you talked to the union lawyer, the DPOA
20  lawyer with regard to Parker.  Putting that aside and
21  putting aside the school, the kids, the report, I know
22  you went to the Garrity.
23      Did you ever have like a second Garrity or -- that
24  came back around, the same ladies came back and asked
25  you questions again about Parker?

---

Page 63

1  **A.  As I recall, it was just one time.**
2  Q.   Okay.  When we add in the Trask -- am I saying that
3  right?  Trask?
4  **A.  I believe so.  I never knew that guy.**
5  Q.   Who was your partner with regard to that situation?
6  **A.  I was off duty.**
7  Q.   Okay.  Okay.  And you did tell me who was in your car.
8      Okay.  So, we have Trask and this February of '17
9  thing and Parker and Crenshaw, and Edward Robinson,
10  Junior, and the raid with the house with the dogs.
11      Are there any other times where you shot someone on
12  or off duty anywhere?
13  **A.  Just dogs.**
14  Q.   Okay.  And had the dogs been with regard to raids in
15  narcotic situations?
16  **A.  Yes.**
17  Q.   How many times have you shot a dog?
18      MR. PADDISON: Objection to relevance.
19      Go ahead and answer.
20  **A.  I can't count.  I was the shotgun guy, so I was first**
21  **person in.**
22      **BY MS. PRESCOTT:**
23  Q.   Dozens and dozens?
24  **A.  I can't give you a count, ma'am.**
25  Q.   Is it -- I mean would you estimate it -- I don't need a

---

Page 64

1  specific count.
2      What do you estimate?
3  **A.  It was a lot.**
4  Q.   Relative to -- okay.  So, you're out with Ways on the
5  night that the shooting -- well, what ultimately ended
6  up happening with Parker, you had worked that day.
7      How long had it been between work and when you
8  started hanging out with Ways?
9  **A.  Well, when I got off work, I called to see where he was**
10  **going to be at.  I told him where I was going.  He said**
11  **they would be over there to meet me, and as soon as he**
12  **got there -- I mean, within seconds -- he got the phone**
13  **call from Townson.**
14      THE REPORTER: "-- from --"?
15  **A.  Townson.**
16      **BY MS. PRESCOTT:**
17  Q.   Okay.  And so where do you guys meet?
18  **A.  One of our friend's house that's close to the precinct,**
19  **as I recall.**
20  Q.   Also an officer?
21  **A.  No.**
22  Q.   Oh, another friend's house.  Okay.
23      And had you been home already, or did you come
24  straight from work?
25  **A.  No, I didn't go home first.**

---

Parker vs.                                                      Police Officer Gerold Blanding
City of Detroit, et al.                                             October 12, 2017

---

Page 65

1 Q.  Okay.  And so when you're in the 10th Precinct, are you
2   the kind of officer walking around in a DPD uniform?
3   Are you in street clothes?  Like what is your normal
4   when you go out?
5 A.  Department-issued special ops uniforms:  Green pants,
6   black shirt, badge on the outside, duty belt on the
7   outside, issue black coat.
8     I can't recall -- because I got issued two of them.
9   One has your name on it and it has a badge, and then one
10   doesn't, but they're both department-issued.  It just
11   depends on the weather.
12 Q.  Okay.
13 A.  And we also have hoodies that are marked, but it just
14   depends on the weather.
15 Q.  Okay.  So, like in an August situation, you would have
16   been wearing -- you still wear the pants and then the
17   black shirt?
18 A.  Yes.  It was cold that day for some reason.
19 Q.  It was a cold day?
20 A.  Yeah.
21 Q.  Okay.  That happens.
22     Okay.  So, that's what you're wearing when you go
23   hang out with Ways, go and hang out with him?
24 A.  Well, we were going to the friend's house, and I know --
25   out of habit, I normally keep different clothes in my

---

Page 66

1   car.  So, I can't recall what had -- I know I had the
2   pants on.  I know I had the duty belt on.  I know I had
3   the shirt on.  But as to what jacket I put on that day,
4   I don't recall.
5 Q.  Okay.  And then do you ever change out of that stuff?
6 A.  No.
7 Q.  Okay.  So, you're in that stuff.
8     And then you get into his car when you guys take
9   off, or he into yours, or how does that work?
10 A.  I got in his car.
11 Q.  Okay.  Is that a personal car or a Detroit PD car?  What
12   was it?
13 A.  Then that was his personal car.
14 Q.  Did it become a City car?
15 A.  No.  He works somewhere else now, so that's why I'm
16   saying it was his personal car.
17 Q.  Okay.  All right.  So, you get in his car and you're --
18   is there anyone else in the car?
19 A.  No.
20 Q.  And do you have like a radio that you keep with you for
21   when you're on duty?
22 A.  Yes.  They did issue us one, but I'm sure mine was in my
23   bag in my trunk.
24 Q.  Okay.  You don't remember having it that night?
25 A.  I could have, but it would have been in my trunk.

---

Page 67

1 Q.  I guess I should have been clear.
2     You don't -- you didn't have it when you were in
3   the vehicle with Ways?
4 A.  No.
5 Q.  Okay.  Does he have his?
6 A.  I have no idea.
7 Q.  Okay.  And then you have your gun?
8 A.  Department-issued gun.
9 Q.  Uh-huh.  And what do you do like with your -- do you
10   carry handcuffs?
11 A.  Yes.
12 Q.  Okay.  So, that's on your belt and whatnot?
13 A.  Yes.
14 Q.  Okay.  And that stays --
15 A.  On-duty belt.
16 Q.  That whole stuff stays with you the whole night?
17 A.  Yes.
18 Q.  So, what else is on there?  Like mace?
19 A.  Extra mags, pepper spray, flashlight, emergency gloves,
20   the holster, my PR-24 clip, but I don't -- I have I
21   wouldn't have carried that off duty.  It would have been
22   in my duty bag.
23 Q.  Okay.  So, those are things on your belt and you're in
24   the truck with him.  And you take off just driving.
25   You're not sure where you're going, or do you like get

---

Page 68

1   the call and not go anywhere until you get the call?
2 A.  Ways got the call.
3 Q.  Okay.  So, Ways gets a call.
4     And what's the first you know of what's going on?
5     What do you first hear?
6 A.  I said -- I asked him, "What's up?"
7     And he said -- well, his exact words was, "CT's son
8   is in trouble."
9 Q.  Okay.  CT was the nickname you guys used for him?
10 A.  For Townson.
11 Q.  Yeah.
12     And one of you is Junior?
13 A.  Me.
14 Q.  You.  Okay.
15     And so do you know Townson's son's mom at all?
16     Her name is Sanchez.
17 A.  Never -- never met her.
18 Q.  Okay.  And so you don't know anything about Parker and
19   Sanchez and Townson and any of that?
20 A.  Nothing.
21 Q.  Okay.  So, Ways says Townson's kid is in trouble.
22     And what else does he say?
23 A.  He's back and forth trying to call Ways, like his phone
24   kept going to voice mail.  Then they were back and forth
25   calling each other.

---

Parker vs.                                                                      Police Officer Gerold Blanding
City of Detroit, et al.                                                              October 12, 2017

---

Page 69

1  Q.  Okay.  Why?  Like what's --
2  A.  Because he's trying to see -- I had never been over to
3    that house.
4  Q.  Okay.
5  A.  Never met that man, never -- I never even knew where his
6    son -- I seen his son before, but I think he came with
7    him to the precinct before.
8  Q.  Okay.
9  A.  But Ways knew apparently where she lived, and where his
10    son had lived.
11  Q.  Okay.
12  A.  I didn't.
13  Q.  Okay.  So, like -- so, is the calling trying to meet up?
14  A.  See where he's at.
15  Q.  Get to where --
16  A.  See where he's at and see what's going on.
17  Q.  Okay.  All right.  And so you hear that the son is in
18    trouble; right?
19  A.  Yes.  He said -- all I heard him say, "Daddy, help me.
20    Come get me," or something.
21  Q.  Okay.  And part of the discussion, too, is to see who is
22    closest and who can get there fastest?
23  A.  Yeah.  Because I knew -- I remember him saying -- asking
24    where he was at.  He didn't know I was with Ways at the
25    time until -- once he did talk to him, he said, "Junior

---

Page 70

1    is with me."
2      But I knew for a fact that Ways stayed, at the
3    time, way out in Southfield.  So, I guess he was -- I'm
4    assuming he was calling to see who was closer to get to
5    that house.
6  Q.  Between you and --
7  A.  No.  Between Ways and Townson.
8  Q.  Okay.
9  A.  I just happened just to be getting ready to hook up with
10    Ways.
11  Q.  When you -- you don't have any personal anything going
12    on in this house at any time that you're heading over to
13    Sanchez's house?
14  A.  No.
15  Q.  And -- but that's not something that -- has anyone ever
16    asked you about that before now that you can recall?
17  A.  I've never even met her, ma'am.
18  Q.  I know.
19      But like at DPD, when they were looking into this,
20    did anyone ever say like, "Do you know this lady?  Do
21    you know anything about her?"
22  A.  I'm sure they have, but I can't recall exactly what was
23    asked.
24  Q.  Okay.  Would everything that you know of the questions
25    you got asked be whatever we have from Garrity?

---

Page 71

1  A.  Yes.
2  Q.  Okay.  And with regard to when you gave your Garrity
3    information, were you honest with them?
4  A.  Yes.
5  Q.  Okay.  And when you wrote your report about what
6    happened, you know that you're doing that in your
7    capacity as a police officer, and you have to be
8    complete and honest and correct with that; right?
9  A.  Yes, ma'am.  I have a good record.
10  Q.  And when you did complete a report about this incident,
11    were you honest in it?
12  A.  Yes.
13  Q.  Okay.  And did you give complete information in it?
14  A.  Yes.
15  Q.  Did you leave out anything, you know, omit anything
16    major that happened or --
17  A.  No.
18  Q.  Okay.  So, when was the last time you saw your report
19    about this incident?
20  A.  Earlier today.
21  Q.  Okay.  And when was the last time before that?
22      So, like, I mean had you just put it into the
23    system and then today was the next time, or was there
24    something in between?
25  A.  They give you a report when you -- as I recall, when you

---

Page 72

1    go to Garrity to refresh your memory.
2  Q.  Uh-huh.  Was there anything that occurred on the night
3    of the shooting that wasn't part of the report for any
4    reason?
5      Like the before stuff or the after stuff or
6    anything?
7  A.  No.
8  Q.  Okay.  And the report that you write up is made the same
9    night as the shooting; right?
10  A.  Yes.
11  Q.  And that's so that you can quickly get down the detail
12    while you remember it the best; right?
13  A.  Yes.
14  Q.  What else did you look at today?
15  A.  That's it.
16  Q.  Just your report?
17  A.  Yes.
18  Q.  Have you ever listened to your Garrity statement?
19      MR. PADDISON:  You can answer.
20  A.  Yes.
21      BY MS. PRESCOTT:
22  Q.  When was the last time you listened to that?
23  A.  Today.
24  Q.  Okay.  So, other -- so, other than the Garrity and the
25    report, is there anything that you looked at, listened

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 73

1  to, touched, examined, anything?
2  **A.  No.**
3  Q.  Okay.  So, those are the two things?
4     There's nothing else?
5  **A.  As far as me, yes.**
6  Q.  Okay.  And is there -- have you read the lawsuit in this
7     case?
8  **A.  Advised of bits and pieces of it.**
9  Q.  When was the last time you looked at the Complaint?
10  **A.  I never personally just looked at it.  I was just**
11  **advised of bits and pieces of it.**
12  Q.  I see.  And relative -- excuse me.
13     Have you listened to Ways' or Blanding's Garrity
14     statements?
15  **A.  I am Blanding.**
16  Q.  I apologize.
17     Ways' or Townson's Garrity statements?
18  **A.  No.**
19  Q.  Have you ever seen a transcript of anybody's anything in
20     this case?  Garrity, deposition, anything?
21     I can show you what it looks like.  A transcript
22     would be like --
23     **MR. PADDISON:** She's just asking about if you
24     reviewed --
25     **BY MS. PRESCOTT:**

Page 74

1  Q.  -- questions and answers.
2     **THE REPORTER:** Excuse me?
3     **MR. PADDISON:** She's just asking about if you've
4     reviewed Blanding's or --
5  **A.  Oh.**
6     **BY MS. PRESCOTT:**
7  Q.  What was said, questions and answers.
8  **A.  No.**
9  Q.  Okay.  Have you read Ways' or Townson's reports from the
10     night of the incident?
11  **A.  As a practice, you will always read your partner's**
12  **report or your partner reads your report.  Your**
13  **supervisor reads your report, you know, spelling and all**
14  **this, and going over penmanship, you know, before you**
15  **submit it, so that you don't get the report back the**
16  **next day and have to make corrections.**
17  Q.  Okay.  So, the night that you guys would have written
18     your reports, you would have seen each other's reports
19     before they were finalized?
20  **A.  I can't remember if they separated us.**
21  **Yeah.  They did separate us for a minute, and**
22  **they -- I was spoken to by Force Investigation, Internal**
23  **Affairs, and they were spoke to by Force and Internal**
24  **Affairs, and that's when they told us we can go ahead**
25  **and do our reports.**

Page 75

1  Q.  Okay.  Who at Force and/or IA talked to you before you
2     did your report?
3  **A.  I don't know, ma'am.  There were so many people there.**
4  Q.  Did you -- were you asked questions -- I mean, was
5     there -- did you just say what happened, or did they
6     just say, "Here is what's going to happen.  You know,
7     here is how we're going to handle this"?
8  **A.  I can't remember, ma'am.  It was confusing.  There was a**
9  **bunch of people there.**
10  Q.  So, you call in your union rep and -- right?
11  **A.  I didn't.**
12  Q.  Your union rep --
13     **THE REPORTER:** I'm sorry.  "Did" or "did not"?
14  **A.  I said I did not.**
15     **THE REPORTER:** Thank you.
16     **BY MS. PRESCOTT:**
17  Q.  Your union rep shows up.
18  **A.  A union rep would show up.**
19  Q.  Okay.
20  **A.  But as far as if it's the one from the 10th Precinct, I**
21  **don't have any idea.**
22  Q.  Okay.  Relative to anyone from Force or IA on the night
23     of the shooting, can you recall any questions that
24     anyone asked you that night?
25  **A.  Just if I was okay.**

Page 76

1  Q.  Okay.  But you said that they separated you, so that --
2     I thought maybe they questioned you some, but you don't
3     remember any questions?
4  **A.  No.  They separated us.  I can't remember the guy's**
5  **name.  One of the union guy's came.  For some reason it**
6  **was cold that day.  I sat there in the car and just**
7  **waited until they said I was clear to go back to the**
8  **station and do paperwork.**
9  Q.  Okay.  So, then you and Ways and Townson go back to the
10     station?
11  **A.  Not together.**
12  Q.  Right, but, I mean -- well, whose car did you go in?
13  **A.  It was either some of the guys from the night crew, a 30**
14  **Series, or -- I can't remember if one of the supervisors**
15  **took me or -- I can't remember.  But I did not ride with**
16  **Ways and Townson.**
17  Q.  Okay.  Does Ways drive his car in?
18  **A.  I believe he did.**
19  Q.  Okay.  And then so you write your report.  And then
20     before it's finalized, you go through the process you
21     described earlier of exchange them, and then the
22     sergeant looks at them as well?
23  **A.  Yes.**
24  Q.  Okay.  So, is that the last time you reviewed Ways and
25     Townson's reports?

Parker vs.                                                    Police Officer Gerold Blanding
City of Detroit, et al.                                          October 12, 2017

---

Page 77

1  A.  I believe so, yes.
2  Q.  Okay.  So, you know you're going to be going to -- at
3    some point along the line you are told that you're going
4    to go to Curtis and Mendota to help Townson's kid?
5  A.  To see what was wrong, yes.
6  Q.  And the goal of getting over there is to go help keep
7    the peace?
8  A.  To see what -- we was going to see what was wrong,
9    ma'am.  I had no idea what they were -- they were
10   talking on the phone.
11 Q.  Ways and Townson were?
12 A.  Yes.
13 Q.  Okay.  And so what you know is the kid is calling for
14   help?
15 A.  Yes.
16 Q.  What about 911?
17   Had someone tried calling 911?
18 A.  I have no idea.
19 Q.  Okay.  And the first you see Townson that night is
20   where?
21 A.  When we got there, he was squared off in the street as
22   if he was about to fight Mr. Parker.
23 Q.  Do you see him before you arrived at Curtis and Mendota?
24 A.  No.
25 Q.  When was the last time before Curtis and Mendota and the

---

Page 78

1    night -- and you just described squaring off.
2      When was the last time, back in time from then,
3    that you had seen Townson?  Like had you seen him at
4    work earlier that day or 10 minutes before at the
5    7-Eleven, or it had been a week or what?
6  A.  No.  He has been off with some injury.  But I would call
7    and check on him.
8  Q.  Okay.  So, it had been a while since you had seen him?
9  A.  Physically, yes.
10 Q.  Okay.  But -- physically laid eyes on him, but you kept
11   in touch, is what you're saying?
12 A.  Yes.
13 Q.  Okay.  So, you did not meet with him ahead of going to
14   Curtis and Mendota?
15 A.  No.
16 Q.  Okay.  Do you know why Officer Ways says under oath
17   that, yes, you did?
18 A.  I didn't.  We didn't.
19 Q.  Okay.  Officer Ways is honest, isn't he?
20 A.  Yes.  He apparently knew where he was going.  I have
21   never been to that house.  I didn't know where the
22   baby's mother lived or nothing.
23 Q.  Okay.  But -- so, you didn't stop in a parking lot and
24   meet up with Townson and drive over to Curtis and
25   Mendota together and arrive together?

---

Page 79

1  A.  No.
2  Q.  Okay.  So, Ways is lying if that's what he says is what
3    went down?
4      MR. PADDISON:  Mischaracterizes his testimony.
5      BY MS. PRESCOTT:
6  Q.  Is Ways lying?
7  A.  No.
8  Q.  Well, then what do you think is going on?
9  A.  I don't know, ma'am.  He was on the phone with him.  So,
10   I don't know if he was telling him the address or
11   whatever.  I don't know if he followed him or what.  But
12   we -- I know we didn't stop.
13 Q.  You didn't go to the Northwest Activity Center?
14 A.  No.
15    That incident was not far from there --
16 Q.  Okay.
17 A.  -- actually.
18 Q.  But you didn't meet Townson at the Northwest Activity
19   Center before going over to Curtis and Mendota?
20 A.  No.
21 Q.  So, if Ways said you did, then that is untrue; right?
22    MR. PADDISON:  Objection.  Calls for speculation.
23    BY MS. PRESCOTT:
24 Q.  Right?
25 A.  I don't remember us stopping, ma'am.

---

Page 80

1  Q.  Well, do you just not remember and you think it's
2    possible or what?
3  A.  Like I said, they were on the phone back and forth,
4    going back and forth.  So, I don't know -- I don't even
5    recall -- when I first saw them, they were squared off
6    in the middle of the street.
7  Q.  Okay.  My question to you is, you did not connect with
8    Officer Townson and meet up with him at Northwest
9    Activity Center?
10 A.  No.
11 Q.  Okay.  And Ways answered that same question "yes."
12    So, he is giving untrue information; right?
13    MR. PADDISON:  I think you're asking two different
14   people the same question.  The answers could be
15   different and both be true.
16    MS. PRESCOTT:  Okay.  I'll just ask him.
17 A.  I don't recall stopping, ma'am.  I know when we got
18   there, I saw them squared off in the street.  I know
19   what car was Townson's, and I saw his car parked in
20   the -- in a driveway.
21    BY MS. PRESCOTT:
22 Q.  And you didn't follow him over to Curtis and Mendota?
23   You didn't follow Townson to Curtis and Mendota from the
24   Northwest Activity Center?
25 A.  Again, when I got there, they were already squared off

---

Parker vs.                                                          Police Officer Gerold Blanding
City of Detroit, et al.                                                    October 12, 2017

---

Page 81

1   in the street.  You could see Townson's car parked in a
2   driveway.
3   Q.   Okay.  So, you didn't all exit your vehicles together at
4   the same time; right?
5   A.   Ways and I did.
6   Q.   But not with Townson; right?
7   A.   No.
8   Q.   So, if Ways said, yes, you did, that's also untrue
9   information; right?
10  A.   Ma'am, I'm telling you what happened.
11  Q.   Okay.  And the answer is, you did not exit your vehicles
12  at the same time as Townson because, according to you,
13  he was already standing in the street; right?
14  A.   Yes.
15  Q.   Okay.  So, what we'll do is -- I've just taken a north,
16  west, east, south look at how Mendota and Curtis run.
17  We'll mark it as Exhibit 1.
18       (Deposition Exhibit 1 marked
19       for identification.)
20       MR. PADDISON:   I'll just place an objection due to
21  the fact that the drawing marked as Exhibit 1 is not to
22  scale.
23       BY MS. PRESCOTT:
24  Q.   Okay.  Can you in your -- with your red, can you mark an
25  "X1" where you -- where the car pulls up?

---

Page 82

1   So, you're in the car with Ways.  And so I'm
2   talking about "X1" will be your car -- the car -- his
3   car, the car you're riding in.
4   A.   (Drawing diagram.)
5   Q.   Okay.  Thank you.
6        And then I'm going to hand you green, and if you
7   could put an "X2" where you see Townson at that time?
8        So, it's as you pull up.
9   A.   I couldn't see the count of the houses that they were
10  down from.
11  Q.   Okay.  Okay.
12  A.   I couldn't --
13  Q.   About where do you think he was, not -- understanding
14  that you're not taking -- you're not going to agree or
15  disagree about where the houses sit or how many there
16  are.
17       About where do you think Townson is?
18  A.   You said mark it how?
19  Q.   "X2."
20  A.   It was further down the block, ma'am.  I think it was
21  more houses.
22  Q.   Okay.  So, ignore --
23  A.   If I were to guess, I would say between here and here.
24  Q.   Okay.  So, you can draw in a circle and mark an "X2"
25  where around it would have been.  That's fine.  It

---

Page 83

1   doesn't have to be exact.
2   A.   (Drawing diagram.)
3   Q.   Okay.  So -- okay.  So, that's -- if that represents
4   Townson, how far away from Parker from Townson?  Is he a
5   house away?  Is he, you know, a foot away?
6        Why don't we have Parker be blue, and do an "X3."
7   A.   (Drawing diagram.)
8   Q.   Is he closer to you?  Further from you?
9   A.   They were right in the street in front of the house.
10  Q.   Okay.  And how close to each other are they relative to
11  how, you know --
12  A.   They were -- like I said, they were squared off as if
13  they were going to fight.
14  Q.   Okay.  So, they were arm's length apart?  Is that what
15  you're trying to say?
16  A.   From what I could see, that's what I would say.
17  Q.   Okay.  Okay.  So, draw in as best you can Parker in blue
18  with an "X3."
19  A.   Okay.
20  Q.   Okay.  And -- okay.  And do you get out?  What do you do
21  as soon as you pull up?
22  A.   I get out the passenger side, and I look down the
23  street, and that's when I saw them squared off.  You
24  could hear them arguing, but as to what they were
25  saying, I had no idea.

---

Page 84

1   Q.   Okay.  So, when you get out, does Ways get out or does
2   he sit?
3   A.   He gets out.
4   Q.   Okay.  And so do you start walking?  Do you sit tight?
5   What do you do?
6   A.   Ways was ahead of me.  He started walking down there.  I
7   stayed near his vehicle the whole time because I was
8   trying to see what was going on, see who else was out
9   there.
10  Q.   Okay.  So, can you draw Ways' path with the red?
11       So, Ways is red, and he starts at "X1."
12       Tell me -- show us on the thing where he gets to.
13  A.   About down here.
14       Not all the way quite to them.
15  Q.   Okay.  So, why don't you do an "X4" about where you
16  think he stops?
17       I mean, you drew a little arrow to where -- what
18  direction he went, but does he stop, or is he just
19  heading that way?
20  A.   He stopped because he took off running.
21  Q.   Okay.  So, Ways stops because Parker takes off?
22  A.   Yes.  He takes off running.
23  Q.   Okay.  So, did Ways only get as close to Parker as
24  you've drawn in on Exhibit 1 so far?
25  A.   I couldn't give you the exact, ma'am.  It was dark out

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 85

1 there. Right here was a streetlight. I'm watching what
2 was going on, assessing the situation.
3 Q. Okay.
4 A. Ways starts going down there as soon as he says, "Oh,
5 it's like that. I've got something for you, niggers,"
6 and he took off. That's when I told him to start coming
7 back.
8 Q. Okay. So, how long are you basically at 1 -- "X1"
9 before you -- do you see Parker running?
10 A. Yeah, I could see somebody take off.
11 Q. Okay. And how long are you hanging out at -- around
12 "X1" before that happens?
13 A. Once I saw him take off, I'm yelling at Ways to come on,
14 to come back. CT was yelling for his son to get his
15 stuff, get his stuff, "Let's go. Let's go. Let's go."
16 Q. Okay. But I'm just trying to get a sense of how long
17 you're there before running occurs, running off.
18 A. Within seconds.
19     As soon as he saw Ways and -- walking down there,
20 that's when he took off.
21 Q. Okay. So, we drew in Ways walking along Curtis
22 eastbound, and you stay by the car on the curb, which is
23 the southwest curb?
24 A. Yes.
25     Then I later had walked over, but I still stayed

Page 86

1 close to his vehicle.
2 Q. Okay. So, let me just unpack a couple of things
3 backwards with some things you said in follow-up.
4     So, are you hearing what Parker and Townson are
5 saying to each other?
6 A. Just -- not verbatim, just them arguing.
7 Q. So, you know that there's an argument, but you don't
8 hear any of the words?
9 A. No.
10 Q. Okay.
11 A. Only words I heard was, after I heard him say, "Oh, it's
12 like that. I've got something for you, niggers," then
13 once he took off, I heard Townson yelling to his son,
14 "Come on. Get your stuff. Let's go. Let's go. Let's
15 go."
16 Q. Okay. Where is Parker when you say he said what you
17 just testified to twice?
18 A. He took off northbound.
19 Q. Is he at "X3" when you hear that?
20 A. Approximately, ma'am. It happened so quick. They were
21 squared off. Assuming when he saw Ways, that's when he
22 took off.
23 Q. Okay.
24 A. And I didn't see him. I didn't know -- I was so far, I
25 couldn't tell if he went to a house, or if he went

Page 87

1 between houses.
2 Q. Okay. And so -- but he says this, "Oh, it's like that"
3 and "I've got something for you," he -- before he's --
4 or as he's running away or before he runs --
5 A. That's not what he said. He said, "I've got something
6 for you, niggers."
7 Q. Okay. When? Is he running?
8 A. Once he looked down and saw Ways walking.
9 Q. Okay. So, before he takes off running?
10 A. Yes.
11 Q. Okay. And you never hear any other words that he or
12 anybody else says?
13 A. No.
14 Q. You don't hear anything Ways says to anybody?
15 A. No.
16 Q. Like does Ways talk to Parker?
17 A. No. Again, from what I saw, he didn't get a chance.
18 Q. Okay. And so if he testified that he was talking to
19 Parker, you just couldn't hear that?
20 A. I couldn't hear nothing, ma'am. I heard what he was
21 saying and I'm assessing the situation. From here was
22 the only street light. Down there it was dark.
23 Q. Okay. And so --
24 A. And I could see Townson's car only because it's silver.
25 Q. Okay. Is Parker -- does he have his shirt on? Does he

Page 88

1 not have his shirt on?
2 A. As I recall in my report, he had on a tank top.
3 Q. Okay. Did you ever see him with his shirt off that
4 night?
5 A. Not that I recall.
6 Q. And you say -- okay. So -- when you say that Parker and
7 Townson are squared off, do they ever lay any hands on
8 each other?
9 A. Not that I saw.
10 Q. Do either of them ever try to take a swing at either
11 one?
12 A. Not that I saw.
13 Q. Did you ever see any contraband on Parker that night?
14 Any drug paraphernalia, anything stolen, any weapons,
15 anything?
16 A. I saw a gun later when he came back down Mendota.
17 Q. Okay. Anything other than that?
18 A. No.
19 Q. All right. And Ways is armed at the time he leaves the
20 car; right?
21 A. I don't know.
22 Q. Did he have a gun that night at all?
23 A. I don't know.
24 Q. Okay. And do you -- Ways testified that Parker said, "I
25 ain't about to fight you because you brought your boys

Parker vs.                                                    Police Officer Gerold Blanding
City of Detroit, et al.                                           October 12, 2017

|  | Page 89 |
|---|---|

1　here to jump me."
2　　Do you remember that?
3　**A. I didn't hear any of that.**
4　Q. Okay. And can you draw -- so, we have Parker standing
5　there with the blue "X3."
6　　Can you draw his path as he runs away?
7　**A. He ran somewhere northbound. Like I said, I was so far**
8　**I couldn't tell if he went into a house or if he went**
9　**between the houses. That's how far I was.**
10　Q. Okay. So, he didn't come west -- he didn't use the
11　streets like to come west on Curtis and then take a
12　right up Mendota, like close to you and then take a
13　right up Mendota?
14　**A. Not that I recall. I just remember him disappearing out**
15　**of my eyesight.**
16　Q. Okay.
17　**A. That's when I started calling for him to come back. The**
18　**next thing I know his car came down Mendota.**
19　Q. So, Ways is our person in red. We see where he's walked
20　to. And then does he turn around and go west along
21　Curtis and turn up Mendota, or does he cut through the
22　houses?
23　**A. You mean as far as did he chase him?**
24　Q. Well, we know -- did he chase him?
25　**A. No.**

|  | Page 90 |
|---|---|

1　Q. Ways didn't?
2　**A. No.**
3　Q. Okay. So, Parker is up with his -- you know, his blue
4　arrow to the north.
5　**A. Uh-huh.**
6　Q. And your -- and Ways has walked down Curtis but you're
7　just saying, "Come on. Let's go." And he turns back
8　around and walks back down Curtis?
9　**A. He's turning around and coming back to me because I**
10　**didn't know where he was going, who he had with him,**
11　**what he was going to do.**
12　Q. Okay. And so you said you saw a car -- you said, "And
13　then we saw a car."
14　　You saw a car with Parker?
15　**A. Yes.**
16　Q. Okay. So, at the time you see the car, had you been on
17　the scene for a minute, 10 minutes, an hour? Like how
18　long had you been there?
19　**A. Maybe a couple of minutes.**
20　Q. Okay. And so when you see the car, can you draw
21　yourself -- you were -- what's -- I don't know that
22　we've really --
23　　MR. PADDISON: We haven't given him --
24　　BY MS. PRESCOTT:
25　Q. -- put much of you on there.

|  | Page 91 |
|---|---|

1　　Do you mind being purple?
2　　It's purple. Snazzy color.
3　　All right. So, you get out of the car, and can you
4　draw where you are when you see the car?
5　**A. What am I? "X4"?**
6　Q. So, you were at "X1," where the car was.
7　**A. Uh-huh.**
8　Q. All right. And you're going to be purple. And you get
9　out of the car, and you said you moved across the street
10　or across the intersection or what?
11　**A. Yes.**
12　Q. Okay. So, draw your path from getting out of the car to
13　where you end up.
14　**A. (Drawing diagram.)**
15　Q. Okay.
16　**A. Somewhere right --**
17　Q. Okay. And put yourself as an "X4" there.
18　**A. (Drawing diagram.)**
19　Q. Okay. So, we can -- later, we'll go back, and we'll
20　know what we're talking about.
21　　Okay. So, now I'm going to ask you a couple
22　questions.
23　　Did you ever go further east than "X4" on the night
24　in question --
25　**A. Maybe --**

|  | Page 92 |
|---|---|

1　Q. -- before the shooting?
2　**A. Maybe a house or so, but I was looking and listening and**
3　**listening for CT to get his son. I still had no idea**
4　**what was going on, but I was looking because, like I**
5　**said, after he made that comment, I was just on alert to**
6　**see where he went, where he was coming out at and**
7　**whatnot.**
8　Q. Okay. So, maybe you went a little bit further east, but
9　did you ever make it down to where "X2" and "3"ish area
10　were?
11　**A. Never.**
12　Q. Okay. All right. So, there you are.
13　　And "X4" is where you are when you see Parker's
14　car?
15　**A. No. I hear it.**
16　Q. You hear the car? Okay.
17　**A. I hear a car.**
18　Q. You hear a car.
19　　Where is Ways at that point?
20　　Can you draw him in red with an "X5"?
21　**A. At that time he may have gotten to here in the street.**
22　Q. Okay. Now, Parker is blue, so where is the car when you
23　first make visual contact with the car?
24　**A. I hear a car squealing tires.**
25　Q. Up -- you're pointing up Mendota north?

Parker vs.                                                          Police Officer Gerold Blanding
City of Detroit, et al.                                                       October 12, 2017

---

Page 93

1  A.  It's coming from this area.
2  Q.  Okay.  So, it's -- and do you see the car coming south
3    on Mendota?
4  A.  Yes.
5  Q.  Okay.  And so that's -- and what -- it was a -- Parker?
6  A.  It was a silver Cadillac, yes.
7  Q.  Okay.
8  A.  It was Parker.
9  Q.  Okay.  You didn't know his name.  I get that.
10 A.  No.
11 Q.  So, what happens as he comes down --
12 A.  Mendota.
13 Q.  -- Mendota?
14 A.  As he's coming down, he came this way, he turned, and he
15   said, "What's up now, niggers?"
16     He didn't -- I don't know if he saw me because I
17   was standing over there.
18     The next thing you know, the window was down.  Like
19   I said, for some reason in August that day, it was cold
20   as hell, and I saw he had a gun in his hand, and he
21   turned the corner real hard, and he was going straight
22   at Ways.
23 Q.  Okay.  So -- so, can you draw in the blue -- we don't
24   necessarily have the whole of Mendota, but the path he's
25   coming south on Mendota?

---

Page 94

1  A.  Yes.
2  Q.  Okay.  So, draw that.
3  A.  (Drawing diagram.)
4  Q.  And then he turns.  And then does he slow down, or
5    what's going on?
6  A.  No.  That's when I said he couldn't see me from where I
7    moved on to the west side of the street, but I can see
8    him heading -- and he had his window down when I saw the
9    gun and him turning and going straight at Ways.  That's
10   when I fired.
11 Q.  Okay.  How fast was he going?
12 A.  Like I told them, approximately 20 miles an hour.  He
13   bent that corner kind of hard.
14 Q.  Do you remember saying he was driving 25 to 30 miles an
15   hour with tires squealing?
16 A.  I said approximately.  Approximately, ma'am.
17 Q.  If you said in the Garrity 25 to 30, is that what you
18   remember?
19 A.  That's what I remember.
20 Q.  Okay.  It was very dark; right?
21 A.  Yes.
22 Q.  And -- okay.  So -- okay.
23     Where is the gun that you say --
24 A.  In his right hand.
25 Q.  Okay.  So, which windows were down?

---

Page 95

1  A.  Just the driver's window.
2  Q.  Okay.  And then where is -- so, do you say anything to
3    him?
4  A.  To who?
5  Q.  To Parker.
6  A.  No.  I didn't have time.
7  Q.  Too fast of a rate of speed?
8     He's driving too fast?
9  A.  Yeah.  Things were going on fast.  When I saw the gun
10   and saw him turn that corner hard, going at Ways, that's
11   when all hell broke loose.
12 Q.  Okay.  And so then what happens?
13 A.  Then I fired in his vehicle into the window, into the
14   driver's side of the vehicle.
15 Q.  Okay.  So, he -- had he come around the corner at that
16   point, like by the time you start shooting?
17 A.  He was -- yes.  He was bending the corner.
18 Q.  I mean, you -- your police report says you -- as you
19   shot -- he was coming south on Mendota, and then you
20   shot, and then he turned.
21     Do you recall that?
22 A.  I recall him coming -- flying down the street.  As to
23   what angle -- south down Mendota.  To what angle I
24   started firing, he couldn't see me.  He was going
25   straight at Ways when I saw his window down with a gun.

---

Page 96

1  Q.  Okay.  Okay.  So, he -- where is -- can you draw "X" --
2    is "X5" where Ways is when you shoot?
3  A.  If the vehicle is going there, he was walking back.
4  Q.  Okay.  And is "X5" about where you are?
5  A.  Approximately.
6  Q.  Okay.  And are you at "X4"?
7  A.  Yes.
8  Q.  Okay.  And so -- and where is the car compared to Ways?
9  A.  Going straight at him.
10 Q.  Okay.  And so does Ways have his gun, at this point,
11   out?
12 A.  I couldn't see that.
13     Ways, sometimes when he's off duty, he would leave
14   it in the car and whatnot.  So, I didn't -- I don't
15   know.
16 Q.  Okay.  Do you ever see Parker's car west of Mendota on
17   Curtis that night?
18 A.  I don't recall.
19 Q.  Did you ever see his car going west on Curtis?  Because
20   I know you've drawn in that he turns to go left and go
21   east on Curtis.
22 A.  Yes.
23 Q.  So, do you ever see him going west on Curtis at any
24   point that night?
25 A.  I don't recall.  It happened so fast.

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 97

1 Q. Well, the -- I mean, he comes south and drives past, and
2 the shooting happens, and then he drives off which
3 direction?
4 A. After Ways got out of the way, he went eastbound on
5 Curtis, and then he went -- I don't know if it was this
6 street or the next street that he went southbound on.
7 Q. Okay. So, all you know is you see taillights going, and
8 then you see him eventually turn southbound?
9 A. Yes.
10 Q. Okay. And you had a bullet in the chamber, and then a
11 full clip of 15?
12 A. Yes.
13 Q. And so you shoot 16 times; right?
14 A. I don't recall how many times I shot.
15 Q. Do you -- did anyone else shoot?
16 A. No.
17 Q. And is there anything else that Parker does that night
18 that -- that you haven't described?
19 A. I was later advised, when I was at the station, from
20 another supervisor.
21 Q. Okay. Let me back up.
22 Is there anything that Parker does that night that
23 you observed that we haven't now covered?
24 A. Once I started shooting at him --
25 Q. Yeah.

Page 98

1 A. -- and saw the gun, and he was going at Ways, it
2 startled him.
3 Q. Okay.
4 A. He swerved. Then that's when he went down one of those
5 side streets southbound.
6 Q. Okay. And so can you draw the swerve in as --
7 A. I can't tell you exactly how that was, ma'am. It
8 happened so quick.
9 Q. Okay. And so is the -- so, your sense of it was that he
10 never knew you were there other than the -- once the
11 shooting, and that's what startles him?
12 A. Exactly.
13 Q. Okay. So, then he jerks the wheel?
14 A. Away from Ways, yes.
15 Q. Okay. And is Ways in the middle -- it looks like you've
16 drawn him basically in the middle of the street?
17 A. He was coming -- walking back towards me.
18 Q. Down the middle of Curtis?
19 A. Yes.
20 Q. Okay. And so you're not sure if he jerked left or he
21 jerked right? Parker, you know, swerved left or swerved
22 right?
23 A. I saw Ways jump out of the way of the vehicle. I know
24 when I started firing, it startled him. He had his
25 window down. He had a gun in his right hand. Then

Page 99

1 he -- I can't tell you if it was Birwood or the next
2 street because it happened so fast.
3 Q. Okay. What was he doing with the gun?
4 A. I thought he was getting ready to shoot at Ways and run
5 him over.
6 Q. Why?
7 A. Because when he turned the corner, he said, "I've got
8 something for you niggers now."
9 Q. Okay. He said that twice?
10 A. As I recall, he said it once, and that's when I started
11 firing. He said -- over here, he said, "Oh, it's like
12 that. I've got something for you." Then he took off.
13 Then when he came back, he said, "now" or
14 something -- "niggers" or something. I can't recall
15 exactly, but I heard him say that, and I saw the gun and
16 him going at Ways. That's the only reason why I fired.
17 Q. Well, "going at Ways." What do you mean "going at
18 Ways"?
19 A. With the vehicle at a high rate of speed.
20 Q. Okay. Having just turned a corner?
21 A. With a gun in his hand.
22 Q. Uh-huh.
23 And so he's raising the gun to shoot him and run
24 him over, according to you?
25 A. Ma'am, it happened so quick, I thought he was going to

Page 100

1 shoot at him or run him over.
2 Q. Okay. Do you remember saying that you shot while he was
3 going southbound down Mendota?
4 A. I started shooting, ma'am, as he was bending the
5 corner --
6 Q. Okay.
7 A. -- on Mendota.
8 Q. And do you remember previously saying that he was
9 driving southbound when you shot?
10 A. I said I observed him coming southbound. It's confusing
11 the way that I say when I started shooting because he
12 was coming southbound when I could see it. When he was
13 turning on Curtis, you could still see it, and that's
14 when I started shooting. As far as -- as to what angle
15 I was at, I know my rounds went towards Mendota and
16 towards this other street over here.
17 Q. Are you standing -- you're standing kind of in the
18 street?
19 A. I moved over to the west side of the street when I heard
20 the car coming.
21 Q. You moved --
22 A. I didn't know who was in the car until I saw him.
23 Q. You moved to the west side of Mendota?
24 A. No. Of Curtis. I stayed on Curtis.
25 Q. Okay. You mean the westbound part?

Parker vs.                                                      Police Officer Jerold Blanding
City of Detroit, et al.                                              October 12, 2017

Page 101

1 A.  Yes.

2 Q.  Because it's -- okay.  But you got yourself at "X4" at

3    the time of the shooting; right?  That's where you were

4    when you shot?

5 A.  Yes.

6 Q.  Okay.  All right.  I just want to make sure I'm

7    understanding it because -- okay.

8      But -- so, you don't recall -- do you recall saying

9    previously that you shot when he was driving southbound;

10   that you -- either you do or you don't.  It's --

11 A.  I don't recall.  Because, like I said, he was coming

12   down there so fast and as he was turning.

13     MS. PRESCOTT:  Okay.  So, let's just go on to the

14   other record for a second, and just give me a second.

15     (Audio recording testimony from page 102

16     excerpted and bound under separate cover.)

17     *

18     *

19     *

20     *

21     *

22     *

23     *

24     *

25     *

Page 103

1      (Non-excerpted testimony resumes.)

2      BY MS. PRESCOTT:

3 Q.  Okay.  Are you saying he went southbound down another

4    street there?

5 A.  Yeah.  That's what I just said.

6 Q.  Okay.  Then let's look at your report.

7      You've got a copy there.

8      THE REPORTER:  Are we still on the separate record?

9      MS. PRESCOTT:  No.  We can go back.

10     BY MS. PRESCOTT:

11 Q.  Okay.  So, I'll just read this, and we can go on from

12   there.

13     So, you lost sight of him.

14     "I then heard a car's tires squealing, and I

15     observed the unknown black male driving a

16     light-colored Cadillac, traveling southbound on

17     Mendota at a very high rate of speed.  I then

18     observed that the unknown black male had a pistol

19     in his hand and yelled through the open window,

20     'What's up now, niggers?'  He then drove the

21     Cadillac directly at Officer Ways and raised up

22     the pistol as if he was going to shoot at Officer

23     Ways."

24     So, I'm going to just pause right there.

25     So, this is still south on Mendota?  He's raising

Page 104

1    it up across himself?

2 A.  No, ma'am.  He was coming southbound when I saw him.

3    When he turned, he basically turned in front of me and

4    was going directly --

5 Q.  And you started shooting?

6 A.  Yes.

7 Q.  Okay.  So, let's just keep reading.

8      "I then feared for the life and safety of

9      Officer Ways and was forced to fire my

10     department-issued weapon --"

11   and you give the make and model --

12     "-- several times at the unknown black

13     male because I feared he was going to shoot

14     Officer Ways or run him over with the car.

15     I then observed Officer Ways jump out of

16     the way and fell on the south side of the

17     street."

18     So, Ways falls on the southern half of Curtis?

19 A.  I can't recall what side he fell on.

20 Q.  Okay.  So, you said here "the south side."

21     Do you think --

22 A.  Then if it was the south side, then it was the south

23   side.

24 Q.  Well, is it or isn't it?

25 A.  I can't recall, ma'am.  If I put that in my report, then

Page 105

1    that's what I said.

2 Q.  That's what you said.

3 A.  Okay.

4 Q.  Do you have any different information here today?

5 A.  No.

6 Q.  Okay.

7      "The unknown black male then drove

8      eastbound on Curtis and then in an unknown

9      direction."

10     So, why are you -- so, you see how you said --

11 A.  Right.

12 Q.  -- that after you shot him, after Ways shot -- jumped

13   out of the way, "then the unknown male then drove

14   eastbound on Curtis"?

15 A.  That's going eastbound.

16 Q.  Okay.  So, he -- you shot and then he was going -- after

17   that, he started going eastbound?

18     I'm on your report, and I'm trying to understand --

19 A.  And I understand what you're saying.

20 Q.  -- your report compared to what you're testifying.

21     MR. PADDISON:  I think --

22 A.  Huh?

23     MR. PADDISON:  Go ahead.

24 A.  I understand what you're saying.

25     I said I shot -- he started going eastbound.

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 106

1 That's when Ways got out of the way. Then he went in an
2 unknown direction. I don't recall if it was the street
3 Birwood or it's another street which would be
4 southbound.
5 BY MS. PRESCOTT:
6 Q. Okay. What I'm asking you here is, on the night in
7 question, you said you shot, Ways jumped, "the unknown
8 black male then drove eastbound on Curtis."
9 Are you here today to say that he already started
10 driving eastbound on Curtis before --
11 A. It was simultaneous, at the same time. It happened as
12 he was turning.
13 Q. All right. And then in this report you say then he
14 drove off in an "unknown direction."
15 You do not say he goes south.
16 Where did south come from?
17 A. I told the supervisors that the vehicle went southbound
18 where I was standing at. I couldn't tell -- I don't
19 even know what street this is until you put this on
20 here. You put this as a different street.
21 Q. Birwood.
22 A. I wouldn't be able to tell you that. That's not my
23 neighborhood.
24 Q. Okay. I didn't ask about Birwood. My question is, is
25 that here today --

Page 107

1 A. He went south. When I said "southbound," I remember him
2 turning right which is southbound, which to me is an
3 unknown direction because I don't know what street he
4 was on or where else he could have turned from there.
5 Q. Okay.
6 A. Other than that, we would have called that out on --
7 Q. Okay. So you are how far away from Ways when you --
8 when you start shooting? How far is "X5" from "X4"
9 about?
10 A. It's 10 feet, approximately. I'm not sure. Maybe a
11 little bit further.
12 Q. Okay. Ways testifies that he chased Parker up Mendota.
13 Is that true?
14 A. I don't recall him chasing anybody. I just saw one
15 person run off, and that was later found out to be
16 Parker.
17 Q. Okay. So, you're just not sure?
18 A. I don't recall that, ma'am.
19 Q. Okay. If he testified that that's what happened, do you
20 think that that's probably what happened, or you think
21 that's wrong?
22 A. I couldn't answer on what he said.
23 Q. That's what I'm trying to get at, your -- how closely
24 you remember it. But it sounds like you don't know?
25 A. No. I said "approximately."

Page 108

1 Q. Okay. And --
2 A. I was close enough to see a gun and close enough to see
3 him getting ready to run Ways over.
4 Q. Well -- and you must have been really close because he
5 was turning the corner right tight to you; right?
6 A. Yes.
7 Q. Okay. And so --
8 A. He didn't look in my direction. He was looking at Ways.
9 Q. Okay.
10 A. That's why I said it startled him.
11 Q. So, why -- are you trying to shoot him where? You're
12 trained to shoot people when you're going to shoot them
13 where? In the leg? In the chest? You're trained to
14 shoot them in the body; right?
15 A. You're trained to shoot, yes, ma'am.
16 Q. Biggest target; right?
17 A. Yes.
18 Q. And so how far away from Parker's car are you when you
19 shoot?
20 A. I couldn't tell you exactly that.
21 Q. It couldn't have been more than a few feet, right, based
22 on what you've drawn?
23 A. Approximately about 10 feet or less.
24 Q. Okay. And so you were -- this is your duty weapon?
25 A. Yes.

Page 109

1 Q. And your duty outfit; right?
2 A. Yes.
3 Q. And you're stepping in at this point because you're
4 going to, according to you, protect Ways' life?
5 A. Yes.
6 Q. Okay. And so that's an official police action; right?
7 You've intervened in the situation; right?
8 A. Yes.
9 Q. And do you ever say to him, "Stop. Police"?
10 A. It happened so quick, ma'am, I didn't have time.
11 Q. Well, you had time to hear him say -- what did he say?
12 A. Something. "What's up now?" whatever.
13 Q. "What's up now?"
14 A. Because he had his window down.
15 Q. Uh-huh. So, you see him --
16 A. I was close enough to hear his tires squealing for him
17 to drive right past me. For some reason he didn't see
18 me until he started -- when I started firing.
19 Q. Do you start raising your gun as you see him coming down
20 the street at you?
21 A. I had my gun ready, ready position, like I'm trained.
22 Q. I mean, like is it -- is it like at shooting, you
23 know --
24 A. No. It was in ready position like I'm trained through
25 DPD.

Parker vs.                                    Police Officer Gerold Blanding
City of Detroit, et al.                                  October 12, 2017

Page 110

```
 1  Q.  Okay.  So, you had time to raise your weapon to shoot,
 2    but not time enough to say, "Stop.  Police"?
 3  A.  It happened so fast.
 4        Yes, ma'am.
 5  Q.  Okay.  And from the time you're there to the time you
 6    shoot 16 times is how long?
 7  A.  It happened within seconds.
 8  Q.  From the time you arrived until then?
 9  A.  Yes.
10  Q.  Okay.  And other -- your co-defendants have said that
11    you-all were there for 10 minutes.
12        Do you remember -- does that sound right?
13  A.  It seemed for me, things happened fast.  As soon as I
14    got there --
15  Q.  Well, it's just one amount of time.  I mean, time is
16    time.
17        MR. PADDISON:  To clarify, it mischaracterizes the
18    testimony.  I don't think anybody gave an exact
19    10-minute time frame.
20        MS. PRESCOTT:  Okay.  Well, we can pull it out.
21        BY MS. PRESCOTT:
22  Q.  Go ahead.
23        You think you were there just a matter of a few
24    seconds before you shoot?
25  A.  I didn't say a few seconds.
```

Page 111

```
 1  Q.  Okay.  Well, do you know?
 2  A.  We were there for a short period of time, ma'am.
 3  Q.  And you -- as far as you know, it might have been
 4    10 minutes or it might have been a few seconds?  You
 5    don't know?
 6  A.  It might have been 10 minutes, or it might have been
 7    less.
 8  Q.  Okay.  And so that's what I'm missing, is if it's
 9    10 minutes, I don't understand what's going on in that
10    10 minutes.
11        Because you -- you know, you get out of the car.
12    Ways walks down.  Someone runs away.  Car comes down.
13    You shoot.
14        So, what is in the rest of that time?
15  A.  I said when we pulled up, they were in the street
16    squared off, arguing.  I couldn't hear what they were
17    saying.  Ways started walking down there.
18  Q.  Yeah.
19  A.  The next thing you know, once he saw Ways -- I'm
20    assuming he saw Ways, and that's when he made the
21    statement and ran off.  Again, like I said, I don't know
22    if he went to a house or between houses because it was
23    dark.
24  Q.  Right.
25  A.  And the next thing you know, I started yelling for Ways
```

Page 112

```
 1    to come on.  I could hear Townson telling his son, "Come
 2    on.  Let's go."
 3        Next thing you know, all hell breaks loose when the
 4    car comes flying down the street --
 5  Q.  Right.
 6  A.  -- with the window down, with him, with a gun in his
 7    right hand, and he's turned to go on Curtis, and he was
 8    going directly at Ways.
 9  Q.  Okay.  And what you -- what I think you've said is, in
10    the time it took Ways to go half a block -- because
11    you've drawn him in --
12  A.  I didn't say half a block now.  I told you earlier, I
13    don't know how many houses that was from Mendota.  I
14    mentioned that.
15  Q.  Well, I know -- we aren't -- I'm not on houses.  I
16    didn't say anything about houses.  You've drawn him
17    going about half a block -- halfway down the street and
18    coming back.  And in that amount of time, Parker is
19    back; right?
20  A.  Yes.
21  Q.  Okay.  Isn't it true that you were disciplined relative
22    to this situation?
23  A.  They gave me a -- I don't know what you call that -- a
24    verbal talk about the extra round thing.  I told them
25    why my gun was able to do that.
```

Page 113

```
 1        THE REPORTER:  Excuse me?  "-- told them --"
 2  A.  Why my gun was able to -- they changed some rule why I
 3    was able to hold that many rounds in there.  Because it
 4    was the first generation.
 5        BY MS. PRESCOTT:
 6  Q.  Okay.  Is it -- did you get disciplined about this
 7    situation or not?
 8  A.  No.  It was just a verbal counseling with my big boss,
 9    my commander.
10  Q.  Okay.  So, let's understand.
11        I would like to know about all discipline you
12    received, whether it's a verbal counseling or other
13    counselings.
14  A.  Okay.
15  Q.  Okay.  And earlier we talked about two times you said you had
16    been disciplined.  You did not mention this, so I want
17    to go back.
18  A.  If you would call that discipline.  All they did was
19    talk to me about it, and that was it.  I didn't lose any
20    days, no ACR entry, nothing.  It was just verbal.
21  Q.  Who talked to you about it?
22  A.  Commander Kyriacou.
23        THE REPORTER:  I'm sorry?
24  A.  Kyriacou.
25        Good luck on the spelling.
```

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 114

BY MS. PRESCOTT:

1 BY MS. PRESCOTT:
2 Q.  Okay.  It was a commander?
3 A.  Yes.
4 Q.  And what did you -- what were you supposed to have done
5 wrong?
6    Like what did they say was wrong?
7 **A.  He said why did I have 16 rounds in my magazine.**
8 Q.  Okay.  Was that something that was considered wrong to
9 do, to have 15 or 16 or whatever?
10 **A.  Not to me because as if he knew and understood it, if**
11 **you know anything about weapons, I had the first**
12 **generation, and they said if you have to force in 15**
13 **rounds, not to.  So, just have 14 in the mag so you can**
14 **keep the spring still fresh, and then put one in the**
15 **pipe so you'll have 15 rounds.**
16 **   My gun was one of the first generations where I**
17 **could put in 15 rounds in the mag without forcing it and**
18 **then put one in the chamber so it equalled 16 rounds.**
19 Q.  Okay.  So, did you get a verbal warning?
20 A.  Yes.
21 Q.  Okay.  Why?  Because they don't understand guns and
22 yours was really a first generation and it was okay and
23 it shouldn't have happened or what?
24 **A.  I explained to him why, and he explained to me the new**
25 **policy, how it's changed, and I said, "Okay."  I said,**

Page 115

1 "It won't happen again."
2 Q.  Okay.  At any point do you get any kind of discipline or
3 criticism, commentary of negative feedback about having
4 shot Demar Parker?
5 A.  No.
6 Q.  Or -- you know, putting 16 bullets into a, you know,
7 residential neighborhood in --
8 A.  No.
9 Q.  -- middle of the evening?
10    Does anyone ever come back to you and say, "Boy,
11 gee, nobody else saw a gun that night.  What do you make
12 of that?  No one ever --"
13 **A.  I know what I saw.**
14 Q.  But no one ever comes back to you and says, "Nobody else
15 saw a gun that night"?
16 **A.  I know what I saw, ma'am.  I can only go by what I saw.**
17 Q.  My question isn't about what you saw.  My question is
18 about what the department asked you.
19    Did the department ask you any questions about how
20 your story was different from anybody else's?
21 A.  No.
22    MR. PADDISON:  Objection.  Mischaracterizes
23 testimony.
24    BY MS. PRESCOTT:
25 Q.  Okay.  For example, no one ever came back to you and

Page 116

1 said, "Well, your partner says you met at the Northwest
2 Activity Center, and you say that didn't happen."
3    They didn't confront you with that and say, "What's
4 the truth?"
5    Right?
6 A.  No.
7 Q.  And nobody ever comes to you and says, "Your partner
8 says that 'I had to jump out of the way, and there was a
9 swerving and I was being swerved at, and then there was
10 shooting'"?
11    No one ever comes and says that to you, do they?
12 A.  No.
13 Q.  And nobody ever says, as far as you know, "Hey, do you
14 think maybe it was dangerous to shoot at a person,
15 causing them to swerve, when somebody else is standing
16 in the street?"
17    Right?  No one ever says that?
18 **A.  They asked me what was the -- what direction I fired and**
19 **what was the backdrop behind there, and I told them the**
20 **telephone pole and the grass because it was in a**
21 **downward direction.**
22 Q.  Okay.  And nobody ever says to you that, you know,
23 "Everybody else says this about the way he's driving,
24 and you say that about the way he's driving, west,
25 east?"

Page 117

1    No one ever comes back to you and tries to put the
2 stories together; right?
3 A.  No.
4 Q.  And no one ever suggests to you that, you know, "Some of
5 the stories don't line up in any way," do they?
6 A.  No.
7 Q.  And nobody ever gives you any discipline for any --
8 anything to do with your reporting of this incident,
9 whether it was truthful or not?
10 A.  No.
11 Q.  And during the investigation -- as we've already
12 covered, right -- nobody ever says to you, you know,
13 "Officer, there's been a lot of people that have been,
14 you know, shot while you have been an officer.  We want
15 to go over, you know, situation by situation," like we
16 did here today; right?
17 **A.  I only talk to my therapist about that.**
18 Q.  There's no training that you've gotten after the
19 incident with Parker because of the incident with
20 Parker; right?
21 **A.  What do you mean "training"?**
22 Q.  Well, like nobody ever said, "Blanding, you've got to go
23 to extra training."
24 A.  No.
25 Q.  Or you need to be pulled out to a particular program or

Parker vs.                                                    Police Officer Gerold Blanding
City of Detroit, et al.                                            October 12, 2017

|                                    Page 118                    |                                    Page 120                    |
| --- | --- |

**Page 118**

1    intervention of any kind; right?
2 A.  No.
3    (Deposition Exhibit 2 marked
4    for identification.)
5    BY MS. PRESCOTT:
6 Q.   And is this your signature here on the back of these
7    Interrogatories I'm marking as Exhibit 2?
8 A.  Yes.
9 Q.   Okay.  There was a set of questions and answers you had
10    to go through with your lawyer.
11    Do you remember that?
12 A.  I'm sure I did, but I don't remember.
13 Q.   Okay.  And that's what you were signing was, you know,
14    the set of questions and answers.
15    I asked about disciplinary history, and the answer
16    came back that you've gotten two written reprimands on
17    two prior occasions.  The first was related to a failure
18    to follow an administrative policy regarding department
19    paperwork.
20    Is that the report we talked about with the box?
21 A.  Yes.
22 Q.   The second being related to discharge of a firearm
23    with -- something about wildlife in an abandoned
24    location.
25    That's the other one?

**Page 120**

1    to help a friend."
2    Why did you answer it that way?
3 A.  Because that's what I did.
4 Q.   Okay.
5 A.  Once I started firing my weapon, then you
6    automatically -- you're going into police mode.
7 Q.   Okay.
8 A.  I could have easily left the location.  He would have
9    never known who I was.  I didn't.  We stayed there.  I
10    did proper notifications and waited.
11 Q.   Okay.
12 A.  I could have easily left.  He would have never known who
13    I was.
14 Q.   Okay.  You could have shot someone and then just walked
15    away from the situation?
16 A.  That happens all the time in the city.  I could have --
17 Q.   Okay.  But that's not legal; right?
18 A.  No, it's not legal.  I did the right legal thing within
19    the line of duty.
20 Q.   Okay.  And so you weren't just there to help a friend at
21    the time that you shoot my client; right?
22 A.  Of course I was there to help my friend.
23 Q.   Right.
24    But at the time you shoot my client, you're acting
25    now -- you understand you're a police officer?

|                                    Page 119                    |                                    Page 121                    |
| --- | --- |

**Page 119**

1 A.  Yes.
2 Q.   Okay.  Do you know why this doesn't also list that you
3    were given verbal counseling about the incident of Demar
4    Parker?
5 A.  I have no idea, ma'am.
6 Q.   You were acting in -- as a police officer when you shoot
7    my client, according to what you said earlier; right?
8 A.  Yes.  Saving Officer Ways' life.
9 Q.   Okay.  An interrogatory I asked -- a question I asked
10    said:
11    "Were you acting in the course and scope
12    of your police duties?  Please explain."
13    And the answer I got back was:
14    "No.  Defendant was off duty at the time
15    of the incident.  Defendant was with his friend,
16    Defendant Ways."
17    It explains about Ways getting the call, and it
18    goes on to say:
19    "Defendant --"
20    meaning you --
21    "-- was armed with his service weapon but
22    did not identify himself as a police officer
23    and did not threaten to arrest Plaintiff or
24    issue Plaintiff a citation.  Defendant did not
25    act as a police officer, but was simply trying

**Page 121**

1 A.  It turns to another police action, yes.
2 Q.   Right.
3    Okay.  And yet -- but it is true you don't identify
4    yourself, say -- we talked about this -- "Stop.
5    Police"; right?
6 A.  I didn't have time, ma'am.
7 Q.   And you don't threaten to arrest Plaintiff while -- do
8    you remember anything you said to my client?
9 A.  I didn't have time, ma'am.
10 Q.   Okay.  All right.  And so you don't see Sanchez that
11    night, the lady at the house?
12 A.  Never saw her.
13 Q.   You're not the one who called 911?
14 A.  No.  I told Townson to call.
15 Q.   Okay.  Did you have a dispute with a supervisor that --
16    and not call him out for that reason that night?
17 A.  Yes.  I had a dispute with a supervisor.
18 Q.   Okay.  What was it about?
19 A.  Because he tried to disarm me while I was still in
20    danger at a scene where a suspect that I just shot at
21    had left.
22    And they said it was improper for him to try to do
23    that.  I have more time than him on the job, and I
24    knew -- I said, "If you're ready to go down and me make
25    statements, let's go.  We don't know where this guy

Case 2:16-cv-13036-GAD-SDD   ECF No. 84-5   filed 07/03/18   PageID.1902   Page 32 of 49

Parker vs.                                                          Police Officer Gerold Blanding
City of Detroit, et al.                                                       October 12, 2017

Page 122

1  went.  I don't know who he's with.  He already came back
2  one time.  You're not going to put me in harm's danger
3  like that."
4      And other supervisors, including his commander, got
5  on him and said that I was correct.
6  Q.  Okay.  So, you were asked to turn over your weapon --
7  A.  At the scene.
8  Q.  -- by your supervisor?
9  A.  No, not my supervisor.  It was another supervisor.
10  Q.  Okay.  And you said, "No, because I might get shot or
11  hurt"?
12  A.  No.  I said, "If you're ready to go --" which he
13  apparently didn't understand the proper procedure.  I
14  said, "If you're ready to go, fine."
15      But he said, "No.  Hand me your weapon."
16      And he was basically going to have me standing out
17  there while we did not know where he was going, what
18  else he was going to go do.
19      And I said, "I'm not giving you my weapon until I'm
20  in a safe environment."
21  Q.  Okay.  And so how many officers are on the scene at that
22  point?
23  A.  A lot.
24  Q.  All right.  A lot, a lot; right?
25  A.  Uh-huh.

Page 123

1      THE REPORTER: I'm sorry.  Is that "yes"?
2  A.  A lot.
3      BY MS. PRESCOTT:
4  Q.  And where are you standing when you have this
5  confrontation with the supervisor?
6  A.  By one of the scout cars.
7  Q.  And can you draw --
8  A.  I can't remember where, ma'am.  They start blocking the
9  streets off and all that staff.
10  Q.  Right.
11      So, you're in between street blockades; right?
12  A.  As I recall, yes.
13  Q.  Okay.  So, who is the supervisor that you have a dispute
14  with?
15  A.  I can't think of his name.  They all know him.  They
16  said he's -- he's a supervisor at Number 12.
17  Q.  And you were in the 12th Precinct's area; right?
18  A.  Yes.
19  Q.  And was he the officer in charge of the scene or what?
20  A.  I have no idea.  He just pulled up to me, didn't even
21  ask me if I was okay, and said, "Officer, relinquish
22  your weapon."
23      And then that's when we start going back and forth.
24  And I said, "If you're ready to go, then let's go, but
25  I'm still in harm's danger."

Page 124

1      MS. PRESCOTT: Okay.  Let's listen to it and we'll
2  just see -- we'll just go onto the other record just to
3  make sure that we've covered what is on here.
4      (Audio recording testimony from page 125
5      excerpted and bound under separate cover.)
6  *
7  *
8  *
9  *
10  *
11  *
12  *
13  *
14  *
15  *
16  *
17  *
18  *
19  *
20  *
21  *
22  *
23  *
24  *
25  *

Page 126

1      (Non-excerpted testimony resumes.)
2      BY MS. PRESCOTT:
3  Q.  Okay.  So, that's where you say "Him and I got into it."
4  A.  Uh-huh.
5  Q.  And she goes on to say, "Did you call 911?"
6      At any point does anyone ever say to you, "What do
7  you mean you got into it with a supervisor that night?"
8  A.  I meant verbally, ma'am.
9  Q.  Well, does anybody else question you from Internal
10  Affairs or beyond this Garrity statement?
11  A.  I -- as I recall, Tony O'Rourke had asked me what
12  happened because he saw I was pissed off.  The commander
13  had asked me.  I can't think of their commander, which
14  would be their 2400 at the time.  And then once they
15  understood what was said to me by him, they went and got
16  on him and told me to stand by and wait until they're
17  ready for me to leave.
18      And they -- one of them, as a matter of fact, even
19  apologized for his actions, saying that he was -- the
20  supervisor was wrong.
21  Q.  Okay.  So, a Detroit police officer on duty asked you
22  off duty to relinquish your weapon after shooting
23  someone --
24  A.  Sergeant.
25  Q.  A sergeant -- after shooting someone, and you got an

Parker vs.                                              Police Officer Gerold Blanding
City of Detroit, et al.                                         October 12, 2017

Page 127

1   apology for this at the end of this?
2   A.  No.  They said --
3   Q.  Is that how it went?
4   A.  It's not exact words.
5   Q.  Okay.
6   A.  They said, "Sorry about that.  He's an asshole.  He
7   doesn't know what he's talking about."
8   Q.  Okay.  And did you give over your weapon that night on
9   the scene?
10  A.  Later when they were getting ready to take me.
11  Q.  Yeah.
12      And so you did give it over that night?
13  A.  I gave it to whatever -- the big boss.  I still didn't
14  give it to him.  I gave it to him, their 2400, and we
15  went back to the station.  And I believe I got it
16  back -- yeah, I did get it back that day.
17      I don't know if I got it back that day at the
18  station or Homicide had gave me a loaner.
19  Q.  Why did you give it over when you gave it over?
20  A.  Because that's procedure.  You're supposed to give it
21  over.
22      That doesn't mean they take it from you, you know.
23  It's evidence then.  So, I gave it to the -- well, the
24  commanding officer.  We go back to the station, and I
25  can't recall if I had -- I'm almost positive they gave

Page 128

1   me a loaner, which would have come from homicide.
2   Q.  Okay.  But what I'm asking is, why do you -- you don't
3   give it to the one guy.
4       Do you know who you give it to?
5   A.  I just said their -- whoever was -- I can't think of his
6   name.  He was the commanding officer of -- from the west
7   side that day.
8   Q.  Okay.  And when you give it to him, you're still
9   standing somewhere in the area of Curtis and Mendota;
10  right?
11  A.  No.  They took me to the station.
12  Q.  So, you had your gun when you left Curtis and Mendota?
13  A.  I gave it to a supervisor of the 12th Precinct, which
14  was a commanding officer.  I can't remember who took me
15  to Number 10, but that gun was with him.
16      As to when they gave me another loaner gun, I don't
17  know, but I still had another gun on me.
18  Q.  There's a Sergeant Terechenot, T-e-r-e-c-h-e-n-o-t(sic).
19  MR. PADDISON:  Terechenok.
20  BY MS. PRESCOTT:
21  Q.  Terechenok?
22  A.  That's the guy I got into it with.
23  Q.  So, according to the Force Investigation report,
24  Sergeant Terechenok reported he asked Officer Blanding
25  for his department identification and his firearm.

Page 129

1   Officer Blanding surrendered his I.D. but not his
2   firearm.  Captain Szilagy, S-z-i-l-a-g-y, ordered
3   Officer Blanding to surrender his firearm.
4       Is that who you think probably --
5   A.  Terechenok is the sergeant I got into it.
6       None of them ever took my I.D.
7       And then when however you pronounce that
8   commander's name or captain, that's who I gave my weapon
9   to, and then I immediately left.
10  Q.  So, this doesn't talk about you getting an apology for
11  being asked to turn over your gun.
12  A.  No.  No.  One of my supervisors said, "That's it.  Just
13  forget it.  Don't worry about.  He's an asshole."
14  Q.  Okay.  But actually the captain agreed with the sergeant
15  that you needed to surrender --
16  A.  Of course he's going to say he ordered me, and I still
17  didn't give it to him.  I gave it to the captain.
18  Q.  Right.  The captain, when he comes, orders you to
19  surrender the firearm just like the sergeant did.
20  A.  No.  He didn't say that.  The sergeant ordered me.
21  Q.  Okay.
22  A.  The captain -- once the captain walked up, after my
23  supervisor and him talked to him, he said, "Officer
24  Blanding, you know you're going to have to give up your
25  weapon.  You're going to have to leave."

Page 130

1       I said, "Okay.  I'm still not giving it to him,"
2   and I removed my weapon and gave it to the captain.
3   Q.  Okay.  The captain asked you to give him your gun;
4   right?
5   A.  Terechenok or whatever is the one that did it.  He just
6   walked -- the captain walked up, said, "Officer, you
7   know what you have to do.  You have to give up your
8   weapon."
9       I can't remember his exact words, ma'am.
10  Q.  Is there some reason why you're worried about agreeing
11  that this is why he ordered you --
12  A.  I'm not worried about it.
13  Q.  -- to surrender your firearm?
14  A.  I'm not worried about it.  You're making a bigger deal
15  out of it than it has to be.
16  Q.  Okay.
17  A.  I know I gave it to him.
18      I didn't give it to that sergeant.
19  Q.  Is this report untrue when it says he ordered you to
20  give him the gun, the captain?
21  A.  Ma'am --
22  Q.  That's all I want to know.
23  A.  Terechenok had ordered me to give it to him.
24  Q.  Okay.  So, is this report untrue when it says that the
25  sergeant --

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 131

1 A.  I can't say that, ma'am.

2 Q.  Okay.  You never got close enough to Parker to smell

3   anything on him, did you?

4 A.  No.

5 Q.  Did you tell anyone that you had been the victim of a

6   felonious assault that night?

7 A.  The felonious assault would have been on Ways.

8 Q.  Okay.  So, you didn't say you had been the victim of a

9   felonious assault; right?

10 A.  I don't recall that.  Ways was the one about to be the

11   victim if he would have got hit or got shot.

12 Q.  Okay.  And so the -- why did no one pursue --

13 A.  I have no idea.

14 Q.  -- Parker?

15 A.  That's -- that's what we wonder.

16 Q.  Well, why didn't you pursue him?

17 A.  How can I pursue him?  I'm not investigator.  That was

18   up to them, the Internal Affairs, Force Investigation.

19 Q.  Well, I just mean that night.  You can get in the car

20   and go down the way.  I mean, you just riddled the car

21   with bullets.

22 A.  In my personal car and chase him and have someone else

23   get killed because you're chasing a guy in your personal

24   vehicle?  That's not smart.

25 Q.  Okay.

Page 132

1 A.  Our chases don't end well in the city.

2 Q.  Any reason that you don't report that you had had a

3   problem with the sergeant?

4 A.  My supervisor prepared that.  He knew him.

5 Q.  Mr. O'Rourke?

6 A.  Yes.  They got on it.

7 Q.  And why is your supervisor out there?

8 A.  Because I called him on his cell phone.

9 Q.  You wanted him to come out there and help sort it out?

10 A.  You always call your immediate supervisor so he doesn't

11   find things out from other people.  And plus he -- I

12   didn't know those other supervisors or nothing.

13 Q.  What does that matter?

14 A.  Because if you have a crew that's working for you, you

15   want them to tell you, "Hey, I just got in trouble with

16   them," or "something happened," or "just got in a

17   shooting," "just got in a car accident," as opposed to

18   them coming to work the next day and finding out from

19   the supervisor.  You don't do that.

20 Q.  Okay.  But why does he have to come out to the site?

21 A.  Because I just was involved in a shooting.

22 Q.  How long have you gone by the handle of "Fatal Force"?

23   MR. PADDISON: Objection.  Relevance.

24 A.  Do I have to answer?

25   MR. PADDISON: Yeah, you can answer.

Page 133

1 A.  That has --

2   BY MS. PRESCOTT:

3 Q.  My question is a how long question.

4   How long?  Years?  Months?

5 A.  That's a martial arts term.

6 Q.  Okay.  How long have you used the term "Fatal Force" as

7   your --

8 A.  I couldn't give you a date.

9 Q.  No one at DPD ever asks you about that?

10 A.  No.  They got that off my Instagram thing when I talked

11   to other martial artists.  They falsified that whole

12   report.  I had just opened up a Facebook, which I

13   probably never used.  The "Fatal Force" is an Instagram

14   thing which, if it was still open, you could see all I

15   talked to is other martial artists.

16 Q.  Who falsified what report?

17 A.  Whoever at Metro Times and whatever you reported to

18   people about me, making it sound like I'm just this

19   rogue cop out here shooting people.

20 Q.  Okay.  So, let's get specific about what we have here.

21   (Deposition Exhibit 3 marked

22   for identification.)

23   BY MS. PRESCOTT:

24 Q.  So, this is you; right?  Exhibit 3, "Fatal Force"?

25 A.  That's from my Instagram.

Page 134

1 Q.  Right.

2   And nobody at DPD ever goes on your Instagram and

3   sees if you were holding yourself out as "Fatal Force";

4   right?

5 A.  As far as investigation, no.

6 Q.  What -- what martial art are you referring to?

7 A.  Something I've been doing since I was a kid.

8   Why does that matter?

9 Q.  Is it Taekwondo or --

10 A.  No.

11 Q.  What is it?

12 A.  Japanese Shotokan karate.

13   THE REPORTER: I'm sorry.  "Japanese --"

14 A.  Japanese Shotokan karate.

15   BY MS. PRESCOTT:

16 Q.  And it's -- and there is some -- is it your position

17   that this form of martial arts is -- endorses fatal --

18   the use of fatal force?

19 A.  I don't know how to properly answer that.

20 Q.  Did you know Crenshaw before the shooting?

21 A.  Who?

22 Q.  Crenshaw, the guy you shot.  Johnny Crenshaw.

23 A.  Never.

24 Q.  Khary Mason, do you know him?

25 A.  Khary Mason?

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 135

1  Q.  Khary Mason.
2  A.  Yes.
3  Q.  How do you know him?
4  A.  We used to work together.  He's at Homicide.
5  Q.  How long -- how many -- how long did you know him?
6  A.  We worked at ATF task force together --
7      THE REPORTER:  I'm sorry.  "-- worked at --"
8  A.  ATF task force together.  And then I transferred over to
9  Number 10 probably in 2010, and he was my regular
10  partner until he left and went to Homicide.
11      BY MS. PRESCOTT:
12  Q.  Okay.  How long was that that you would have been
13  regular partners?
14  A.  I couldn't tell you.  Maybe two, three years.
15  Q.  Okay.  And you two were also friends; right?
16  A.  Yes.
17  Q.  Outside of work?
18  A.  Yes.
19  Q.  And considered him a close friend; right?
20  A.  Yes.
21  Q.  And the ATF task force when you first started working
22  with him, what year would that have put us in?
23  A.  I was at two task forces in 2006.  I was at ATF task
24  force and DEA task force.
25  Q.  Okay.  So, you would go back with him about ten years,

Page 136

1  then?
2  A.  I couldn't say that because I was at ATF task force
3  before him.
4  Q.  He was one of the people that was investigating for
5  Homicide in the -- with regard to the shooting of
6  Parker; right?
7  A.  Yeah.
8      But he couldn't say anything about it.
9  Q.  Couldn't say anything about the fact that you had been
10  friends for ten years?
11  A.  I mean, I'm sure he can, but as far as giving me details
12  and stuff, he doesn't do that.
13  Q.  Uh-huh.
14      What about the other guy who investigated for
15  Homicide?  What was his name?
16  A.  Who?
17  Q.  There's no one else you know that was an investigator?
18  A.  They have a --
19  Q.  A task force?
20  A.  -- a shooting team or whatnot.
21      Yeah.  So, I don't know who was all on it.  I know
22  just about everybody on the department.  I've been on
23  the job so long.  But as far as the Homicide having
24  their own, I guess it's a shooting team or a team that
25  deals with police shootings, enforcement.  It's a

Page 137

1  different little group.
2  Q.  Do you ever talk to Mason about the situation with
3  Parker?
4  A.  No, we couldn't.
5  Q.  I mean, he never questions you?
6  A.  No.
7  Q.  And you --
8  A.  Oh.
9  Q.  Go ahead.
10  A.  I guess one time, I was down there at Homicide, taking
11  another suspect down there.  And I guess they brought
12  Parker in for questioning.
13  Q.  Actually, he decided to come in voluntarily.
14      But go ahead.
15  A.  Okay.  Well --
16  Q.  But he's there.  You see him?
17  A.  But he still didn't know who I was.
18      So, they just made sure that I walked around the
19  hallway.  My deal with my prisoner, that had nothing to
20  do with that.  And then I -- that was it.
21  Q.  Okay.
22  A.  And he walked right past me.  I didn't know that he
23  still didn't know who I was.
24  Q.  So, Mason talked to you about that at that point; is
25  that --

Page 138

1  A.  No, they saw --
2  Q.  The question had been -- and just to help you --
3  A.  I just so happened to be at Homicide, with a homicide
4  suspect.
5  Q.  I'm with you.
6  A.  As I was standing at their witness room, they came in or
7  whatever you want to say -- he came in or whatever with
8  Parker.
9      I knew who he was, but he didn't know who I was.
10  Q.  And how did you know who he was?
11  A.  I just -- I don't forget a face, ma'am.  I knew he
12  looked familiar, and then the way that they looked, and
13  they were like, oh, can't have you two together.
14      And I was like -- you know, I said, "Okay."
15      And then the guy walked past, and I said, "He
16  already walked past me."
17      And he was like, "Did he say anything to you?"
18      I said, "He doesn't know who I am."
19      And, see, I want to share something with you.
20      This is how they switched it up.  That's the
21  picture of when I was in the Bahamas.  This is something
22  from Facebook, how they switched it up.  This is a
23  picture of me from in the Bahamas, sitting there
24  smiling, and they switched this up to make this look
25  like this is my Instagram photo, and it's not.

Parker vs.                                              Police Officer Gerold Blanding
City of Detroit, et al.                                        October 12, 2017

---

Page 139

1    So, like I said, they're trying to make me look
2  like some rogue cop.
3    BY MS. PRESCOTT:
4  Q.  Is that not a picture of you?
5  A.  It's two pictures, if you look at it closely.
6    One is -- at the top which says, "Fatal Force,"
7  which is my Instagram.  It's when I was down in the
8  Bahamas with my wife.
9  Q.  Okay.
10 A.  That picture of me with the weights, that's from my --
11 someone set that up on my Facebook.  So, they switched
12 it around and tried to make me look like I'm some damn
13 killer.
14 Q.  Okay.  But -- so, this is a picture of you and your
15 weights -- with your weights; right?
16 A.  Yes.
17 Q.  The picture is you, and the "Fatal Force" is your
18 handle?
19    MR. PADDISON:  Go ahead and answer.
20 A.  Yes.
21    BY MS. PRESCOTT:
22 Q.  We got -- okay.  All right.  I don't know what -- is
23 this something different?
24 A.  It's the image that they're trying to make me look like.
25 That's from Facebook, which I never use.

---

Page 140

1    (Deposition Exhibit 4 marked
2    for identification.)
3    BY MS. PRESCOTT:
4  Q.  Okay.  Is this Exhibit 4 a picture where you have the
5  boxing gloves on and the whatever?
6  A.  You don't see boxing gloves.  That's weights.
7  Q.  Okay.  What is --
8  A.  And at the top, as a matter of fact --
9  Q.  Oh, I see.  Yeah, you're right.  That's weights behind
10 it.  Okay.
11 A.  Which that's what -- I didn't like how they tried to
12 switch it.
13    MR. PADDISON:  Well, no.  We'll get to that.
14    MS. PRESCOTT:  Okay.
15 A.  Okay.
16    MS. PRESCOTT:  You can get to it.  I really don't
17 care --
18 A.  Well, it's a big deal to me because it's -- it's
19 jeopardizing my career.
20    BY MS. PRESCOTT:
21 Q.  Okay.  Well, let's get -- let's get something clear.
22 The picture of you with the weights is a picture you've
23 used as your -- is it a picture you have used as your
24 identifying picture, your -- I don't have the right
25 word.

---

Page 141

1  A.  On Facebook, which someone posted for me.
2  Q.  Okay.  But you used -- this is the picture that you
3  uploaded on Exhibit 4; right?
4  A.  Yes.  Someone else did it for me.
5  Q.  Okay.  And then separately your Instagram handle is the
6  "Fatal Force"; right?
7  A.  Yes.
8  Q.  Okay.  And so you think someone is trying to smear you
9  as a bad cop because why?
10 A.  Between you and the people from Metro Times, yes.
11 Q.  No, no, no.
12    What is --
13 A.  Because why would they switch --
14 Q.  -- being done that's unfair?
15 A.  Why would they switch -- why would they switch those
16 pictures around and try to make me sound like I'm some
17 rogue cop and just like --
18 Q.  What is unfair about what's on Exhibit 3 or 4?
19 A.  How they switched those pictures around.
20 Q.  Okay.  Show me.
21 A.  That "Fatal Force" is not the "Fatal Force" picture that
22 I put out there on the Internet.  It was a picture of me
23 sitting up smiling in the Bahamas.  I'm saying they're
24 tying to make me look like I'm just this evil person.
25 They put that all in the paper, in the Metro Times.

---

Page 142

1  That's the only reason why he knew who I was.
2  Q.  Okay.
3  A.  Now he confronted me at the school.  That's what I'm
4  saying.
5    You know, so, whatever.  People do anything to get
6  money, I guess, but that's slander.
7  Q.  Okay.  And nobody did anything to get money that made
8  you put yourself out there as "Mr. Fatal Force," did
9  they?  You chose to do that?
10 A.  It's a martial arts term, ma'am.
11 Q.  You chose to do that; right?
12 A.  Yes.
13 Q.  Okay.  And what is that -- what are we supposed to take
14 from that?  That's --
15 A.  To be honest with you, not switch the pictures around.
16 Q.  What are we supposed to understand about you when you
17 are "Mr. Fatal Force"?  That's who you are to
18 Instagram --
19 A.  But why would you put a picture --
20    THE REPORTER:  I'm sorry.
21    BY MS. PRESCOTT:
22 Q.  My question is --
23    MR. PADDISON:  Go ahead and answer her question;
24 okay?
25 A.  Okay.

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

---

Page 143

1  **BY MS. PRESCOTT:**
2  Q.  Put Exhibit 3 out of your head.  Let's say that we never
3  saw Exhibit 3.
4      We know you're "Mr. Fatal Force."  That's your
5  name.
6      What are we supposed to understand about the use of
7  "Fatal Force" or your interaction with that concept?
8  **A.  I have no idea.**
9  Q.  You just -- it just happened to be your name you picked?
10 **A.  Yes.**
11 Q.  Okay.  You can't think of any reason why?
12 **A.  No.**
13 Q.  Do you remember telling the officers that -- in the
14 investigation that you stayed by the truck the whole
15 time and didn't cross the street?
16 **A.  I remember saying "I stayed close to the truck."**
17 Q.  You don't remember saying you stood by the truck the
18 whole time, twice?
19 **A.  I could have.**
20 Q.  Do you know why you would have?
21 **A.  Because the truck was still in close distance to me from**
22 **the whole time -- the whole incident.**
23 Q.  Well, do you know why you would have said you didn't
24 cross the street?
25 **A.  I can't recall, ma'am.**

---

Page 144

1      As far as staying by the truck, never walking down
2  where Ways went, never getting down where Townson and
3  Parker went, no, I never did.  I was still by the truck.
4  Q.  What kind of gun was he holding?  Parker?
5  **A.  All I can say is, it was a dark semi-automatic.**
6  Q.  Do you have any idea why Ways would say he couldn't see
7  any gun?
8      **MR. PADDISON:** Calls for speculation.
9      **BY MS. PRESCOTT:**
10 Q.  That he -- it was impossible to see because it was dark?
11 **A.  Possibly because it was dark; possibly because he saw a**
12 **car coming at him with headlights on.  I have no idea**
13 **why he couldn't see --**
14 Q.  Uh-huh.  Well, you saw a car coming at you with
15 headlights on; right?  The headlights were on; right?
16 **A.  Yes, ma'am.**
17 Q.  Okay.  Did anyone ever go through your training history
18 relative to this investigation with Parker?  Like IA or
19 the people who were doing the Garrity questioning?
20 **A.  I have no idea.  They have to go through MAS, which is**
21 **our training thing, and I'm a certified instructor in**
22 **several areas for the Detroit Police Department.**
23 Q.  Okay.  And so you are somebody who has -- your MAS file
24 says you've been to training on use of force; right?
25 **A.  Yes.  I assist with the defensive tactics courses when**

---

Page 145

1  they have it.
2  Q.  Okay.
3  **A.  I assist with a lot of things that they sent me to**
4  **become an instructor.  And when they need me at the**
5  **academy, they sign me up.**
6  Q.  And you sign in on handwriting sheets like a -- like
7  literally a roster when you go to those trainings;
8  right?
9  **A.  Yes.**
10 Q.  When you had the shooting with Parker, when was the last
11 time you had been to a use of force training?
12 **A.  We have to go to 40-hour block once a -- once a year,**
13 **and you have to go to the gun range quarterly, and they**
14 **go through use of force there as well.**
15 Q.  Okay.  And the year before the shooting of Parker, do
16 you remember what would have been covered in that block?
17     I mean, I know that there's lots covered that
18 doesn't have to do with use of force.  There's legal
19 updates and other stuff.
20     With regard to use of force, do you remember
21 anything that was covered that particular -- within that
22 year?
23 **A.  No.**
24 Q.  How about the year before?
25 **A.  It's the same thing.**

---

Page 146

1  Q.  How about in the five years prior?
2  **A.  As far as what training I went through?**
3  Q.  Specific to the use of force, what particular subjects,
4  topics they covered.
5  **A.  It's kind of a broad question, ma'am.  I mean, within**
6  **five years I became an active shooter instructor, a**
7  **handcuff instructor, PR-24 instructor, asp baton**
8  **instructor.  I assist with -- because of my background**
9  **with the defensive tactics when they need help with**
10 **that.**
11     **So, a lot of things I'm certified through the**
12 **department as an instructor.**
13 Q.  Okay.  So, I'm asking about the five years prior to the
14 shooting what you can talk to me about, about which --
15 what of those you had in the five years prior to this
16 shooting?
17 **A.  I couldn't give you them verbatim.  I would have to have**
18 **someone pull it up in MAS.**
19 Q.  Okay.  And with regard to the use of force, you
20 understand that you can't use force unless you report
21 that the suspect was using force first; right?
22 **A.  Of course.**
23 Q.  Okay.  And so, for example, if you shot someone, you
24 understand that that would be illegal unless there was
25 some use of force by them first; right?

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 147

1 A. Extreme measures, yes.
2 Q. Okay. And that, in fact, you -- it would have to be
3 true that the person was using active aggression, if not
4 deadly force, before you would be justified in pulling
5 out a gun and shooting them; right?
6 A. Yes.
7 **He had a gun. He's charging my partner with a**
8 **vehicle. I'm not going to wait for it to happen and**
9 **then react. I prevented him from getting shot or ran**
10 **over, which I stated several times.**
11 Q. Okay. And so you understood at the night -- on the
12 night of the 15th that if -- of course, if you had shot
13 a person out on the street without him having a gun or
14 driving at your partner, that would be illegal; right?
15 A. Of course.
16 Q. And you could be prosecuted for that; right?
17 A. Of course.
18 Q. And so did you ever talk to Ways or Townson about
19 whether they saw a gun that night?
20 A. I don't recall.
21 Q. Do you know why they testified that Parker swerved at
22 Ways before the shooting?
23 MR. PADDISON: Objection. Calls for speculation.
24 A. I don't recall that, ma'am. It happened so quick, like
25 I said.

Page 148

1 BY MS. PRESCOTT:
2 Q. Do you know why Parker and Townson, sitting all the way
3 to today, were squared off in the street as of the time
4 you pulled up there?
5 A. I found out later.
6 Q. What did you find out?
7 A. **It was something dealing with the kids and -- his son**
8 **and his daughter.**
9 Q. Okay. You talked to Townson about it or what?
10 A. **I asked him what was going on later. He said his son**
11 **called for help and apparently something happened with**
12 **his son and his daughter. As far as -- as to what**
13 **specifically, I don't know. Like I said, I've only seen**
14 **his son a couple of times. I never seen his sister.**
15 Q. Okay. So, you talked to Townson about the situation
16 after the fact of how this all unwound?
17 A. **Yeah. What was going on, what was up.**
18 Q. Okay. And I'll just keep going here.
19 You never see Parker flip a U-turn in the street,
20 do you?
21 A. I don't recall that.
22 Q. Do you see him stop a bus? You know, step into traffic,
23 Parker --
24 A. **No.**
25 Q. -- cause a bus to have to stop?

Page 149

1 A. **No.**
2 Q. Do you know why it would be that you weren't questioned
3 in this matter for months after it happened by the --
4 you know, by the department?
5 You didn't give your Garrity for quite a while.
6 A. **I have no idea, ma'am.**
7 Q. Did you -- no one ever explained that to you?
8 A. **No.**
9 Q. Did you get to see Parker's questioning when he comes in
10 with his lawyer at any time?
11 A. **No.**
12 Q. Let's look at the Complaint.
13 Yeah, okay. So, if you turn to page 10, paragraph
14 51, this is our account of what happened, and I just
15 want to understand your take on some of these points.
16 So, on page 10, paragraph 51, at the top, says the
17 time of this event was shortly after 11:00 p.m.
18 Do you know whether -- what the time was?
19 A. **Uh-uh.**
20 THE REPORTER: I'm sorry. Is that --
21 MR. PADDISON: Is that "yes" or "no"?
22 A. **Oh, I'm sorry.**
23 **I would have to look at my report as to what time**
24 **approximately.**
25 BY MS. PRESCOTT:

Page 150

1 Q. Okay. We can -- so, whatever your report says is the
2 best your remember?
3 A. **Yes.**
4 Q. Okay.
5 "-- and the street was well-lit and the
6 weather conditions were mild."
7 Is that true or not true?
8 A. **This corner was lit, but it was cold.**
9 Q. Okay. There's no fog or sleet or anything. It was
10 August; right?
11 A. **Yeah, it was August, but I remember it was cold.**
12 Q. Okay. Was it clear outside?
13 A. **It was dark, ma'am, but the corner where we parked, it**
14 **was a street light.**
15 Q. Okay.
16 A. **Down where they were at, it was dark.**
17 Q. What I'm asking is, it wasn't foggy or something?
18 A. **I don't recall.**
19 Q. Okay.
20 "Plaintiff was --"
21 so, Parker --
22 "-- lightly dressed in shorts, gym shoes
23 and a light shirt. No bulky clothing such as
24 to conceal a weapon."
25 Is that true or not true, or you don't know?

Parker vs.                                                    Police Officer Gerold Blanding
City of Detroit, et al.                                              October 12, 2017

Page 151

1  A.  I don't know.
2  Q.  Don't know.  Okay.  53:
3      "Plaintiff had no weapons."
4      You dispute that?
5  A.  I saw him with a weapon.
6  Q.  The gun you testified about?
7  A.  Yes.
8  Q.  And nothing else; right?
9  A.  And the car.
10 Q.  But no other weapon; right?
11 A.  No.
12 Q.  Okay.
13     "Townson approached aggressively and began
14     to question Plaintiff --
15  Parker --
16     "-- asking certain questions."
17     Do you know whether any of that is true on 54?
18 A.  Like I said, I saw them arguing in the street.  I
19  couldn't hear exactly what they were saying.
20 Q.  Okay.  And who approached who or whatever?
21 A.  I don't know.  They were both in the street when I got
22  there.
23 Q.  Okay.
24     Parker --
25     "Plaintiff observed Defendant Townson's

Page 152

1      service weapon sticking out of his pocket."
2      Do you know whether that --
3      MR. PADDISON:  Objection.  Calls for speculation.
4      BY MS. PRESCOTT:
5  Q.  -- happened?
6      That's my question.
7      Do you know if that happened?
8  A.  I don't know.
9  Q.  Do you know if Townson had a weapon that night?
10 A.  I don't know.
11 Q.  Okay.
12     "DPD --"
13  Number 56:
14     "DPD policies authorize on- and off-duty
15     police officers to carry their service weapons."
16     Is that true?
17 A.  Yes.
18 Q.  Okay.  And, in fact, you can carry concealed; right?
19 A.  Yes.
20 Q.  Okay.  All right.  So, 58, is it common for Detroit
21  police officers to carry their weapons if they need to
22  respond to a call or a need for immediate action?
23     MR. PADDISON:  Objection.  Calls for speculation.
24     You can answer to the best of your ability.
25 A.  As far as I know, yes.

Page 153

1      BY MS. PRESCOTT:
2  Q.  Okay.  And Townson's status as an officer allows him to
3  have a gun.  We -- that's obvious.  We know that.
4      Okay.  60:
5      "Marcus Ways and Jerald Blanding, also
6      Detroit police officers, arrived on the scene,
7      also armed with guns."
8      So, you know you were and you're not sure about
9  Ways?
10 A.  I don't know if his gun was on him, or, like I said, in
11  the car.
12 Q.  Okay.  Does Townson ever hand you a gun that night?
13 A.  No.
14 Q.  I mean -- okay.  I just want to --
15     All right.  Okay.  62:
16     "Ways and Blanding reported to the scene
17     on duty or were third-party interveners in the
18     dispute --"
19     MR. PADDISON:  Can you finish the paragraph,
20  please?
21     BY MS. PRESCOTT:
22 Q.  (Reading.)
23     "-- between Plaintiff and his ex-girlfriend
24     regarding Townson's son."
25     You didn't know what the dispute was; right?

Page 154

1  A.  No.  I just know his son called for help.
2  Q.  And your -- we covered, I think, the rest of that.
3      You were called to the residence by Townson.  You
4  know that; right?
5  A.  I wasn't called.  Ways was called.  I happened to be
6  with Ways.
7  Q.  Okay.  And you get out of the car to help Ways; right?
8  A.  To help Ways and Townson.
9  Q.  Okay.  And you're unrelated to the ex-girlfriend and
10  Townson and Townson's son; right?
11 A.  Correct.
12 Q.  That's 64.  It also says you have no personal interest
13  in the matter to motivate you as your own personal dog
14  in this fight or beef; right?
15 A.  What's the number you're reading?
16 Q.  64.  You had no personal interest in the matter to
17  motivate your own intervention?
18     You didn't have a personal stake in this; right?
19     MR. PADDISON:  In what exactly?
20 A.  I was going to help Townson and see what was wrong with
21  his son with Ways.
22     BY MS. PRESCOTT:
23 Q.  Okay.  The next one says:
24     Parker --
25     "Plaintiff asked Townson to put the gun

Parker vs.                                                    Police Officer Gerold Blanding
City of Detroit, et al.                                              October 12, 2017

|  | Page 155 |
|---|---|

```
 1      down."
 2      Were you -- could you hear any of that?
 3  A.  No.
 4  Q.  Okay.  So, you don't know one way or another?
 5  A.  No.
 6  Q.  Okay.  This -- 66:
 7      "Townson, Ways and Blanding began to close
 8      in on Plaintiff."
 9      Did you ever sort of make a like circle around
10  Parker?
11  A.  Never got close to him.
12  Q.  Okay.
13  A.  Not down the street.
14  Q.  Okay.  67 says that he stepped into the bright lights
15      illuminating Curtis Street and tried to draw attention
16      to himself.
17      Did you see that?
18  A.  No.
19  Q.  Okay.  68, the next page:
20      "Plaintiff was able to avoid the closing
21      officers."
22      You deny that you were closing in on him; right?
23      First of all?
24  A.  No, I wasn't.
25  Q.  Okay.  And he ran to his vehicle?
```

|  | Page 156 |
|---|---|

```
 1      You know that he certainly got to his vehicle;
 2      right?
 3  A.  Yes.
 4  Q.  And it says it was to the east of the individual guys,
 5      you guys, and it was parked facing west.
 6      Do you know anything about that?
 7  A.  Uh-uh.
 8  Q.  Okay.
 9      THE REPORTER: I'm sorry.  Is that --
10      MR. PADDISON: Is that a "no"?
11      BY MS. PRESCOTT:
12  Q.  Yeses and nos.
13  A.  No.
14      I'm sorry.
15      No.
16  Q.  Okay.  It goes on that he entered the vehicle and headed
17      west on Curtis past you-all.
18      Did he pass you guys on Curtis?
19  A.  Not that I recall.
20  Q.  Okay.  And then, 70, he drove several blocks down and
21      turned around in a parking lot and drove back down
22      east -- now this time eastbound.
23      Did that happen?
24  A.  I don't understand.
25  Q.  That's 70.
```

|  | Page 157 |
|---|---|

```
 1  A.  I don't understand how that's written.
 2  Q.  Yeah.  So, it takes off with 69.  So, 69 says he's
 3      heading west on Curtis past you-all, and then 70, he
 4      drove several blocks and then turned around, going the
 5      other way.
 6  A.  That would be going -- coming southbound --
 7  Q.  Going east?
 8  A.  -- then going eastbound.
 9  Q.  It would be going west, turning around and coming back
10      east on --
11  A.  No, I don't remember him driving past me.
12  Q.  -- on Curtis.
13      You don't remember that?
14  A.  I don't remember him driving past me first.  I just
15      remember him coming southbound down Mendota.
16  Q.  Okay.
17      "As Plaintiff returned down Curtis
18      eastbound and headed home, Ways stepped into
19      the middle of the street just before the
20      intersection of Mendota with his service
21      weapon drawn."
22      Is that true?
23  A.  I didn't see Ways with his weapon out.
24  Q.  Okay.  Did he step into the middle of the street from --
25  A.  He was in the street.
```

|  | Page 158 |
|---|---|

```
 1  Q.  Okay.
 2      "Blanding was standing on the north driver's
 3      side of the street."
 4      Which is -- I mean we have "X4" on Exhibit 1.
 5      You  were on the north side of Curtis; right?
 6  A.  Yes.  72.  Right.
 7  Q.  (Reading.)
 8      "As Plaintiff drove, Defendant Blanding,
 9      and potentially others, deployed deadly force,
10      firing handgun wildly and repeatedly at
11      Plaintiff's car."
12  A.  I wouldn't say "wildly."
13  Q.  Okay.  Other than "wildly," we know you shot at the car;
14      right?
15  A.  I shot at him.
16  Q.  And you hit -- and you hit -- you saw that you were
17      hitting the car; right?
18  A.  You don't know that until later, ma'am.  I told them I
19      was -- I know I shot at his vehicle down -- down window.
20  Q.  Okay.  So, you're standing 10 feet away from this car?
21  A.  I said "approximately."
22  Q.  I understand.
23      Approximately 10 feet away from this car, you put
24      16 -- you fire 16 shots, and you don't know whether any
25      of them hit?
```

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 159

1 A. I later saw that they hit his car.
2 Q. Okay. But at the time -- fair enough.
3    At the time, you didn't know; right?
4 A. Correct.
5 Q. And 75:
6    "The shots were aimed and intended to kill
7    the Plaintiff."
8    We already discussed that.
9    That's true?
10 A. That's what you're saying. I mean, you don't want to
11   kill anybody, but I was shooting to protect Ways.
12 Q. Well, so you didn't intend to kill him?
13 A. I was shooting to protect Ways.
14 Q. Okay. Intending to -- if that was what it took, to kill
15   Demar Parker; right?
16 A. I don't like how you're wording it like that.
17 Q. Okay.
18    "Including one shot directly in the driver's
19    side window of Plaintiff's car."
20    Do you recall that?
21 A. (No verbal response.)
22 Q. Do you recall it?
23 A. I recall shooting at his car, but the way you're wording
24   this to "kill" the Plaintiff, that was never my
25   intention to do that.

Page 160

1 Q. Okay. Well, what -- I guess what I'm asking now is, do
2   you remember shooting straight into the -- like at chest
3   level?
4 A. Into the window?
5 Q. Yeah.
6 A. Yes.
7    See, that's the crap that I'm talking about.
8    MR. PADDISON: I understand.
9 A. He didn't do this.
10    THE REPORTER: Excuse me?
11    BY MS. PRESCOTT:
12 Q. What did he not do? Sixty -- was it 76?
13 A. 77.
14 Q. (Reading.)
15    "Once he felt he was safe from Defendants,
16    Plaintiff pulled over and called for help."
17    Do you think that didn't happen?
18 A. Uh-huh.
19 Q. What --
20    THE REPORTER: I'm sorry. Is that --
21 A. That was a no.
22   I'm sorry.
23    BY MS. PRESCOTT:
24 Q. But what do you think happened?
25 A. One of the witnesses said that he called and was calling

Page 161

1   for somebody to come pick him up. That's why they kept
2   me at the scene so long, to see if he would go to the
3   hospital. He didn't call 911 or anything.
4 Q. And what do you draw from the fact that he didn't call
5   911?
6 A. He had something to hide. He wanted to go get rid of
7   that gun first.
8 Q. Okay. So, why didn't you-all call 911?
9 A. We did call 911.
10 Q. Who?
11 A. Townson called 911 and described the vehicle and what
12   direction the vehicle went.
13 Q. He doesn't remember doing that.
14 A. Townson doesn't remember what? Calling 911?
15 Q. Right.
16 A. Okay.
17 Q. Nor is the tape anywhere that there's any call.
18 A. Okay.
19 Q. So --
20 A. When other units got there, I told them what type of
21   vehicle it was and what direction it went.
22 Q. Well, why don't you call 911?
23 A. Ma'am, it was so much going on. You know, you don't --
24   I advised them which he went and all that stuff.
25    They told me later that they found that vehicle

Page 162

1   stashed and that he was on the phone with someone saying
2   that he just got shot. "Come get me. Come get me."
3 Q. Okay.
4 A. So, they kept me at the scene to wait to see which
5   hospital that he possibly went to, which he didn't until
6   later. And his story, what he came up with, was
7   something totally different.
8 Q. What was his story he came up with?
9 A. I don't know. I don't know. They wouldn't tell me.
10 Q. Who did you get all this information from?
11    MR. PADDISON: Objection to the extent it calls for
12   communication protected under attorney/client privilege.
13 A. I just know, ma'am.
14    BY MS. PRESCOTT:
15 Q. Well, you don't just know. I mean, you had to have
16   gotten it from somewhere.
17    MR. PADDISON: Objection to the extent it calls for
18   information protected under attorney/client privilege.
19    I'm instructing my client not to answer.
20    BY MS. PRESCOTT:
21 Q. I'll take an answer. I mean --
22    MR. PADDISON: No. I'm instructing him not to
23   answer about conversations he had with his attorney.
24    MS. PRESCOTT: I didn't ask for that. I want to
25   know who he heard it from first.

Parker vs.                                                           Police Officer Jerold Blanding
City of Detroit, et al.                                                        October 12, 2017

---

Page 163

1  A.  I'll plead the Fifth on that.
2      MR. PADDISON: No.
3      BY MS. PRESCOTT:
4  Q.  Well, you can't plead the -- I mean, that's not --
5      MR. PADDISON: That's not a criminal question.  I
6  am instructing you not to answer.
7      BY MS. PRESCOTT:
8  Q.  Who in the department do you hear that from?
9  A.  Just other officers.
10 Q.  Which other officers?
11 A.  I don't know their names.
12 Q.  Okay.  Well, how many -- like who is on the list of
13 possibilities?
14 A.  Ma'am, there was a lot of people at that scene.
15 Q.  I know, but not a lot of people know where he went and
16 what he did and what he called.
17     So, who is giving you the information on the
18 investigation?
19 A.  I can't remember who told me when they found his car.
20 But they said, "We found his car stashed."
21 Q.  They found his car stashed?
22 A.  Uh-huh.
23     THE REPORTER: I'm sorry.  Is that --
24 A.  Stashed.
25     BY MS. PRESCOTT:

---

Page 164

1  Q.  You mean the car that you made undrivable and he drove a
2  mile away?
3  A.  If that's what you're saying.
4  Q.  Okay.  And so you think that there's something wrong
5  with not calling 911 after the police have just shot
6  you?  You think that that indicates that he was guilty
7  of something?
8  A.  Why wouldn't you call 911 if someone just shot you?
9  Q.  Well, why wouldn't you call 911 if you just someone and
10 you're a police officer?
11 A.  Because I had Townson call 911, like I said.  When other
12 supervisors got there, they were receiving information
13 to go look for him.
14 Q.  You weren't -- you didn't delay calling 911 so that you
15 guys could create a story?
16 A.  No.  They got there real quick, and I didn't have to
17 make up a story.
18 Q.  How long?  How long did it take them?
19 A.  For the police to get there?
20 Q.  Yeah.
21 A.  Under 5 minutes.
22 Q.  Then why don't you call the police when you get there
23 and you have this --
24 A.  And tell them --
25 Q.  -- belligerent guy in the street and, you know --

---

Page 165

1  A.  And tell them what happened, tell them -- you can only
2  be brief, but tell them what kind of vehicle he was in
3  and what direction.  That was told.
4      As to which officer --
5  Q.  Right.
6  A.  -- I don't know.
7  Q.  Why don't you guys call 911 the night instead of going
8  over there with your guns and getting out and walking
9  out on the street and ultimately ending in a shooting?
10 A.  Apparently, 911 was called prior to us getting there.
11 Q.  So, you knew that too; right?
12 A.  I found that out later.
13 Q.  Okay.  You knew -- well, Ways knew that at the
14 time Blanding -- or -- excuse me -- Townson knew that at
15 the time.
16     You learned that later?
17 A.  Yes.
18 Q.  Okay.  And so that was one of the reasons why they
19 needed you to go there because they were worried that
20 911 wasn't getting there fast enough?
21     MR. PADDISON: Objection.  Calls for speculation.
22     BY MS. PRESCOTT:
23 Q.  Is that what you understood later --
24 A.  A friend called us and he wanted to see where Ways --
25     THE REPORTER: I'm sorry?

---

Page 166

1  A.  A friend, Townson, wanted to see who was closer to get
2  to his son because I know Townson stays way out in
3  Southfield.
4      (Deposition Exhibit 5 marked
5      for identification.)
6      BY MS. PRESCOTT:
7  Q.  Here is Exhibit 5.  So, this is Khary Mason.
8      Are you Facebook friends with him?
9  A.  I don't open Facebook, but he is my friend.  I don't
10 even have Facebook any more.
11 Q.  Okay.  Irrespective of that, at some point, did you
12 become friends with him on Facebook?
13 A.  I have no idea, ma'am.  I barely know how to work
14 Facebook.  Someone opened it for me.
15     (Deposition Exhibit 6 marked
16     for identification.)
17     BY MS. PRESCOTT:
18 Q.  Okay.  I'll hand you Exhibit 6.
19     Is this your MAS record?
20 A.  What is that?
21     MR. PADDISON: MAS.
22 A.  Oh, yeah.  This is what I was talking about.
23     BY MS. PRESCOTT:
24 Q.  Turning to page 8 of 11 -- the pages are at the bottom
25 left -- what is the "Use of Force PI," that's almost

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

---

Page 167

1  dead in the middle of the page under "Use of Force
2  Summary"?
3     Do you know what that is?
4  A.  I guess that means the counts of use of force. I don't
5  understand what the "PI" is.
6  Q.  "Felonious Assault on a Police Officer," two counts, do
7  you know what that is?
8  A.  I don't know what they mean by that.
9  Q.  "Firearm Discharge Reports and Investigation," two, do
10  you know what that is?
11  A.  Probably when I killed a dog and shot him. But this
12  isn't up-to-date as far as that.
13  Q.  "Resisting and Obstructing," two counts, are you
14  familiar with ever being charged or alleged to have been
15  involved --
16  A.  These aren't charges --
17     MR. PADDISON: No, these aren't charges.
18     BY MS. PRESCOTT:
19  Q.  Okay. I'm asking you whether you've ever been charged
20  with resisting or obstructing.
21  A.  No.
22  Q.  Or assault and battery?
23  A.  No.
24  Q.  Anywhere?
25  A.  No.

---

Page 168

1  Q.  Have you ever been arrested?
2     MR. PADDISON: Objection. Relevance.
3     You can answer.
4  A.  No.
5     BY MS. PRESCOTT:
6  Q.  Okay. "Use of Force History," what is -- looking over
7  these dates, does this tell -- can you tell me anything
8  about any of these incidents?
9  A.  No.
10  Q.  May of -- like the bottom one on page 8 is May of 2012.
11     Do you know what that was?
12  A.  Where?
13  Q.  So, it's the bottom thing. "Draw Firearm and Acquire
14  Target Reports," "Use of Force (PI)," 5-23-12.
15     Do you know what that is?
16  A.  We pulled over -- if I recall, because it had him -- we
17  pulled over like five guys that just shot somebody's
18  house up. So, of course we're going to acquire target
19  while we get them out of the vehicle. And we got a gun
20  out of there.
21  Q.  What was the use of force?
22     MR. PADDISON: You can answer.
23  A.  They're saying pointing your weapon.
24     BY MS. PRESCOTT:
25  Q.  Well, under that -- after "Acquired Target," under that

---

Page 169

1  is "Use of Force."
2  A.  I have no idea.
3  Q.  Okay. The one that's earlier than that is 4-17-12, also
4  with the same supervisor.
5     Do you know what this is?
6  A.  No.
7  Q.  "Citizen Complaints," page 9 and going on to page 10 and
8  page 11, looking at the dates of these, I think the
9  earliest one is 4-16-03, "Force," a male, 39, in
10  narcotics.
11     Do you remember a name associated with that?
12  A.  No, ma'am.
13  Q.  How about with any of these?
14  A.  No.
15  Q.  Were you questioned in each of these instances on pages
16  9, 10 and 11?
17  A.  I'm sure I was, but you see the charges that happened on
18  them.
19  Q.  Well, I just need to know if you remember specific dates
20  of being questioned.
21  A.  No, ma'am.
22  Q.  Do you know whether there were -- what -- you don't know
23  the circumstances of any of these, it sounds like?
24  A.  I would have to look back in the archives to see, ma'am.
25  Q.  And what does "Not Sustained" mean?

---

Page 170

1     Some of them say "Exonerated."
2     What does "Not Sustained" mean?
3  A.  I'm assuming it wasn't enough for them to go forward
4  with anything.
5  Q.  Okay. So, there's a "Force," 4-1-11, against a male,
6  16-year-old, "Sustained."
7     What was that?
8  A.  Where are you looking?
9  Q.  It's on page 10, about this far down, 2 or 3 inches
10  down, 4- --
11     MR. PADDISON: For the record, my ongoing
12  objection. Foundation.
13     BY MS. PRESCOTT:
14  Q.  -- -1-11 --
15  A.  I can't recall these things. But it says "Not
16  Sustained."
17  Q.  Looking at the one that says, "Sustained" against a
18  male, age 16 --
19     MR. PADDISON: I think it's --
20     BY MS. PRESCOTT:
21  Q.  -- and the female "Sustained" --
22     MR. PADDISON: We're looking at 2010, 10-10-2010?
23     MS. PRESCOTT: Yeah. And it looks like it was
24  closed out 4-1-11.
25     BY MS. PRESCOTT:

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

---

Page 171

1 Q.  You don't remember what that was?
2 A.  Uh-uh.
3     MR. PADDISON: Is that a "no"?
4 A.  No, I don't.
5     I'm sorry.
6     BY MS. PRESCOTT:
7 Q.  Okay.  Next.
8     Do you know why your discipline file doesn't
9 contain discipline?
10 A.  Because I'm a good officer.  I don't get in trouble.
11 Q.  Well, it doesn't contain the discipline we know you got.
12    Do you know why that would be?
13 A.  I'm not a supervisor, ma'am.  How am I supposed to know
14 that?
15    (Deposition Exhibit 7 marked
16    for identification.)
17    BY MS. PRESCOTT:
18 Q.  Okay.  There's something here relative to mistreatment
19 of a person or a prisoner, the charge being that you
20 did, while off duty, mistreat a fellow officer by using
21 force without cause or justification.
22    Do you remember that?
23 A.  No.  I never had any conflict with another officer.  I
24 don't know what that is.
25 Q.  Hearing officer was Ella Bully-Cummings, 2002.

---

Page 172

1 A.  Who?
2 Q.  Ella Bully-Cummings.
3 A.  That was our old chief.
4 Q.  Yeah, I know.
5 A.  Oh.
6 Q.  Does that refresh your memory?
7 A.  That was some allegations that my ex-girlfriend said,
8 and she found me not guilty on all that, and that
9 officer ended up getting dismissed from the job.  That
10 was an ex-girlfriend.  They threw all that crap out
11 because she was lying and forced her to retire.
12 Q.  Okay.  So, if Exhibit 7 is relating to this -- this
13 girlfriend was a police officer?
14 A.  Yes.
15 Q.  Okay.  So, she made an allegation against you of using
16 force against her --
17 A.  No.  She made allegations --
18 Q.  -- harming her?
19 A.  -- against some property or something, and I did -- if
20 you did your homework, you'll see plenty of reports that
21 I did against her.  That's why that was thrown out.
22 That's why she is no longer a police officer.
23 Q.  Okay.  So, Exhibit 7 is relating to that -- that person?
24 A.  As I recall.  That's the only time -- when you
25 mentioned -- only reason I said that is because you

---

Page 173

1 mentioned Ella Bully-Cummings.  Because as soon as she
2 heard the story, she threw it out.
3 Q.  Okay.  And --
4 A.  As far as me --
5 Q.  What was the name of the officer?  The female officer?
6 A.  Tracey Elledge.
7    She doesn't even stay here any more.
8    THE REPORTER: Excuse me?
9 A.  She doesn't even live here any more.  I don't know
10 where; don't care.
11    BY MS. PRESCOTT:
12 Q.  Okay.  Have you ever -- has anyone ever sought a PPO
13 relative to you?
14 A.  I sought a PPO against her.
15 Q.  Did you hear my question?
16 A.  What?
17 Q.  Has anyone ever sought a PPO against you?
18 A.  Not as far as I know.
19    MS. PRESCOTT: Okay.  Why don't we take a break,
20 and I'll look at my notes.
21    (Short recess at 4:37 p.m.)
22    * * *
23    (Record resumed at 4:50 p.m.)
24    BY MS. PRESCOTT:
25 Q.  Just a couple of quick odds and ends.

---

Page 174

1    Am I correct in understanding that there -- it has
2 never come a time when anyone has ever given you any
3 commentary, criticism, critique on what happened between
4 you and Demar Parker?
5 A.  No.
6 Q.  Okay.  Relative to times when you have been evaluated --
7 you get certain evaluations at different times.
8    Have citizen complaints ever been part of the
9 discussions of your evaluations?
10 A.  Not as far as I know.  We get a -- forgot what you call
11 it -- evaluation every year, but I've always been at the
12 maximum one for years.  I forgot what it's -- service
13 rating.
14 Q.  Right.
15    No one has ever said, you know, "Watch out for this
16 number of citizen complaints," or any kind of references
17 to --
18 A.  I see a lot of -- we got complaints all the time when we
19 worked narcotics, ma'am.
20 Q.  But my question remains that no one has raised this
21 issue with you at your evaluation?
22 A.  No.
23 Q.  Between the night of the shooting and when you leave
24 that scene and the day of your Garrity interview, do you
25 know of any steps and investigation that were going on?

---

Parker vs.
City of Detroit, et al.

Police Officer Gerald Blanding
October 12, 2017

---

Page 175

1    I guess you saw Parker at the station, so you at
2  least know that he was in there.
3  Q.  Anything else you know that went on in that
4  intervening time?
5  A.  I saw Parker later, but not that day.  I mean, it had to
6    be weeks before I saw him down at Homicide.
7  Q.  Okay.  Anything you know that went on between the night
8    of the shooting and your Garrity interview to
9  investigate the situation?
10 A.  No.
11 Q.  You don't have any recordings, audio or visual, from
12   that night, I assume?
13 A.  No.
14 Q.  You don't know of anyone who does?
15 A.  No.
16   I wish I did, but no.
17 Q.  You don't know of any reason that Parker and Ways would
18   have any problem with each other; right?
19 A.  I'm sure after this situation.  I mean --
20 Q.  I apologize.  I should make this clear.
21   Before the incident that we're here about in August
22   of 2015, you don't know of anything between them; right?
23 A.  Not -- no.
24   MS. PRESCOTT: Okay.  Okay.  Those are my
25   questions.

---

Page 176

1    MR. PADDISON: Okay, Officer Blanding, a couple
2  real quick follow-ups.
3  A.  This is yours.
4    *  *  *
5    EXAMINATION
6  BY MR. PADDISON:
7  Q.  First and foremost, do you believe the action you took
8    in shooting Demar Parker's vehicle saved the life of
9  Officer Ways?
10   MS. PRESCOTT: Form.  It's argumentative.
11 A.  Yes.
12   MS. PRESCOTT: And leading.
13   BY MR. PADDISON:
14 Q.  You have been shown what's been marked as Exhibit 3;
15   correct?
16 A.  Yes.
17 Q.  And it's been suggested this purports to be your
18   Instagram; correct?
19 A.  Yes.
20 Q.  Okay.  Now, across the top it is the handle "Fatal
21   Force"; correct?
22 A.  Yes.
23 Q.  Okay.  The photograph that's displayed in the middle of
24   that -- of this Instagram page, is that a photograph of
25   you?

---

Page 177

1  A.  Yes.
2  Q.  Is that a photograph from your Instagram?
3  A.  No.  That's from Facebook.
4  Q.  Okay.  Do you have any idea why this purported Instagram
5    page would have a photo from Facebook?
6  A.  It's -- someone switched that around through Metro Times
7    or whatever.  I have no idea why they did it.
8  Q.  So --
9  A.  Well, I know why they did it, but they switched the
10   photos around.
11 Q.  Why do you believe they did it?
12   MS. PRESCOTT: Objection.  Speculation.
13 A.  To make me look bad.
14   BY MR. PADDISON:
15 Q.  You worked in Narcotics for a period of time; correct?
16 A.  Half my career.
17 Q.  Okay.  Are you familiar with the slang "ice"?
18 A.  Yes.
19 Q.  Okay.  What is your understanding of what the term "ice"
20   means?
21 A.  Methamphetamine.
22 Q.  And methamphetamine can be smoked; correct?
23   MS. PRESCOTT: Objection to the form.  It's
24   leading.
25 A.  Yes.

---

Page 178

1    BY MR. PADDISON:
2  Q.  Can methamphetamine be smoked?
3  A.  Yes.
4  Q.  Okay.  So, if someone had the handle "Lit Up the Ice,"
5    would you assume that it was referring to smoking
6  methamphetamine?
7  A.  Not necessarily.
8  Q.  Okay.  Is it possible that it's your attorney's handle
9    that he's had since 16 and refers to hockey?
10 A.  That would be a good one.
11 Q.  Okay.  Does the handle "Fatal Force" have anything to do
12   with your employment as a law enforcement officer?
13 A.  No.  That's with my martial arts.
14 Q.  Okay.  Officer Blanding, if an individual has a CPL, can
15   they carry a concealed weapon?
16 A.  Yes.
17 Q.  Okay.  Is it illegal to -- for an ordinary citizen to
18   carry handcuffs?
19   MS. PRESCOTT: Foundation.
20 A.  No.
21   BY MR. PADDISON:
22 Q.  Okay.  Is it illegal for a citizen with a CPL to carry
23   an extra magazine for their firearm?
24 A.  No.
25   MS. PRESCOTT: Foundation.

---

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 179

1    BY MR. PADDISON:
2  Q.  Officer Blanding, you testified that you were standing
3  at what appears to be on the northwest corner of Curtis
4  and --
5  A.  That's east.
6  Q.  I'm sorry.
7     Well --
8  A.  Okay.
9  Q.  Okay.  The northeast corner of Curtis and Mendota,
10  correct, at a time -- well, strike that.
11     You were standing at the corner of -- the northeast
12  corner of Curtis and Mendota when you heard the car
13  being driven by Demar Parker approach?
14     MS. PRESCOTT: Leading.
15  A.  Yes.
16     BY MR. PADDISON:
17  Q.  And at some point you observed Mr. Parker with a
18  firearm; correct?
19     MS. PRESCOTT: Leading.
20  A.  Yes.
21     BY MR. PADDISON:
22  Q.  When did you observe Mr. Parker with a firearm?
23  A.  As he was turning.
24  Q.  Okay.  As he was -- as Mr. Parker was turning, were the
25  headlights from his vehicle still in your face?

Page 180

1  A.  Not --
2     MS. PRESCOTT: Leading and foundation.
3  A.  -- at that time.
4     THE REPORTER: I'm sorry?
5     BY MR. PADDISON:
6  Q.  Go ahead and answer.
7  A.  Not at that time.
8  Q.  Okay.  Were you able to see clearly into the vehicle?
9  A.  Yes.
10  Q.  Okay.  Did you observe Mr. Parker's vehicle coming
11  directly at you prior to turning?
12     MS. PRESCOTT: Objection to the form.  It's
13  leading.
14  A.  I could hear a vehicle coming.
15     BY MR. PADDISON:
16  Q.  Okay.  Could you observe Officer Ways at the time that
17  Mr. Parker's vehicle was turning?
18  A.  Yes.
19  Q.  Okay.  When Mr. Parker's vehicle turned, could you
20  observe Officer Ways within the range of the headlights
21  of Mr. Parker's vehicle?
22     MS. PRESCOTT: Leading.
23  A.  Yes.  The vehicle was going straight at him.
24  By MR. PADDISON:
25  Q.  Okay.  So, based on your perceptions, do you believe

Page 181

1  that the headlights of Mr. Parker's vehicle were pointed
2  directly at Officer Ways?
3     MS. PRESCOTT: Same objection.
4  A.  Yes, they were.
5     MR. PADDISON: You can place an ongoing, and we can
6  speed this up.
7     BY MR. PADDISON:
8  Q.  In your experience, is it difficult to see into a
9  vehicle with headlights pointing directly at you?
10     MS. PRESCOTT: Objection. Form.
11  A.  Yes.
12     BY MR. PADDISON:
13  Q.  Okay.  So, based on your experience, would it have been
14  difficult for Officer Ways to see into the vehicle?
15  A.  Yes.
16  Q.  It would have been difficult for him to determine
17  whether or not Officer -- excuse me -- Mr. Parker had a
18  firearm?
19     MS. PRESCOTT: Objection. Form.
20  A.  Yes.
21     BY MR. PADDISON:
22  Q.  So, the drawing has been marked as Exhibit 1; is that
23  correct?
24  A.  Yes.
25  Q.  Okay.  Is this drawing to scale?

Page 182

1  A.  No.
2     MS. PRESCOTT: I'll stipulate it's not, yeah.
3     BY MR. PADDISON:
4  Q.  Okay.  You've made a number of markings on this drawing;
5  correct?
6  A.  Yes.
7  Q.  Okay.  Are those drawings indicative of exact distances?
8  A.  No, not exact distances.
9  Q.  Okay.  Is it fair to say they're rough approximations?
10  A.  Yes.
11     MS. PRESCOTT: Same objection.  It's leading.
12     BY MR. PADDISON:
13  Q.  When you were driving with Officer Ways to the location,
14  you passed near the Northwest Activity Center, did you
15  not?
16     MS. PRESCOTT: Objection to the form.  Leading.
17  A.  Yes.  It's close by where the incident happened at.
18     BY MR. PADDISON:
19  Q.  Okay.  Do you know whether or not at that time Officer
20  Ways observed Officer Townson's vehicle?
21  A.  I couldn't -- I didn't know that.
22  Q.  Okay.  Do you know if -- when he says -- when Officer
23  Ways says that he met Officer Townson at the Northwest
24  Activity Center whether he meant that he simply observed
25  Officer Townson's vehicle or whether he stopped and

Parker vs.
City of Detroit, et al.

Police Officer Gerold Blanding
October 12, 2017

Page 183

1 actually spoke to him?
2     MS. PRESCOTT: Form. It's argumentative.
3 **A. No, we didn't stop and speak to him, but he could have**
4 **saw his vehicle. He knew where we were going. I didn't**
5 **know where we were going.**
6     BY MR. PADDISON:
7 Q. Would it be unusual to say you met someone at a certain
8   location if you saw them on the street and followed
9   them?
10     MS. PRESCOTT: It's argumentative and leading.
11 **A. Yes.**
12     BY MR. PADDISON:
13 Q. Okay. So, if Officer Ways saw Officer Townson's
14   vehicle, would it be unusual to say, "Yeah, I met him at
15   that location"?
16     MS. PRESCOTT: It's asked and answered.
17 **A. Yes.**
18     BY MR. PADDISON:
19 Q. You weren't driving at that time, were you?
20 **A. No.**
21 Q. Officer Blanding, when you were initially with Officer
22   Ways, did you know exactly what was going on at the
23   Curtis location?
24 **A. No. I just knew that his son had called Townson and**
25 **said that he was in trouble and he needed help.**

Page 184

1 Q. Okay. Are you aware of a DPD policy governing off-duty
2   police officers who become aware of criminal activity
3   that is not in their immediate vicinity?
4 **A. Explain it one more time.**
5 Q. I can rephrase that if you need.
6 **A. Okay. Yes.**
7 Q. Okay. If you're off duty and you became aware of some
8   sort of criminal activity that's not in your immediate
9   vicinity, what is your appropriate course of action per
10   DPD policies?
11 **A. To dial 911.**
12 Q. Okay. Notify on-duty law enforcement?
13 **A. Yes.**
14 Q. Okay. Were you acting as a police officer when you and
15   Officer Ways traveled to the Curtis location?
16     MS. PRESCOTT: Objection to the form.
17 **A. No.**
18     BY MR. PADDISON:
19 Q. Okay. Were -- do you believe that Officer Townson was
20   acting as a police officer when he engaged with
21   Mr. Parker?
22 **A. No, I believe --**
23     MS. PRESCOTT: Objection to the --
24 **A. -- he was --**
25     MS. PRESCOTT: -- foundation.

Page 185

1 **A. -- going to help his son.**
2     THE REPORTER: Excuse me?
3     MS. PRESCOTT: Objection to the foundation.
4 **A. I believe he was going to help his son.**
5     BY MR. PADDISON:
6 Q. Okay. Did you -- when you observed Officer Ways
7   approach Mr. Parker and Officer Townson, did you observe
8   Officer Ways take any police action?
9 **A. No.**
10 Q. Officer Blanding, from the time you -- Officer Ways
11   first got the call, up and until you fired on
12   Mr. Parker's vehicle, did you take any police action?
13     MS. PRESCOTT: It's been asked and answered.
14 **A. No.**
15     BY MR. PADDISON:
16 Q. Okay. Now, is there a DPD policy regarding your
17   obligations if you fire a weapon on or off duty?
18 **A. Yes.**
19 Q. Okay. What is that policy?
20 **A. Stay at the scene, don't police any brass.**
21     THE REPORTER: "-- don't --" I'm sorry?
22 **A. Don't police any brass. Don't pick it up. Call for an**
23 **immediate supervisor to -- call for immediate supervisor**
24 **and call for union steward. Let them basically call for**
25 **back-up.**

Page 186

1     BY MR. PADDISON:
2 Q. Okay. So, if I'm understanding your testimony
3   correctly, regardless of whether you are off duty or on
4   duty, regardless of the circumstances, any time you fire
5   a weapon, you're required to notify DPD?
6 **A. With the exception of if you're at the gun range, but,**
7 **yes.**
8 Q. Fair enough. Fair clarification.
9     Is the DPD policy that once you fire a weapon, with
10   the exception of being at the gun range, you immediately
11   become a police officer again?
12 **A. Yes. That's taking police action.**
13 Q. Okay. You said you observed Mr. Parker run from the
14   location where he had had altercation with Officer
15   Townson; correct?
16 **A. Yes.**
17 Q. And after you observed Mr. Parker run, you observed
18   Officer Ways coming back in your direction; correct?
19 **A. Correct.**
20 Q. Do you know whether or not Officer Ways was following
21   anybody?
22 **A. No.**
23 Q. Okay. So, you don't know what Officer Ways' state of
24   mind was at the time?
25     MS. PRESCOTT: Objection. Objection to the form.

Case 2:16-cv-13036-GAD-SDD   ECF No. 84-5   filed 07/03/18   PageID.1918   Page 48 of 49

Parker vs.                                                    Police Officer Gerold Blanding
City of Detroit, et al.                                               October 12, 2017

Page 187

1 A.  No.
2      BY MR. PADDISON:
3 Q.  Okay.  So, you don't know whether or not Officer Ways
4  was attempting to follow Mr. Parker?
5      MS. PRESCOTT: Objection to the form.
6 A.  No.
7      MR. PADDISON: Okay.  I think that does it.
8      * * *
9      RE-EXAMINATION
10     BY MS. PRESCOTT:
11 Q.  Anything you know, sir, about what Townson was thinking
12  that night, or how he was -- what -- where his head was
13  would be because Ways told you what Townson had said to
14  him on the phone?
15 A.  Yes.  Because he said his son had called for help, and
16  he wanted to see where he was at.
17 Q.  Okay.  But I'm right that you didn't talk to Townson
18  that night before the shooting?
19 A.  No.  I was listening back and forth to them on the
20  phone.  I couldn't really hear what Townson was saying.
21  I could hear Ways --
22 Q.  Okay.
23 A.  -- saying where at -- you know, "Where's he at?" and
24  different stuff like that.
25 Q.  So, you could hear half the conversation?

Page 188

1 A.  Not even half.  Just like, "Where is he at now?"
2  "Where?"  "Okay."  You know, stuff like that.
3 Q.  Okay.  What policy are you talking about, about what to
4  do when you've got a shooting, what to do when you have
5  discharged a weapon?  These things you just mentioned,
6  policies, what policies are those?
7 A.  You have to make your notifications.
8 Q.  Are they written policies?
9 A.  I'm sure they're written.  They're just policies per my
10  experience that I know what you're supposed to do if you
11  fire your weapon.
12 Q.  Okay.  And in terms of what policies are written
13  relative to deploying force, would you be able to give
14  me details on any of those?
15 A.  As far as the correct order, not offhand.
16 Q.  When you are at "X4," you hear tires squealing kind of
17  behind you and over your right shoulder?
18 A.  I can't say what shoulder, ma'am, I just hear tires
19  squealing and see a car coming at a high rate of speed.
20 Q.  Okay.  Well, he's coming from behind you; right?
21 A.  Yes.
22 Q.  Okay.  And do you turn to the sound?
23 A.  Yes.
24 Q.  Because you want to see that it's the guy that just ran
25  off as opposed to some old lady?

Page 189

1 A.  I'm looking everywhere, ma'am.
2 Q.  Okay.  And you lock eyes with the guy or not?
3 A.  No.  He never saw me.
4 Q.  Okay.  So, he rolls down the window?
5 A.  The window is already down.
6 Q.  Window is down, and he's telling you "What now?" or
7  "Look what I've got" or whatever?
8 A.  He wasn't telling me.  He was saying it as he was
9  driving toward Ways.
10 Q.  Okay.  And so he's saying that while he's turning the
11  corner or on Mendota or what?
12 A.  As I recall, yes.
13 Q.  Which one was it?
14 A.  As he was turning the corner, that's when I could see he
15  had a weapon in his hand.  He was saying whatever I said
16  on the PCR, "What's up now, niggers," or something like
17  that.
18 Q.  Okay.  But by then you're already shooting because
19  you're shooting as he's turning; right?
20 A.  Once I saw the gun and saw him going at Ways, that's
21  when I started shooting.
22 Q.  You're looking where you're shooting; right?  Of course?
23 A.  Of course.
24 Q.  So, when you just testified that you were --
25 A.  Oh, God.

Page 190

1 Q.  -- looking at Ways, when was that?  That was before you
2  were shooting?
3      MR. PADDISON: Objection.  Mischaracterizes the
4  testimony.  The question was could he see Ways.
5      BY MS. PRESCOTT:
6 Q.  Were you ever looking back at where Ways was?
7 A.  I saw where Ways was at.  I saw him with the gun in his
8  hand.  I saw him turning the corner hard.  I saw him
9  accelerating towards Ways.  That's when I started to
10  shoot.
11 Q.  Okay.  So, you know Ways is off down the way where we
12  have "X5," and now you turn your attention to the place
13  you're going to shoot; right?  So, you make sure there's
14  no children, no ladies, no whatever.  You're looking
15  where you're going to shoot; right?
16 A.  Of course.
17 Q.  And as you testified before, that's as he's turning from
18  south to east, making that turn; right?
19 A.  Yes.
20      MS. PRESCOTT: Okay.  That's all the questions.
21      MR. PADDISON: That does it.
22      Could I get an E-trans and -- I know I say this
23  every time.  Some people are using PTX, others are doing
24  PDF.  We can't open the PTX format, so if I can get an
25  ordinary PDF, I would very much appreciate that.  And

Parker vs.                                      Police Officer Gerold Blanding
City of Detroit, et al.                              October 12, 2017

Page 191

1   could I get it with an index as well.
2       (Deposition concluded at 5:06 p.m.)
3       *  *  *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192

1       STATE OF MICHIGAN  )
2       COUNTY OF OAKLAND  )
3               CERTIFICATE OF NOTARY PUBLIC
4           I do hereby certify that the witness, whose
5       attached testimony was taken in the above matter, was
6       first duly sworn to tell the truth; the testimony
7       contained herein was reduced to writing in the presence
8       of the witness by means of stenography; afterwards
9       transcribed; and is a true and complete transcript of
10      the testimony given.
11          I further certify that I am not connected by blood
12      or marriage with any of the parties; their attorneys or
13      agents; and that I am not interested, directly or
14      indirectly, in the matter of controversy.
15          In witness whereof, I have hereunto set my hand
16      this day at Highland, Michigan, County of Oakland, State
17      of Michigan on Friday, October 20, 2017.
18
19
20      _____
21
22              John J. Slatin, RPR, CSR-5180
23              Certified Shorthand Reporter
24          Notary Public, Oakland County, Michigan
25          My commission expires:  July 25, 2023